# In the
# United States Court of Appeals
# For the Fourth Circuit

NETCHOICE,

*Plaintiff-Appellee,*

v.

JAY JONES, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE COMMONWEALTH OF VIRGINIA,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Eastern District of Virginia, Case No. 1:25-cv-02067
Hon. Patricia T. Giles, U.S. District Judge

## OPPOSED MOTION FOR STAY OF
## PRELIMINARY INJUNCTION PENDING APPEAL

Jay Jones
ATTORNEY GENERAL
Tillman J. Breckenridge
SOLICITOR GENERAL
Triston C. O'Savio
ASSISTANT SOLICITOR GENERAL
202 N. 9th St.
Richmond, VA 23219
T: 804.786.7704
solicitorgeneral@oag.state.va.us

Erin B. Ashwell
John D. Adams
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
T:804.775.1002
F: 804.775.2002
eashwell@mcguirewoods.com
jadams@mcguirewoods.com

Benjamin L. Hatch
MCGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, Virginia 23510
T: 757.640.3727
F: 757.640.3947
bhatch@mcguirewoods.com

March 9, 2026

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................ 1

BACKGROUND ................................................................................. 6

    A.    Virginia enacts SB 854 to stop a youth public
          health crisis. ................................................................ 6

    B.    The district court enjoins SB 854. ........................... 8

STANDARD OF REVIEW ................................................................ 10

ARGUMENT ................................................................................... 11

I.    Virginia is likely to succeed on the merits of its appeal. .............. 12

    A.    The district court misapplied the rigorous standard
          for facial challenges and misunderstood SB 854's
          scope. ........................................................................ 12

    B.    SB 854 is content neutral. ....................................... 16

          1.    SB 854 does not discriminate among different
                types of content. ........................................... 16

          2.    SB 854 draws permissible distinctions between
                speakers without reference to the content of
                speech. ............................................................ 19

    C.    SB 854 is narrowly tailored and advances an important
          government interest. .................................................. 20

II.    The equities favor a stay pending appeal. .................................. 25

    A.    Virginia will be irreparably harmed. ..................... 25

    B.    NetChoice will not suffer irreparable injury. ....... 26

    C.    The public interest favors staying the injunction
          pending appeal. ........................................................ 27

CONCLUSION ............................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ...................................................................25

*Am. Fed'n of Tchrs. v. Bessent,*
    152 F.4th 162 (4th Cir. 2025) ....................................... 11, 12

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ...............................................................18

*Brown v. Ent. Merchants Ass'n,*
    564 U.S. 786 (2011) ........................................... 19, 21, 22

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier,*
    2025 WL 3458571 (11th Cir. Nov. 25, 2025)..... 2, 21, 22, 23, 25, 26, 27

*Courthouse News Serv. v. Smith,*
    126 F.4th 899 (4th Cir. 2025) ...........................................21

*Doe v. Burlew,*
    165 F.4th 525 (6th Cir. 2026) .................................... 12, 14

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975) ...............................................................19

*Facebook, Inc. v. Duguid,*
    592 U.S. 395 (2021) ...............................................................18

*Free Speech Coal., Inc. v. Paxton,*
    606 U.S. 461 (2025) ................................... 3, 15, 20, 21, 23, 24

*Ginsberg v. New York,*
    390 U.S. 629 (1968) ...............................................................26

*GLBT Youth in Iowa Schs. Task Force v. Reynolds,*
    114 F.4th 660 (8th Cir. 2024) ...........................................12

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ............................................................... 23

*Hulbert v. Pope,*
  70 F.4th 726 (4th Cir. 2023) ............................................... 16

*In re Georgia Senate Bill 202,*
  160 F.4th 1171 (11th Cir. 2025) ....................................... 14

*Maryland v. King,*
  567 U.S. 1301 (2012) ........................................................... 25

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ............................................... 16, 19, 20

*Miranda v. Garland,*
  34 F.4th 338 (4th Cir. 2022) ............................................. 26

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ..................................... 2, 12, 13, 14

*NetChoice, LLC v. Bonta,*
  152 F.4th 1002 (9th Cir. 2025) ............................ 14, 16, 20

*NetChoice, LLC v. Fitch,*
  2025 WL 2078435 (5th Cir. July 17, 2025) ......................... 2

*Nken v. Holder,*
  556 U.S. 418 (2009) ..................................................... 11, 27

*Packingham v. North Carolina,*
  582 U.S. 98 (2017) ............................................................... 21

*Pierce v. N.C. State Bd. of Elections,*
  97 F.4th 194 (4th Cir. 2024) ............................................. 11

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ..................................................... 16, 19

*Simon v. City & Cnty. of San Francisco,*
  135 F.4th 784 (9th Cir. 2025) ............................................. 6

*TikTok Inc. v. Garland,*
 604 U.S. 56 (2025) ....................................................................... 19, 23

*Trump v. CASA, Inc.,*
 606 U.S. 831 (2025) ............................................................................. 25

*Turner Broad. Sys., Inc. v. FCC,*
 512 U.S. 622 (1994) ............................................................................. 19

*L.W. ex rel. Williams v. Skrmetti,*
 73 F.4th 408 (6th Cir. 2023) ............................................................... 27

**Statutes**

28 U.S.C. § 1292(a)(1) ................................................................................ 10

Va. Code § 59.1-575 ......................................................................... 8, 17, 18

Va. Code § 59.1-577.1 ........................................................................ 6, 8, 16

Va. Code § 59.1-584 ......................................................................... 8, 10, 25

**Rules**

Fed. R. App. P. 8(a)(2)(A)(i) ........................................................................ 6

4th Cir. R. 27(a) .......................................................................................... 6

**Other Authorities**

ATTORNEY GENERAL NEWS RELEASE, *Attorney General Jay
 Jones Takes Steps to Keep Virginia's Children Safe from
 Predatory Social Media Companies,*
 https://tinyurl.com/y3p96smd............................................................ 10

Mot. to Stay, *Comput. & Commc'ns Indus. Ass'n v. Uthmeier,*
 No. 25-11881 (11th Cir. June 9, 2025), Dkt. 10.................................... 6

## INTRODUCTION

Social media is addictive and harmful to children. Kids average 5 hours a day on social media, with many spending 10-plus hours scrolling—leading to never-before-seen rates of anxiety, depression, eating disorders, and self-harm. Facing these harms, Virginia's legislature unanimously enacted SB 854 to give parents a tool and recommend a solution to help combat the epidemic their children are facing. The statute strikes a careful balance between access to social media and overuse, solely requiring a one-hour daily default setting— which parents can adjust up or down—per platform, per day, for children under 16. NetChoice, a trade association of social media companies, mounted a facial, pre-enforcement challenge to the law, claiming it violates the First Amendment. But its record was devoid of facts; it did not challenge that social media is harmful or show evidence regarding enforcement. Despite this thin record, and unrebutted evidence of social media's harm to Virginia's children, the district court found Virginia had a compelling state interest *but* still preliminarily enjoined Virginia's Attorney General from enforcing this much-needed statute.

This Court should stay that injunction pending appeal. Virginia is likely to succeed on the merits of its appeal. And the Commonwealth will be irreparably harmed if it cannot enforce its laws to protect its children. Both the Fifth and Eleventh Circuits—in appeals regarding Mississippi and Florida laws, respectively, addressing social media's harms to children—stayed preliminary injunctions pending appeal. *See NetChoice, LLC v. Fitch*, 2025 WL 2078435 (5th Cir. July 17, 2025), *declining to lift stay*, 145 S. Ct. 2658 (2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 3458571 (11th Cir. Nov. 25, 2025). A stay is likewise required here.

In granting the preliminary injunction, the district court made three fundamental errors on the merits, each warranting vacatur or reversal.

First, the district court misconstrued the pre-enforcement facial challenge standard. Despite the Supreme Court's recent reminder in *Moody v. NetChoice, LLC*, 603 U.S. 707, 724-26 (2024), the district court declined to engage with SB 854's full scope or to weigh its constitutional versus unconstitutional applications, instead focusing on select hypotheticals. In doing so, the court categorically enjoined Virginia's

nuanced statute without making any factual findings or requiring NetChoice to provide evidence of SB 854's actual impact (if any) on speech. The district court thus ignored that SB 854 imposes only an incidental burden on speech. After completing the age verification, adults are free to access any speech on any social media platform for as long as they would like, and minors are free to access any speech on any platform for as long as their parents would like. SB 854 does not prevent children from accessing any speech, so long as their parents approve access. For the same reason, SB 854 does not ban any platform from conveying any message to any user, nor does it impose any rigid time limit on their ability to do so. The law imposes only a default setting, giving parents—not the government—the final say and the ability to override that default in either direction.

To be sure, giving parents tools to combat their children's mental health crisis may have incidental burdens on speech, including the age verification requirement. But there is no "First Amendment right to avoid age verification." *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 483 (2025). Such incidental burdens on speech receive only intermediate scrutiny, which SB 854 readily survives. Had the district court conducted

the proper analysis, it would have recognized that many if not all of the law's applications are constitutional, which is fatal to NetChoice's facial challenge.

Second, SB 854 is independently subject to intermediate scrutiny because it is content neutral. The district court misread SB 854 as discriminating based on content and so subjected it to strict scrutiny. But SB 854 imposes a one-hour default on all social media platforms, no matter their content. The district court nonetheless deemed SB 854 content-based because it defines "social media platform" as not including websites that predominantly feature "content preselected by the provider and not generated by users" and offered as examples material those sites commonly publish, like "news, sports, entertainment, ecommerce, or interactive gaming content." Those examples are not content-based carveouts. Social media platforms are covered—and non-social media sites are excluded—no matter the subject matter, messages, or viewpoints on their pages.

Third, the district court—addressing intermediate scrutiny in the alternative—distorted that standard. Missing the Supreme Court's guidance in *Free Speech Coalition*, the district court demanded that SB

854 exactly fit the problem at hand. But SB 854 is more than sufficiently tailored to survive intermediate scrutiny. The one-hour adjustable limit targets social media addiction and imposes only incidental hurdles to accessing social media. And contrary to the district court's suggestion, Virginia is not limited to the tools that platforms have voluntarily provided in protecting its children—which would leave the Commonwealth with no way to protect children at all.

Having incorrectly resolved the merits, the district court then neglected the other preliminary-injunction factors, including Virginia's and the public's overwhelming interest in protecting children. For those same reasons, the balance of the equities favors staying the injunction pending appeal. The statute became effective on January 1, 2026, and the Attorney General began enforcement efforts. The preliminary injunction paused those efforts, leaving the Commonwealth's children at the mercy of the platforms. Virginia and its children suffer irreparable harm each day that the Commonwealth is unable to enforce SB 854. That significant injury is not outweighed by the purported First Amendment harms that worry NetChoice. SB 854 enables both children and social media platforms to convey whatever content they desire in the amount of

time that parents permit their children to access the platform. And NetChoice and its members that benefit from addicting Virginia's children do not speak for the children; Virginia does. SB 854 should go into effect pending appeal.[1]

## BACKGROUND

### A. Virginia enacts SB 854 to stop a youth public health crisis.

SB 854 requires social media platforms to "limit a minor's use of [a] social media platform to one hour per day" per platform, and to "allow a parent to give verifiable parental consent to increase or decrease the daily time limit." Va. Code § 59.1-577.1(B). The statute, unanimously enacted, aims to protect children from addiction to social media and to return control to parents.

Social media's features—customized feeds, autoplay, infinite scrolling, push notifications, and public validation—make it addictive,

---

[1] NetChoice opposes this motion for a stay pending appeal and intends to file an opposition. 4th Cir. R. 27(a). The Commonwealth did not move for a stay in the district court because such motion would have been futile. Fed. R. App. P. 8(a)(2)(A)(i); *Simon v. City & Cnty. of San Francisco*, 135 F.4th 784, 815 n.22 (9th Cir. 2025); *see, e.g.*, Mot. to Stay, *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881 (11th Cir. June 9, 2025), Dkt. 10 (moving in the first instance in the Eleventh Circuit).

particularly to kids. A.104-105, A.128. On average, teens spend nearly 5 hours a day on various social media platforms, and nearly 10% use their phones for 10-plus hours. A.104-107, A.146. This non-stop scrolling rewires children's brains in ways similar to those "seen in individuals with substance use or gambling addictions." A.106, A.124, A.128. And, like with other addictions, the longer a child spends on social media, the greater the harms. A.113-114.

Study after study has tied too much social media to "lower self-esteem," "greater loneliness," "body image issues," "disordered eating," ADHD, and higher rates of anxiety and depression. A.108-109. Those mental health disorders are now at an all-time high among Virginia's children. A.152. Forty percent of Virginia teens "feel sad or hopeless for extended periods of time," "one in three suffer from anxiety," "[o]ne in five has engaged in self-harm," and "20% have seriously considered suicide." A.104-108, A.151. The situation is so dire that the prior U.S. Surgeon General declared a public health crisis, calling on States to protect their children. A.132-134.

Virginia did. After two years of engaging with stakeholders, the Commonwealth required social media companies to impose a *default*

*setting* for children under 16, adjustable by their parents: one hour of access per day, per social media platform. Va. Code § 59.1-577.1. The statute—publicly supported by NetChoice member Meta during the legislative process, A.188—ensures that minors can meaningfully access social media platforms while protecting them from addiction.

SB 854 applies only to social media platforms, defined as "public or semipublic Internet-based service[s] or application[s]" that "[c]onnect[] users in order to allow users to interact socially with each other within such service or application." Va. Code § 59.1-575. It excludes online forums, like the *New York Times* or Amazon, that primarily contain "content preselected by the provider and not generated by users" "and for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of such content." *Id.* The Attorney General has "exclusive authority" to enforce the statute. Va. Code § 59.1-584(A)-(B), (E).

## B. The district court enjoins SB 854.

In late 2025, NetChoice challenged SB 854, alleging it violates the First Amendment rights of social media platforms and Virginians. The

district court granted a preliminary injunction on February 27, 2026. *See* A.31.

Finding NetChoice likely to succeed on its First Amendment claim, the court concluded that SB 854 is content-based because, in defining "social media platform," it "exempts certain subject matter." A.21. Rather than focusing on the functional portion of the definition that actually defines "social media platform," the court emphasized the statutory *examples*—"news, sports, entertainment, ecommerce, or interactive gaming content"—of forums with "content preselected by the provider." A.19, A.21. The court also faulted SB 854 for regulating "user-generated" but not "provider-selected speech," reasoning that this "speaker preference" "should be treated as though it is content based." A.21.

The court then found that SB 854 failed both strict and intermediate scrutiny. It recognized that—as "NetChoice concedes"— "Virginia has an interest in protecting children," and "from the established record," "this interest is compelling." A.23.[2] But, finding the

---

[2] The district court did not make explicit factual findings but credited the evidence and opinions of Dr. Melissa Nelson, a pediatrician and vice chair of the Virginia State Board of Health. A.6 (noting that NetChoice does not challenge their accuracy); *see* A.102-115.

statute both overinclusive and underinclusive, the court held that SB 854 was not narrowly tailored and Virginia had not tried "other less restrictive means to achieve [its] goals," like "launch[ing] advertising campaigns to ensure parents know how to use the current tools" provided by social media platforms. A.23-26.

Prior to the preliminary injunction, the Attorney General sent compliance letters to social media platforms, triggering the statute's 30-day notice-and-cure period. Va. Code § 59.1-584(B); *see* OFFICE OF THE ATTORNEY GENERAL NEWS RELEASE, *Attorney General Jay Jones Takes Steps to Keep Virginia's Children Safe from Predatory Social Media Companies*, https://tinyurl.com/y3p96smd. Those enforcement efforts are now paused.

## STANDARD OF REVIEW

Jurisdiction is proper under 28 U.S.C. § 1292(a)(1). This Court has broad discretion to restore the status quo pending appeal. For a stay pending appeal, the movant must show that (1) it is likely to succeed on the merits of the appeal, (2) it will be irreparably injured during the appeal absent a stay, (3) the stay will not "substantially injure the other parties interested in the proceeding," and (4) the public interest favors a

stay. *Nken v. Holder*, 556 U.S. 418, 434 (2009). "The first two factors . . . are the most critical." *Id.*

Virginia appeals a preliminary injunction. "[A] preliminary injunction is an extraordinary remedy never awarded as of right"—it is "the exception, not the rule." *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 169 (4th Cir. 2025) (internal quotations omitted). The plaintiff must "show (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that the injunction is in the public interest." *Id.* at 168-69. The grant of a preliminary injunction is reviewed for abuse of discretion, but legal conclusions are reviewed "de novo." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024).

## ARGUMENT

The preliminary injunction should be stayed pending appeal. Virginia is likely to succeed on the merits, and the equities favor the Commonwealth.

**I.    Virginia is likely to succeed on the merits of its appeal.**

SB 854 does not violate the First Amendment. It is a content-neutral statute that readily survives intermediate scrutiny. This Court is likely to reverse the grant of the preliminary injunction on appeal. *See Am. Fed'n of Tchrs.*, 152 F.4th at 169-70.

**A.    The district court misapplied the rigorous standard for facial challenges and misunderstood SB 854's scope.**

To start, the district court subjected SB 854 to the wrong test, missing many of the statute's applications while focusing myopically on NetChoice's hypotheticals. This error alone warrants vacatur. *See, e.g.*, *Moody*, 603 U.S. at 724-25 (vacating and remanding on this basis); *Doe v. Burlew*, 165 F.4th 525, 527, 532-33 (6th Cir. 2026) (likewise vacating and remanding where district court "did not engage in the demanding comprehensive review that a facial challenge requires"); *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 670 (8th Cir. 2024) (same).

1. The district court applied the wrong standard. "NetChoice asserts a facial challenge," seeking to invalidate the statute not only as to the platforms but as to anyone. A.12. By design, such facial challenges are "hard to win." *Moody*, 603 U.S. at 723. Usually, the plaintiff must

show that the law is unconstitutional "in every conceivable application." A.16. But, under the overbreadth doctrine, First Amendment plaintiffs can prevail by demonstrating that "the law's unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724. This requires the court to "perform a full-scope review of the law's coverage and an in-depth review of the law's applications" before "weighing the unconstitutional versus constitutional applications." A.16-17.

The district court explicitly declined to conduct that analysis here: "NetChoice asserts a facial challenge, which does not require a fact-intensive analysis of the statute's application." A.12, A.17. So the court did not fully "assess [SB 854's] scope," nor did it catalogue all of its possible applications, figure out which "violate the First Amendment," and then "measure them against the rest." *Moody*, 603 U.S. at 724-25.

The court mistakenly deemed that analysis unnecessary. As the court reasoned, "[f]acial challenges can take two different approaches," one "assert[ing] that the statute is unconstitutional in every conceivable application" and the other, "taken in a challenge for overbreadth," that requires determining "whether 'a substantial number' of the statute's

applications are unconstitutional, judged in relation to the statute's 'plainly legitimate sweep.'" A.16-17 (quoting *Moody*, 603 U.S. at 723). According to the district court, NetChoice pursued the first type and "seeks to invalidate SB 854 based on its content restrictions, not overbreadth." A.17.

But NetChoice did not ask to be in that first category—which would require it to carry the impossible burden of proving *all* applications of SB 854 unconstitutional. *Compare* Mem. in Supp. of Mot. for Prelim. Inj. at 13-14, Dkt. 5, *with* A.17. Instead, NetChoice's challenge falls—like all other First Amendment facial challenges—into the second category. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1019 (9th Cir. 2025); *Doe*, 165 F.4th at 529-30. So even though "NetChoice seeks to invalidate SB 854 based on its content restrictions," "the appropriate framework *does* [ ] require a weighing of SB 854's applications." A.17 (emphasis added). And even if weighing wasn't required, the district court still had to "systematically" catalogue and address "*every application*," *In re Georgia Senate Bill 202*, 160 F.4th 1171, 1176 (11th Cir. 2025); *Bonta*, 152 F.4th at 1021 (emphasis added), to determine "that SB 854 is unconstitutional in *every application*," A.17 (emphasis added).

2. Because the district court refused to catalogue SB 854's applications, it missed many—including those in which the statute is likely only to have an "incidental effect on protected speech." *Free Speech Coal.*, 606 U.S. at 478. For example, despite the district court's concern, *see* A.24-25, SB 854 does not meaningfully impair adults' access to social media; "it simply requires them to verify their age before accessing it," just as they would have to provide proof of age "to obtain alcohol, tobacco, a lottery ticket, a tattoo , . . . and a driver's license[.]" *Free Speech Coal.*, 606 U.S. at 479, 481-82 (internal citations omitted). And for minors, SB 854 is not a ban from social media nor does it "block minors' access to constitutionally protected speech," *contra* A.24; it is a one-hour parentally-adjustable default *per platform per day*. The record is devoid of proof—NetChoice's burden to adduce—that any child will be prevented from accessing desired content or that any platform will be unable to convey their own expression in that time. SB 854 is *at least* constitutional in this substantial number of applications, making a facial challenge categorically inappropriate.

**B.    SB 854 is content neutral.**

The district court also erred in concluding that SB 854 regulates based on content. A.18. States may regulate the content of speech only in narrow circumstances, for fear of silencing certain messages or viewpoints. But the government can "regulate features of speech unrelated to its content," *McCullen v. Coakley*, 573 U.S. 464, 477 (2014), "specify[ing] when, where, or how speech may be delivered," *Hulbert v. Pope*, 70 F.4th 726, 733 (4th Cir. 2023). These content-neutral regulations face intermediate scrutiny and need only be narrowly tailored to serve a significant governmental interest.

**1.    SB 854 does not discriminate among different types of content.**

SB 854 sets a parentally-adjustable one-hour default on any social media platform. Va. Code § 59.1-577.1(B). This default applies "without reference to the content of the regulated speech"—no matter whether users are talking sports, politics, or celebrity gossip. *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015); *cf. Bonta*, 152 F.4th at 1016 (restricting child users' access to "like counts" was content based because it turned on "the idea or message expressed" by likes).

The district court nonetheless held that SB 854's definition of "social media platform" discriminates based on content. To be a "social media platform," a site must "[c]onnect[] users in order to allow [them] to interact socially with each other" and allow users to

- "[c]onstruct a public or semipublic profile,"

- "[p]opulate a public list of other users with whom such user shares a social connection," and

- "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."

Va. Code § 59.1-575. To clarify that these functional features do not encompass websites that nobody considers social media, the statute also states that "social media platform" does not include forums where "content" is "preselected by the provider and not generated by users":

> No service or application that consists primarily of news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users, and for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of such content, or that is for interactive gaming, *shall be considered to meet this criterion on the basis of that function alone.*

*Id.* (emphasis added). For instance, Amazon is not a "social media platform" simply because customers can interact with each other by posting product reviews, just as the *New York Times* is not a "social media

17

platform" simply because users can interact with each other in the comments section.

The district court misread this language—the consequence of NetChoice bringing a pre-enforcement challenge before the Attorney General or any Virginia court had the opportunity to interpret the statute and explain how it operates, *see Broadrick v. Oklahoma*, 413 U.S. 601, 617-18 (1973)—and held that SB 854 discriminates against protected speech that is not "news, sports, entertainment, ecommerce" or "interactive gaming" because it "exempt[s] [those] subject matter categories" from the statute. A.19-21.

But SB 854 does no such thing. The statute offers "news, sports, entertainment, ecommerce" or "interactive gaming" as *examples* of "content preselected by the provider and not generated by users." Va. Code § 59.1-575; *see Facebook, Inc. v. Duguid*, 592 U.S. 395, 402-03 (2021) (explaining the series-qualifier canon). No website is exempted based on its content; a social media platform dedicated to sports or politics is just as covered by SB 854 as is Instagram or TikTok. Instead, the definition turns on whether any "interactive functionality" is secondary to provider-generated content—no matter the subject matter or viewpoint. The

statute's functional definition thus "regulate[s] features of speech unrelated to its content." *McCullen*, 573 U.S. at 477; *cf. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 789 (2011) (prohibiting the sale of "violent video games" that permit players to kill or assault); *Reed*, 576 U.S. at 159 (exempting signs conveying certain messages).

### 2. SB 854 draws permissible distinctions between speakers without reference to the content of speech.

The district court also deemed SB 854 content-based because in regulating only social media platforms, the statute "favors provider-selected speech over user-generated speech." A.21. But nothing about that distinction discriminates based on *content*. Laws distinguish between speakers all the time. *See, e.g.*, *TikTok Inc. v. Garland*, 604 U.S. 56, 72-73 (2025). Such distinctions are permissible so long as they do not reflect a "content preference" and are "justified by some special characteristic of the particular speaker being regulated." *Id.* (cleaned up) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658, 660-61 (1994)). Nothing in the record suggests that SB 854 intended to target "ideas or images that [Virginia] thinks unsuitable" for children. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975). And

Virginia had good reason to single out social media platforms: the Surgeon General's advisory and other studies establish that excessive exposure to social media platforms uniquely triggers neural pathways comparable to addiction. A.104-107, A.128-127. This speaker preference cannot "be treated as though it is content based." A.21; *see Bonta*, 152 F.4th at 1016 (rejecting argument that "focus on social media makes the entire act content based").

### C. SB 854 is narrowly tailored and advances an important government interest.

SB 854 is content-neutral and so subject to intermediate scrutiny. *McCullen*, 573 U.S. at 479-80. The statute readily survives that test, and the district court erred in concluding otherwise. For intermediate scrutiny, the regulation must "advance[] important governmental interests unrelated to the suppression of free speech" and must not "burden substantially more speech than necessary to further those interests." *Free Speech Coal.*, 606 U.S. at 471.

Virginia does not seek to suppress any viewpoint or message, but instead to "protect[] its youth from the harms associated with the addictive aspects of social media." A.30. This is a "compelling interest,"

as the district court recognized and NetChoice conceded. *Id.*; *accord Uthmeier*, 2025 WL 3458571, at *6.

SB 854 is narrowly tailored to remedy the harm at hand. The statute does not bar any child from any social media platform, nor does it bar them from any features or content on those platforms. *Cf. Packingham v. North Carolina*, 582 U.S. 98, 107-08 (2017) (law completely prohibiting sex offenders from accessing any social media sites), *but see Uthmeier*, 2025 WL 3458571, at *6 (finding narrowly tailored a statute banning child access to social media without parental approval). Instead, SB 854 sets a one-hour *adjustable* default *per platform* to target the root of the problem: addicted children spending hours a day doomscrolling. A.104-107, A.110-111, A.124, A.128. This time limit "alleviates that harm in a direct and material way" by giving parents control without preventing children from engaging in their desired speech. *Courthouse News Serv. v. Smith*, 126 F.4th 899, 913 (4th Cir. 2025) (cleaned up); *see* A.24 (recognizing that minors that exceed the default can obtain the same content and messages through other forums).

Finding to the contrary, the district court effectively applied strict scrutiny by another name. *Compare, e.g.*, A.26 (relying on *Brown*, 564

U.S. at 805, to find SB 854 insufficiently tailored) *with Uthmeier*, 2025 WL 3458571, at *7 (explaining that "cases centered on impermissible content-based restrictions," like *Brown*, should not be used to assess intermediate scrutiny).

1. To start, the district court faulted SB 854 for being overinclusive because it "covers a significant amount of protected speech." A.26. But nothing in the record suggests that SB 854 "blocks minors' access" to any speech or that minors "would be barred from watching an online church service" or "science or history programming." A.24. All they have to do is get their parents' permission to watch more than an hour. And they only have to get that permission once—by having their parent change a base setting. This is at most an incidental burden on speech, and as far from a ban on speech as possible without completely giving up on protecting children at all.

Either way, the district court is asking the wrong question. Intermediate scrutiny does not demand that a statute limit its reach to "only unprotected speech," or that it be "the least intrusive means of achieving the desired end." *Uthmeier*, 2025 WL 3458571, at *6, *8 (internal quotations omitted). The statute may cover protected speech so

long as it does not "burden *substantially* more speech than is necessary" to address the problem. *Free Speech Coal.*, 606 U.S. at 496 (quoting *TikTok*, 604 U.S. at 70) (emphasis added); *see Grayned v. City of Rockford*, 408 U.S. 104, 120 (1972) (upholding statute prohibiting picketing near schools even though it "prohibits some picketing that is neither violent nor physically obstructive" and "[s]uch expressive conduct may be constitutionally protected at other places or other times"). So it is here. Even if a child's parents do not change the limit, this time limit would only require the child to look to other, less addictive forms of media for online church or educational programming, and does not prevent the statute from being sufficiently tailored. *See Uthmeier*, 2025 WL 3458571, at *8.

The district court further deemed SB 854 overinclusive because "its age verification burdens adults' . . . rights to access protected speech." A.26. But the Supreme Court rejected that position last Term in *Free Speech Coalition*. Age verification is a "modest" and common tool used to "protect[] children" while "allowing adults full access to the content in question." 606 U.S. at 496 (upholding age verification for adults accessing pornography as "sufficiently tailored"); *see supra* p. 15.

2. The district court also considered SB 854 to be underinclusive because it does not address digital gaming, citing extra-record studies suggesting that gaming can be addictive too. A.26-27. But a State need not "address all aspects of a problem in one fell swoop." *Free Speech Coal.*, 606 U.S. at 498. Social media poses particular harms to children, and the Commonwealth acted to resolve that problem. Virginia cannot be blamed for not regulating all other addictive products in the same statute.

3. Finally, the district court faulted Virginia for not trying other means to resolve the problem, reasoning that "parents have ample tools to limit minors' access to social media" and suggesting that the Commonwealth "work with companies and launch advertising campaigns to ensure parents know how to use the current tools effectively." A.25. But intermediate scrutiny does not demand that the government first try out "some less-speech-restrictive alternative." *Free Speech Coal.*, 606 U.S. at 497-98 (rejecting that State had to "encourag[e] parents to install content-filtering software on their children's devices" before requiring age verification). The General Assembly was entitled to conclude "that parental controls were not working" and that "simply offering parents a new tool . . . would not suffice when parents were not

taking advantage of the tools already available." *Uthmeier*, 2025 WL 3458571, at *8.

SB 854 survives intermediate scrutiny.

## II. The equities favor a stay pending appeal.

Not only is Virginia likely to win on appeal, but the equities strongly favor a stay.

### A. Virginia will be irreparably harmed.

The Commonwealth will suffer irreparable harm because it is currently prevented from enforcing its bipartisan and unanimously adopted statute protecting its children. SB 854 went into effect on January 1, 2026, but social media platforms declined to comply. Before the preliminary injunction, the Attorney General sent compliance letters to several platforms. *See* Va. Code § 59.1-584(A). Those enforcement efforts are now at a standstill. Preventing Virginia from enforcing its law "clearly inflicts irreparable harm on the [Commonwealth]." *Abbott v. Perez*, 585 U.S. 579, 602-03 & n.17 (2018). Indeed, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C. J., in chambers)). And this is not just any law: SB 854

is intended to serve one of the Commonwealth's most important responsibilities—protecting its children. *See Ginsberg v. New York*, 390 U.S. 629, 640 (1968) (recognizing this "transcendent interest in protecting the welfare of children," above and beyond "parental control or guidance") (internal quotations omitted).

**B. NetChoice will not suffer irreparable injury.**

In contrast, NetChoice suffers no irreparable harm if SB 854 is in effect pending appeal. SB 854 satisfies the First Amendment, and "[w]ithout [an] alleged constitutional injury," NetChoice suffers no "irreparable harm." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022). Either way, NetChoice's purported "loss of First Amendment freedoms" is not so significant as to outweigh the harms to the Commonwealth and its youth. A.27; *see Uthmeier*, 2025 WL 3458571, at *9. Platforms will still be able to speak to adult users for as long as they want, and vice versa. And SB 854's default setting permits both children and social media platforms to convey any content they desire in the amount of time that parents permit their children to access the platform.

## C. The public interest favors staying the injunction pending appeal.

Finally, public interest demands a stay. Virginia is facing a youth mental health crisis. Anxiety, depression, self-harm, and suicide have skyrocketed. A.107-111. Yet platforms continue to develop ever more addictive features. To be sure, as the district court noted, the public has an interest in avoiding constitutional violations. A.29. But there is no infringement here. And the public has an even more compelling interest "in the protection of children and the enforcement of [a] law that seeks to do just that." *Uthmeier*, 2025 WL 3458571, at *10; *accord L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 421 (6th Cir. 2023) (staying injunction pending appeal given "the public-health considerations undergirding the law" and "irreversible health risks to [the State's] children"). Platforms' desire to keep kids scrolling does not outweigh the public's interest in the "prompt execution" of a democratically enacted law protecting the Commonwealth's most vulnerable. *Nken*, 556 U.S. at 427.

## CONCLUSION

This Court should grant a stay pending appeal.

Dated: March 9, 2026

Respectfully submitted,

*/s/ Benjamin L. Hatch*

Jay Jones
ATTORNEY GENERAL
Tillman J. Breckenridge
SOLICITOR GENERAL OF VIRGINIA
Triston Chase O'Savio
ASSISTANT SOLICITOR GENERAL
202 North 9th Street
Richmond, VA 23219
T: 804.786.7704
solicitorgeneral@oag.state.va.us

Benjamin L. Hatch
MCGUIREWOODS LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, Virginia 23510
T: 757.640.3727
F: 757.640.3947
bhatch@mcguirewoods.com

Erin B. Ashwell
John D. Adams
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: 804.775.1002
F: 804.698.2002
eashwell@mcguirewoods.com
jadams@mcguirewoods.com

*Counsel for Defendant-Appellant Jay Jones, in His Official Capacity as Attorney General for the Commonwealth of Virginia*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 5,199 words, excluding the parts exempted by Fed. R. App. P. 27(a)(2)(B).

This motion complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Benjamin L. Hatch*
Benjamin L. Hatch

*Counsel for Defendant-Appellant Jay Jones, in His Official Capacity as Attorney General for the Commonwealth of Virginia*

## CERTIFICATE OF SERVICE

I certify that on March 9, 2026, the foregoing document was electronically filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve all counsel of record.

/s/ *Benjamin L. Hatch*
Benjamin L. Hatch

*Counsel for Defendant-Appellant Jay Jones, in His Official Capacity as Attorney General for the Commonwealth of Virginia*