No. 26-1252

IN THE

# United States Court of Appeals for the Fourth Circuit

NETCHOICE,

*Plaintiff-Appellee,*

v.

JAY JONES, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF VIRGINIA,

*Defendant-Appellant.*

**On Appeal from the United States District Court
For the Eastern District of Virginia, No. 1:25-cv-02067**

## OPENING BRIEF OF APPELLANT

BENJAMIN L. HATCH
McGuireWoods LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, Virginia 23510
T: 757.640.3727
F: 757.640.3947

ERIN B. ASHWELL
JOHN D. ADAMS
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
T:804.775.1002
F: 804.775.2002

April 23, 2026

JAY JONES
  *Attorney General*

TILLMAN J. BRECKENRIDGE
  *Solicitor General*

TRISTON C. O'SAVIO
  *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

Table of Contents ......................................................................................i

Table of Authorities...........................................................................iv

Introduction.......................................................................................... 1

Issues Presented................................................................................... 4

Jurisdictional Statement...................................................................... 4

Statement ............................................................................................. 4

    A.    Social media platforms' addictive features create a youth public health crisis............................................. 4

    B.    States enact laws to combat the depression, anxiety, and social disorders foisted on their children by social media companies ............................. 8

    C.    Through NetChoice, the largest social media companies band together to form a united litigation arm ................................................................ 9

    D.    Virginia's General Assembly deliberates and studies the problem for two years before passing legislation ................................................................... 9

    E.    Virginia enacts the Parental Control Provision to ensure parents can limit social media use by their children under 16 years old, starting with a one-hour daily default for each social media platform....... 10

    F.    NetChoice raises a facial challenge to Virginia's default setting law without developing any factual record of the law's applications ...................... 13

    G.    The district court finds Virginia has a compelling state interest, but still enjoins the law as facially invalid under the First Amendment........................... 15

Standard of Review ........................................................................... 17

Summary of Argument....................................................................... 17

Argument............................................................................................ 20

I.  A preliminary injunction is an extraordinary remedy that places the burden on the plaintiff to show entitlement to the injunction ................................................ 20

II. The district court erred in concluding NetChoice was likely to succeed on the merits ........................................ 21

   A.  The district court misapplied recent Supreme Court precedent in evaluating Plaintiffs' facial challenge .................................................................... 21

       1.  The district court applied the wrong standard ........................................................... 21

       2.  The Parental Control Provision's many constitutional applications outweigh any unconstitutional applications ........................... 26

   B.  The district court erred in applying strict scrutiny .... 32

       1.  SB 854 does not regulate the content on social media platforms ..................................... 34

       2.  SB 854 distinguishes between speakers based on functional features, not content .......... 36

       3.  The district court erred in finding to the contrary ........................................................... 39

   C.  The district court erred in concluding the Parental Control Provision is insufficiently tailored ................................................................... 42

       1.  The district court correctly concluded that the Commonwealth's interest in protecting children is compelling ...................................... 42

       2.  The Provision readily survives intermediate scrutiny ......................................................... 44

       3.  The Parental Control Provision survives even strict scrutiny ......................................... 48

III. The district court erred in concluding that the remaining preliminary injunction factors favored NetChoice ..................................................................... 52

Conclusion ........................................................................................ 54

Request for Oral Argument ............................................................ 55

Certificate of Compliance ............................................................... 56

Certificate of Service ...................................................................... 57

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
  585 U.S. 579 (2018) ............................................................................53

*American Booksellers v. Webb,*
  919 F.2d 1493 (11th Cir. 1990) .........................................................33

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) ...........................................................................41

*Brown v. Entertainment Merchants Association,*
  564 U.S. 789 (2011) ..................................................................... 33, 45

*Bruni v. City of Pittsburgh,*
  941 F.3d 73 (3d Cir. 2019) .................................................................40

*Computer & Communications Industry Association v. Paxton,*
  747 F. Supp. 3d 1011 (W.D. Tex. 2024) ............................................35

*Computer & Communications Industry Association v. Uthmeier,*
  No. 25-11881, 2025 WL 3458571 (11th Cir. Nov. 25, 2025) ... 34, 35, 39,
  40, 43, 45, 46, 47, 50, 53, 54

*Computer & Communications Industry Association v. Uthmeier,*
  No. 4:24-cv-438-MW/MAF, --- F.Supp.3d ----, 2025 WL 1570007
  (N.D. Fla. June 3, 2025) ............................................................. 34, 35

*Courthouse News Service v. Smith,*
  126 F.4th 899 (4th Cir. 2025) .................................................... 34, 44

*E.K. by & through Keeley v. Department of Defense Education Activity,*
  807 F. Supp. 3d 517 (E.D. Va. 2025) .................................................21

*Enhanced Athlete Inc. v. Google LLC,*
  No. 19-cv-08260-HSG, 2020 WL 4732209 (N.D. Cal.
  Aug. 14, 2020).....................................................................................31

*Free Speech Coalition, Inc. v. Paxton,*
606 U.S. 461 (2025) .....................................19, 27, 28, 32, 44, 46, 47, 48

*Ginsberg v. New York,*
390 U.S. 629 (1968) .................................................................54

*Giovani Carandola, Ltd. v. Fox,*
470 F.3d 1074 (4th Cir. 2006) .............................................42

*GLBT Youth in Iowa Schools Task Force v. Reynolds,*
114 F.4th 660 (8th Cir. 2024).......................................23, 26

*Globe Newspaper Co. v. Superior Court,*
457 U.S. 596 (1982) ...............................................................43

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ...............................................................46

*Hebb v. City of Asheville,*
145 F.4th 421 (4th Cir. 2025).............................................33

*Hulbert v. Pope,*
70 F.4th 726 (4th Cir. 2023)...............................................38

*Maryland v. King,*
567 U.S. 1301 (2012) .............................................................53

*McCullen v. Coakley,*
573 U.S. 464 (2014) ......................................... 33, 44, 48

*Miranda v. Garland,*
34 F.4th 338 (4th Cir. 2022)....................................... 20, 52

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ........................18, 21, 22, 23, 24, 26, 30, 31, 35, 42

*Munaf v. Geren,*
553 U.S. 674 (2008) ...............................................................20

*NetChoice, LLC v. Fitch,*
  134 F.4th 799 (5th Cir. 2025) ...............................................................25

*NetChoice, LLC v. Bonta,*
  152 F.4th 1002 (9th Cir. 2025) ............................................................35

*NetChoice, LLC v. Bonta,*
  170 F.4th 744 (9th Cir. 2026) ................................................... 23, 24, 26

*NetChoice, LLC v. Reyes,*
  748 F. Supp. 3d 1105 (D. Utah 2024) ..................................................35

*New York v. Ferber,*
  458 U.S. 747 (1982) ...............................................................................43

*Packingham v. North Carolina,*
  582 U.S. 98 (2017) .................................................................................45

*Pierce v. North Carolina State Board of Elections,*
  97 F.4th 194 (4th Cir. 2024) .................................................................17

*Porto Rico Railway, Light & Power Co. v. Mor,*
  253 U.S. 345 (1920) ...............................................................................40

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ..................................................................... 33, 34, 37

*Schleifer by Schleifer v. City of Charlottesville,*
  159 F.3d 843 (4th Cir. 1998) ................................................................43

*TikTok Inc. v. Garland,*
  604 U.S. 56 (2025) ....................................................................... 37, 44, 46

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) ...............................................................................53

*Turner Broadcasting System, Inc. v. F.C.C.,*
  512 U.S. 622 (1994) ........................................................................ 36, 37

*United States v. O'Brien,*
   391 U.S. 367 (1968) ..................................................................27, 30

*United States v. Playboy Entertainment Group, Inc.,*
   529 U.S. 803 (2000) ..................................................................49, 50

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ........................................................................33

*Washington State Grange v. Washington State Republican Party,*
   552 U.S. 442 (2008) ..................................................................21, 22

*Yates v. United States,*
   574 U.S. 528 (2015) ..................................................................40, 41

**Statutes**

28 U.S.C. § 1292 ..............................................................................4

28 U.S.C. § 1331 ..............................................................................4

47 U.S.C. § 230 ..............................................................................31

Ark. Code § 4-88-1402 ......................................................................8

Fla. Stat. § 501.1736........................................................................8

O.C.G.A. § 39-6-2............................................................................8

Ohio Rev. Code § 1349.09....................................................................8

Va. Code § 59.1-575 ........................................................ 11, 12, 38, 39, 41

Va. Code § 59.1-577.1 ............................................................. 10, 11, 12

Va. Code § 59.1-584 ............................................................. 12, 17, 53

**Other Authorities**

News Release, Office of the Attorney General, Attorney General Jay
   Jones Takes Steps to Keep Virginia's Children Safe from Predatory

Social Media Companies (Feb. 16, 2026),
https://tinyurl.com/y3p96smd ............................................................ 17

## INTRODUCTION

Attempting to squeeze a novel case into distinguishable precedent, the district court lost sight of first principles and enjoined a carefully and narrowly tailored law that imposes a minor temporary burden on speech. Virginia passed a law requiring social media companies serving Virginia's minors under 16 to limit their use to one hour per day *unless* a parent changes the setting. So, the burden on the social media company is to create a parental control with a one-hour default, or if it already has parental controls, change the default from unlimited to one hour (and, if it chooses, geofencing so that it operates only in Virginia). NetChoice claims its members already have parental controls, so it is just a matter of changing the default setting—not much burden at all. The burden on the underage user is to get mom or dad or a guardian to change the one-hour default *if* the minor wants to use the platform more than an hour a day. The burden on an adult user is to engage in age verification—a burden the Supreme Court already has determined does not warrant strict scrutiny. These minor burdens should not render a law unconstitutional—particularly when the court found Virginia had established a *compelling* state interest.

- 1 -

The undisputed record establishes that social media is addictive and harmful to children. Children's obsessive scrolling, enabled and encouraged by social media platforms, is generating never-before-seen rates of anxiety, depression, eating disorders, and self-harm. And it is well-known that social media companies make parental controls hard to find and execute, to the extent they have such controls at all. Virginia's legislature unanimously enacted the Parental Control Provision to change the incentive so social media companies make parental controls easier to navigate: a one-hour daily default setting per social media platform, per day, for children under 16, which parents have the power to adjust up or down.

NetChoice, an association of social media companies, brought a facial, pre-enforcement First Amendment challenge to the Parental Control Provision. Its challenge was devoid of facts and left unrebutted the Commonwealth's evidence of social media's harm to Virginia's children, which the district court found sufficient to establish that Virginia had a compelling state interest. And yet, the district court preliminarily enjoined Virginia's Attorney General from enforcing this much-needed statute.

The extraordinary relief of enjoining a legislature's statutory solution to a difficult and dangerous social problem may issue only after the facial challenger develops—and the district court evaluates—a factual record of the full scope of the law's applications. The district court explicitly declined to conduct this examination, somehow concluding that NetChoice could prove that the Parental Control Provision is unconstitutional *in every conceivable application* without parsing most of those applications. The district court's rebuff of recent Supreme Court precedent governing facial challenges and governing incidental burdens on speech requires vacatur.

In concluding that the Parental Control Provision is unconstitutional, the district court also erred in comparing the Provision to historical bans on speech. That comparison misapprehends the Provision's effect. The Provision imposes no ban on speech. It creates a default setting that enables kids to access any platform for *at least* an hour per day per platform, *and longer if their parents approve.* In so doing, it rightfully places parents—not platforms—in the driver's seat when deciding how much time their children should spend on social media platforms.

Consistent with several other Circuits' recent decisions, this Court should vacate the preliminary injunction and remand.

## ISSUES PRESENTED

1. Did the district court err in concluding that NetChoice was likely to establish that Virginia's Parental Control Provision violates the First Amendment?

2. Did the district court err in weighing the public interest, the balance of equities, and irreparable harm against Virginia?

## JURISDICTIONAL STATEMENT

NetChoice invoked the district court's jurisdiction under 28 U.S.C. § 1331. J.A. 41. On February 27, 2026, the district court entered a preliminary injunction, J.A. 28, and the Commonwealth noticed an appeal from that order on March 3, 2026, J.A. 321. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT

### A. Social media platforms' addictive features create a youth public health crisis

Social media platforms' features make social media addictive to children. J.A. 154. Their complex algorithms customize each user's feed, and then employ autoplay and infinite scrolling to ensure that users

never reach the end of those feeds.  J.A. 155.  And they send out push notifications and other forms of public validation, such as likes and shares, that keep users coming back for more.  J.A. 155, 161.

Platforms profit from and encourage this addiction; the more eyes (*i.e.*, users) that a platform has on it, and the longer those users scroll, the more the platform earns in advertising dollars.  *See* J.A. 145 (NetChoice General Counsel and Director of Strategy Initiatives describing advertisers as "the main source of revenue for many online services," and projecting that the Provision may lead advertisers "to reduce or curtail their spending on advertisements" on social media platforms).  These addictive features work; 95% of teens use social media, and they spend, on average, nearly 5 hours a day on various platforms.  J.A. 154–155, 196–199.  Nine percent of teenagers use their phones for more than 10 hours a day.  J.A. 157.

These addictive features make social media harmful to minors.  In moderation, social media can "have benefits for some children and adolescents," providing online communities where children can express themselves and meet others with shared interests.  J.A. 162, 164; *see also* J.A. 162–163.  But used in excess, social media poses "a profound risk of

- 5 -

harm to the mental health and well-being of children and adolescents."
J.A. 173. "[A]dolescence is a vulnerable period of brain development," as
children are forming their "identities and sense of self-worth," gaining
foundational knowledge and skills that will carry them through life, and
learning how to have healthy and fulfilling relationships with peers. J.A.
174; *see also* J.A. 155–156. Social media can disrupt all this. Kids stay
on platforms hour after hour, looking for the next dopamine boost and
not wanting to "miss[] out" on the next new trend. J.A. 179; *see also* J.A.
155. This constant activity can literally rewire children's brains, causing
"distinct changes" in the parts that are key to "impulse control, emotional
regulation, and . . . social behavior"—changes similar to those "seen in
individuals with substance use or gambling addictions." J.A. 174, 178;
*see also* J.A. 156–157. And, like with other addictions, the longer a child
spends on social media, the greater the harms. J.A. 163–164.

The impacts of this addiction are severe. Children who spend too
much time on social media suffer from "loss of sleep," higher "obesity
rates," impaired "cognitive function," and lower "academic performance."
J.A. 174; *see also* J.A. 161. The mental health harms are even more
devastating. Study after study has tied social media, especially excessive

use, to "lower self-esteem," "greater loneliness," "body image issues," "disordered eating," "ADHD," and higher rates of anxiety and depression. J.A. 158–159 (collecting studies).  Those mental health disorders are now at an all-time high among Virginia's children.  J.A. 174.  More than 77% of Virginia teens spend more than 3 hours a day on screens, and 40% spend more than 5 hours.  J.A. 154.  Not coincidentally, 40% "feel sad or hopeless for extended periods of time," and "one in three suffer from anxiety."  J.A. 154; *see also* J.A. 173.  "One in five has engaged in self-harm," and "20% have seriously considered suicide."  J.A. 157–158.

Children recognize that social media is harming them, but many are unable to stop using it on their own.  J.A. 162.  And social media companies know that their platforms pose significant risks to children. Many offer parental controls and limit the content that young users can see; TikTok, for instance, voluntarily imposes a 60-minute daily default for its young users.  J.A. 179–182.  But these voluntary measures are frequently not enough for parents and kids to moderate social media use. J.A. 161–162.  After all, parental controls are notoriously hard to find and use on many applications.  J.A. 161–162.

**B.** **States enact laws to combat the depression, anxiety, and social disorders foisted on their children by social media companies**

The situation is so dire that the prior U.S. Surgeon General declared a public health crisis, calling on States to protect their children. J.A. 160, 182.

States began answering the Surgeon General's call to action. Arkansas, California, Colorado, Florida, Georgia, Maryland, Mississippi, Ohio, Tennessee, Texas, and Utah have all passed laws regulating social media platforms' interactions with minors. J.A. 245–264. Several of those states have sought to prohibit children from creating social media accounts altogether or without parental consent. *Cf.*, *e.g.*, Fla. Stat. § 501.1736 (2024) (prohibiting children 13 and under from having social media accounts at all and requiring parental approval for 14- and 15-year-olds); Ark. Code § 4-88-1402 (2023) (barring all minors from opening accounts absent parental consent); O.C.G.A. § 39-6-2 (2024) (same); Ohio Rev. Code § 1349.09 (2023) (barring all children under 16 from opening accounts absent parental consent). And all these state laws have been subject to heavy litigation. J.A. 245–264.

**C.**   **Through NetChoice, the largest social media companies band together to form a united litigation arm**

Many of the largest social media platforms are members of NetChoice, a national trade association of online businesses.  J.A. 130–131.  NetChoice's members include Meta (which owns and operates Facebook and Instagram), Google (which owns and operates YouTube), TikTok, and X (formerly Twitter).  J.A. 131 & n.3.

On behalf of its members, NetChoice has repeatedly brought challenges to undermine states' laws regulating social media platforms' interactions with minors in recent years.  J.A. 245–264.  This includes challenges to *all* of the state legislation discussed above—meaning at least eleven other states have separately drawn challenges from NetChoice.  J.A. 245–264.

**D.**   **Virginia's General Assembly deliberates and studies the problem for two years before passing legislation**

For two years, the General Assembly considered the views of parents, children, and industry, including social media platforms themselves.  Having considered that input, the Commonwealth proposed a novel approach.  Rather than prevent children from engaging on social media platforms altogether, the General Assembly crafted Senate Bill

854, which struck a balance to enable minors to meaningfully access social media platforms, while protecting them from addiction by returning control to parents. *See* Va. Code § 59.1-577.1 (effective Jan. 1, 2026).

Virginia's bill was publicly supported by NetChoice member Meta during the legislative process. J.A. 238. A Meta representative testified that the bill was "an appropriate step forward," and that Meta could "stand up and support the bill"—in particular, because it "provides flexibility on [platforms'] end from a programming standpoint to get this done for teens." J.A. 238. The Meta representative further explained that the bill "actually mimics a significant amount of what we already have for our teen accounts and Instagram." J.A. 238.

### E. Virginia enacts the Parental Control Provision to ensure parents can limit social media use by their children under 16 years old, starting with a one-hour daily default for each social media platform

The bipartisan General Assembly passed the bill (the "Parental Control Provision" or the "Provision") unanimously, J.A. 4, and the Governor signed it into law as part of the Consumer Data Protection Act. As enacted, the Parental Control Provision requires social media companies to impose a *default setting* for children under 16 of one hour

of access per day, per social media platform, and to "allow a parent to give verifiable parental consent to increase or decrease the daily time limit." Va. Code § 59.1-577.1. The Provision applies only to social media platforms, which are defined as "public or semipublic Internet-based service[s] or application[s]" that "[c]onnect[] users in order to allow users to interact socially with each other within such service or application." Va. Code § 59.1-575.

Moreover, to be covered by the Parental Control Provision, a platform must allow users to:

- "[c]onstruct a public or semipublic profile for purposes of signing into and using such service or application";

- "[p]opulate a public list of other users with whom such user shares a social connection within such service or application"; and

- "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users."

Va. Code § 59.1-575.

The Parental Control Provision further tailors its application by identifying functions that would not, alone, transform a forum into a social media platform. Forums that "exclusively provide[] email or direct messaging services" do not qualify as social media platforms "on the basis

- 11 -

of that function alone." Va. Code § 59.1-575. The same is true for "interactive gaming" and other fora like Amazon or the *New York Times* "that consist[] primarily of news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users, and for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of such content." *Id.*

The Parental Control Provision applies only to social media platforms that have "users in the Commonwealth," and the Provision's requirements apply only to those Virginia users. Va. Code § 59.1-575. To identify young users in Virginia, social media platforms must use "commercially reasonable methods, such as a neutral age screen mechanism." *Id.* § 59.1-577.1.

The Attorney General has "exclusive authority" to enforce the Parental Control Provision. Va. Code § 59.1-584(A)-(B), (E). Before bringing an enforcement action, the Attorney General must provide "30 days' written notice identifying the specific provisions . . . being violated." *Id.* § 59.1-584(B). If the platform cures those alleged violations within 30 days, then "no action shall be initiated[.]" *Id.*

- 12 -

### F.    NetChoice raises a facial challenge to Virginia's default setting law without developing any factual record of the law's applications

In late 2025, NetChoice filed yet another complaint—this time, challenging Virginia's efforts to protect its children from social media platforms' addictive features. NetChoice alleged that the Parental Control Provision violates the First Amendment rights of its members who fit the Provision's definition of social media platforms. J.A. 37–77. NetChoice also purported to represent the interests of Virginia's children, claiming that the Parental Control Provision violates their First Amendment rights, too.

In its effort to represent the interests of Virginia's children, however, NetChoice made no attempt to deny the harms that its members were wreaking on those very same children. Dr. Melissa Nelson, the Vice Chair of the Virginia State Board of Health, submitted a detailed declaration, citing extensive studies showing that social media platforms' features were addictive to children, and that excessive use of social media causes physical and mental harms to addicted children. J.A. 152–164. NetChoice did not challenge her qualifications, rebut any of the studies, or submit any of its own contrary evidence.

- 13 -

Rather, in seeking a preliminary injunction, NetChoice declined to dispute the Commonwealth's evidence of the harms that social media platforms inflict on Virginia's children. J.A. 3 (citing J.A. 153). NetChoice also declined to develop a factual record demonstrating the Parental Control Provision's range of applications to Virginia's children, despite relying nearly exclusively on purported violations of the First Amendment rights of Virginia's children and adults in its preliminary injunction briefing on the merits of its First Amendment claim. Dkt. 5 at 9–19.[1] NetChoice never, for instance, showed how much time Virginia children spent on each member platform on average, nor did it even attempt to estimate how many parents would keep the one-hour default, much less increase or decrease it.

NetChoice put forth some facts about the application of the law to NetChoice's members—albeit contradictory ones. On the one hand, NetChoice claimed that the Parental Control Provision would inflict irreparable harm on its members because putting "parental consent tools" in place would require the expenditure of "significant resources"

---

[1] "Dkt." references ECF numbers of documents filed before the district court; "4th Cir. Doc." references ECF numbers of documents filed before this Court.

- 14 -

and harm "their business models." J.A. 145. On the other hand, NetChoice claimed that its members *already had* parental controls in place. J.A. 134–137.

### G. The district court finds Virginia has a compelling state interest, but still enjoins the law as facially invalid under the First Amendment

The district court credited the Commonwealth's unrebutted evidence of the harm that social media platforms are inflicting on Virginia's children. J.A. 3. Among other facts, the district court recognized that social media platforms' "[f]eatures such as tailoring content to the individual user, infinite scroll, push notifications, and validation mechanisms (likes, etc.) lure users to stay tuned into or return to their social media"; that children are "particularly susceptible" to social media platforms' "addictive" nature; and that Virginia is "facing a mental health crisis among its youth." J.A. 3. As a result, the district court found that Virginia has a compelling interest in protecting children. J.A. 20.

Still, the district court granted a preliminary injunction. J.A. 27. In finding NetChoice likely to succeed on its First Amendment claim, the court first concluded that NetChoice's challenge sought to prove that the Parental Control Provision was "unconstitutional in every conceivable

- 15 -

application," and so the court declined to "weigh[] [the Provision]'s applications" to determine whether its "unconstitutional applications substantially outweigh its constitutional applications." J.A. 13–14.

Next, the district court concluded that the Parental Control Provision is content based because, in defining "social media platform," the Provision "exempts certain subject matter." J.A. 18. Rather than focusing on the functional portion of the Provision that actually defines "social media platform," the court emphasized the statutory *examples*— "news, sports, entertainment, ecommerce, or interactive gaming content"—of forums with "content preselected by the provider." J.A. 13–14. The court also faulted the Provision for regulating "user-generated" but not "provider-selected speech," reasoning that this "speaker preference" "should be treated as though it is content based." J.A. 18.

The district court then concluded that the Parental Control Provision failed both strict and intermediate scrutiny, based on its determinations that the Provision was not narrowly tailored and that Virginia had not tried "other less restrictive means to achieve [its] goals," like "launch[ing] advertising campaigns to ensure parents know how to use the current tools" provided by social media platforms. J.A. 20–23.

Prior to the preliminary injunction, the Attorney General sent compliance letters to social media platforms, triggering the Parental Control Provision's 30-day notice-and-cure period. Va. Code § 59.1-584(B); *see* News Release, Office of the Attorney General, Attorney General Jay Jones Takes Steps to Keep Virginia's Children Safe from Predatory Social Media Companies (Feb. 16, 2026), https://tinyurl.com/y3p96smd. Those enforcement efforts are now paused.

The Attorney General noticed an appeal from the district court's order on March 3, 2026. J.A. 321.

## STANDARD OF REVIEW

The grant of a preliminary injunction is reviewed for abuse of discretion, but legal conclusions are reviewed "de novo." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024).

## SUMMARY OF ARGUMENT

In granting the preliminary injunction, the district court made three fundamental errors on likelihood of success, each warranting vacatur of the preliminary injunction.

First, the district court misconstrued the pre-enforcement facial challenge standard. Despite the Supreme Court's recent reminder in

- 17 -

*Moody v. NetChoice, LLC*, 603 U.S. 707, 724–26 (2024), the district court declined to engage with the Parental Control Provision's full scope or to weigh its constitutional versus unconstitutional applications, instead focusing on select hypotheticals. In doing so, the court categorically enjoined Virginia's nuanced statute without parsing its many applications that impose only minimal and incidental burdens on speech. Had the district court conducted the proper analysis, it would have recognized that many (if not all) of the Provision's applications are constitutional, which is fatal to NetChoice's facial challenge.

Second, the district court misread the Parental Control Provision as discriminating based on content. But the Provision imposes a one-hour default on all social media platforms, no matter their content. The district court nonetheless deemed the Provision content based because it defines "social media platform" as not including websites that predominantly feature "content preselected by the provider and not generated by users" and offered as examples material those sites commonly publish, like "news, sports, entertainment, ecommerce, or interactive gaming content." Those examples are not content-based carveouts. Social media platforms are covered—and non-social media

- 18 -

sites are excluded—no matter the subject matter, messages, or viewpoints on their pages.

Third, in concluding that the Parental Control Provision is insufficiently tailored, the district court distorted both the intermediate and strict scrutiny standards. Missing the Supreme Court's guidance in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025), the district court demanded that the Provision exactly fit the problem at hand. But the Provision is more than sufficiently tailored to survive intermediate scrutiny. The one-hour adjustable limit targets social media addiction and imposes only incidental hurdles to accessing social media. And contrary to the district court's suggestion, even strict scrutiny would not limit Virginia to the tools that platforms have voluntarily provided in protecting its children, which would leave the Commonwealth with no effective way to protect children.

Having incorrectly resolved the merits, the district court then neglected the other preliminary injunction factors, including Virginia's and the public's overwhelming—indeed, compelling—interest in protecting children. The Parental Control Provision became effective on January 1, 2026, and the Attorney General began enforcement efforts.

The preliminary injunction paused those efforts, leaving the Commonwealth's children at the mercy of the platforms. Virginia and its children suffer irreparable harm each day that the Commonwealth is unable to enforce the Provision. That significant injury is not outweighed by the purported First Amendment harms that worry NetChoice. The Provision enables both children and social media platforms to convey whatever content they desire in the amount of time that parents permit their children to access the platform.

## ARGUMENT

### I. A preliminary injunction is an extraordinary remedy that places the burden on the plaintiff to show entitlement to the injunction

A preliminary injunction is an "extraordinary and drastic remedy," and is "never awarded as of right"—it is the "exception," not the "rule." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (cleaned up). Plaintiffs seeking a preliminary injunction must show that: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Miranda v. Garland*, 34 F.4th 338, 358 (4th Cir. 2022).

- 20 -

A plaintiff's "failure to show any one of the relevant factors mandates denial of the preliminary injunction." *E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, 807 F. Supp. 3d 517, 530 (E.D. Va. 2025) (cleaned up)).  Because NetChoice is not likely to succeed on the merits and the balance of equities and public interest strongly favor the Commonwealth, this Court should vacate the district court's order.

## II.    The district court erred in concluding NetChoice was likely to succeed on the merits

### A.    The district court misapplied recent Supreme Court precedent in evaluating Plaintiffs' facial challenge

#### 1.    The district court applied the wrong standard

In a facial challenge under the First Amendment, the hurdle to obtain a preliminary injunction is particularly high.  Unlike an as-applied challenge, where an individual seeks to prevent the law from being applied to *him*, in a facial challenge, the plaintiff attempts to invalidate the law wholesale and prevent it from applying to *anyone*.  "Claims of facial invalidity often rest on speculation about the law's coverage and its future enforcement," *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (cleaned up), risking "premature interpretation of statutes on the basis of factually barebones records," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (cleaned up).

Facial challenges also "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.

To succeed on a facial challenge, a plaintiff must do more than simply point to a handful of hypothetical scenarios in which the law might run up against the First Amendment. Instead, a plaintiff must establish that the law's "unconstitutional applications *substantially* outweigh its constitutional ones." *Moody*, 603 U.S. at 723–24 (emphasis added).

In *Moody v. NetChoice*, the Supreme Court established a two-step approach to evaluate facial challenges brought under the First Amendment. First, courts must evaluate a law's "scope" by considering the "activities" it covers and the "actors" it regulates. *Moody*, 603 U.S. at 724. Second, courts must identify which of a law's many applications would violate the First Amendment and which would not. *Id.* at 725.

The district court failed to conduct this analysis at all. It dismissed the need to parse and weigh the law's full set of applications based on its determination that NetChoice had opted to prove that the law was "unconstitutional in every conceivable application," rather than that the

- 22 -

Provision's unconstitutional applications substantially outweigh its constitutional applications. J.A. 13–14. That conclusion was wrong, both in assessing NetChoice's stated argument and in applying the First Amendment.

No matter the substantive basis of a First Amendment challenge to a statute, and no matter the tier of scrutiny, the plaintiff must follow the procedural framework of cataloging the law's applications and showing the unconstitutional ones "substantially outweigh" constitutional ones. *Moody*, 603 U.S. at 724, 740 (requiring this for state statutes limiting platforms' editorial discretion, whether subject to "strict or intermediate scrutiny"); *see also, e.g.*, *GLBT Youth in Iowa Schs. Task Force v. Reynolds*, 114 F.4th 660, 669–70 (8th Cir. 2024) (same for "content-based" restriction on books available in school libraries); *Doe v. Burlew*, 165 F.4th 525, 532–33 (6th Cir. 2026) (same for ban on anonymous social media profiles). Even content-based statutes subject to strict scrutiny are not automatically unconstitutional in all applications—they impose different burdens in different situations, each of which must be catalogued and analyzed for a sufficient interest and tailoring. *NetChoice, LLC v. Bonta*, 170 F.4th 744, 755–60 (9th Cir. 2026).

The Ninth Circuit rejected NetChoice's contrary position just last month. *Bonta*, 170 F.4th at 755–56. Like here, the district court concluded that California's statute "burdens speech based on content in *every* application." *Id.* at 755. The Ninth Circuit reminded NetChoice that, rather than focusing on its preferred hypotheticals, it must "establish [a] factual record so that the district court could [] properly consider[] every conceivable application." *Id.* at 758. "[N]either parties nor courts can disregard the requisite inquiry into how a law works in all of its applications." *Id.* at 758 (quoting *Moody*, 603 U.S. at 744).

That is what happened here. There was no proof of the universe of platforms covered or what speech they convey, and there was no analysis of whether the speech at issue is expressive, commercial, or unprotected altogether. Nor did the district court consider how many parents will agree to change the default, and by how much. The district court did not even address whether it is "'realistic' rather than 'fanciful'," *Burlew*, 165 F.4th at 532, that the Provision would operate to prevent swaths of teenagers from viewing religious, science, or history programming on social media platforms. *See* J.A. 21.

In its briefing below, NetChoice engaged in pure fancy, speculating that young children are clamoring to listen to hours and hours of Fourth Circuit arguments.  Dkt. 5 at 24; 4th Cir. Doc. 15 at 6.  As much as the Commonwealth wishes that teens were so engaged with this Court's happenings, it further wishes the district court had held NetChoice to its burden to prove it, and then prove that these teens could not get a parent to adjust the default limit so they could listen to Fourth Circuit arguments, and then prove that these intrepid teens could not simply download the arguments and listen as long as they wanted.  The district court did not consider these questions—and the record provides no answers.

Where district courts fail to conduct the necessary analysis of whether the law's unconstitutional applications substantially outweigh its constitutional ones, many circuit courts have agreed on the proper recourse:  vacate the district court's order, and remand for application of the proper test.  *E.g.*, *Burlew*, 165 F.4th at 527 (vacating and remanding where district court "did not engage in the demanding comprehensive review that a facial challenge requires"); *NetChoice, LLC v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025) (vacating and remanding because, "[b]y not

- 25 -

determining the full scope of actors regulated by the Act and the activities it regulates, the district court did not apply *Moody* in the manner now required"); *GLBT Youth in Iowa Schs. Task Force*, 114 F.4th at 670 (vacating and remanding where the district court "did not perform the necessary inquiry set forth in *NetChoice*"). Vacatur at least is warranted, but in light of the clearly proper applications of this law, vacatur with instructions to deny the motion is more appropriate.

### 2. The Parental Control Provision's many constitutional applications outweigh any unconstitutional applications

Parsing the Parental Control Provision's many applications would have revealed that virtually all of them involved only minimal and incidental burdens on speech. Though NetChoice failed to satisfy its burden to develop the "record . . . on third-party speech and the full scope of a law's potential applications," *Bonta*, 170 F.4th at 755 (cleaned up), many of the Provision's constitutional applications are readily apparent from the text of the law.

The most obvious example is the incidental burden that age verification imposes on adults' speech. The Supreme Court already has ruled on this specific issue, so there can be no question that requiring

- 26 -

adults to verify their ages is a constitutionally allowable incidental burden on speech. Where laws impose only an incidental burden on speech, intermediate scrutiny applies. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 483 (2025); *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968). And because the Parental Control Provision readily survives intermediate scrutiny (see *infra* at 44–48), NetChoice cannot establish that the unconstitutional applications of the Provision outweigh those many constitutional applications—let alone that the Provision is unconstitutional in every conceivable application.

In *Free Speech Coalition*, the Supreme Court considered the First Amendment burdens associated with regulating minors' access to obscene speech. 606 U.S. at 466. Even though adults have the right to access obscene speech and "submitting to age verification is a burden on the exercise of that right," the Court recognized that "simply requir[ing] proof of age to access content that is obscene to minors . . . does not directly regulate the protected speech of adults." 606 U.S. at 482. Thus, any burden age verification imposes on adults is "only incidental to the statute's regulation of activity that is not protected by the First

- 27 -

Amendment." *Id.* at 482–83. Such incidental burdens are subject to intermediate scrutiny. *Id.* at 483.

The same is true of the burden that the Parental Control Provision imposes on adults. There is no "First Amendment right to avoid age verification." *Free Speech Coal.*, 606 U.S. at 483. Just as "simply requir[ing] proof of age to access content that is obscene to minors . . . does not directly regulate the protected speech of adults," *id.* at 482, requiring proof of age before allowing users who want to spend more than an hour on the platform to proceed to the requested media does not directly regulate the protected speech of either the users or the platforms. Likewise, the burden of age verification is here, too, incidental to the regulation of activity not protected by the First Amendment: requiring social media platforms to provide parents with effective tools to protect their children's health and welfare.

In many applications of the Parental Control Provision, age verification is the only burden that the Provision imposes on speech for both adults *and minors.* That is because the Provision does not ban any platform from conveying any message to any user, nor does it impose any rigid time limit on their ability to do so. The Provision imposes only a

- 28 -

default setting, giving parents—not the government, and not social media platforms—the final say and the ability to override that default in either direction. Only in instances where parents decline to extend the amount of time that their children can spend on social media platforms will the Provision operate to restrict access to speech.

Similarly, NetChoice and the district court mischaracterized the Provision's burdens on children's speech. It is at least odd for NetChoice to assert the rights to free speech for the children whose mental health its members are destroying—but in any event, NetChoice failed to grapple with the incidental nature of the burden below. NetChoice's briefing focused on its speculation on harm to children under 16 from being limited to only one hour on each platform a day. Dkt. 5 at 12, 17–19. But that is not the burden on children. NetChoice loves repeating over and over how its member platforms already give parents the choice of how long to allow their children to use those platforms.[2] So its members' user base cannot assert a right against parental permission (a right that does not exist in any event). Rather, the only right they can

_____

[2] *E.g.*, J.A. 80, 82–85, 87, 134–106, 138, 145–146; Dkt. 5 at 3, 5–7, 18; Dkt. 28 at 12; 4th Cir. Doc. 15 at 24.

- 29 -

assert is a right against the parental choice starting at a one-hour limit and facing the *burden* of having a parent change the setting.  There is no reasonable argument that this minimal burden possibly could be subject to anything greater than intermediate scrutiny.

In that sense, too, *United States v. O'Brien* is instructive.  There, the Supreme Court affirmed the constitutionality of a law restricting the destruction of draft cards, concluding it imposed a permissible, incidental burden on speech.  391 U.S. at 376–77, 382–86.  In so doing, the Court distinguished between statutes whose "necessary scope and operation" abridge constitutional rights, and statutes that have "no such inevitable unconstitutional effect."  391 U.S. at 384–85.  The Parental Control Provision has no inevitable unconstitutional effect:  instead, the inevitable effect is that parents will have to decide the amount of time that their children can spend accessing each social media platform, which is the very protection that NetChoice says its members already offer to parents.

Finally, there is the burden on NetChoice's members.  As the Supreme Court made clear in *Moody*, a platform is not necessarily engaged in protected expression simply because it disseminates speech;

rather, whether such dissemination constitutes expression turns on specific facts about the platform's functions and how it transmits speech. *See, e.g.*, 603 U.S. at 725–26. Nothing in the Parental Control Provision regulates NetChoice members' choices about how to "curate" speech. Dkt. 5 at 20; *see also Moody*, 603 U.S. at 725. And NetChoice's arguments that the Provision's requirement of parental consent prohibits its members from speaking are surprising, given the frequency with which it claims that its members are *already* imposing parental consent tools. *See supra* n.2. Let alone the consistency with which its members disavow being speakers altogether when convenient. *See, e.g.*, *Enhanced Athlete Inc. v. Google LLC*, No. 19-cv-08260-HSG, 2020 WL 4732209 (N.D. Cal. Aug. 14, 2020) (Google and YouTube relying on defense that they shall not "be treated as the publisher or speaker of any information provided by another information content provider" under 47 U.S.C. § 230).

NetChoice's argument that the Parental Control Provision imposes new burdens on its members' speech turns on a concession: the existing parental controls it hides behind are toothless. Conversely, if social media platforms' existing parental controls work, then the burden that the Provision imposes on social media companies is to adjust the default

setting on controls that they already tout. Upon changing that setting, the companies likely would choose to switch from creating a maze of clicks and taps, to making it easy for parents to change the setting from one hour to something greater, but that is not a burden required by the Parental Control Provision. No one—not NetChoice's members, not adult users, and not children—is subject to more than an incidental burden on speech.

## B.    The district court erred in applying strict scrutiny

The district court should not have applied strict scrutiny to the Parental Control Provision for two independent reasons. First, regardless of content neutrality, incidental burdens on speech are subject to the intermediate scrutiny framework. *Free Speech Coal.*, 606 U.S. at 483; *see supra* at 26–28. Second, to the extent that the Parental Control Provision imposes any direct burdens on speech, those limitations do not run afoul of the First Amendment. Freedom of speech, although powerful, "is not absolute." *Free Speech Coal.*, 606 U.S. at 470 (cleaned up). The government has "leeway to regulate features of speech unrelated to its content" and to "impose reasonable restrictions on the time, place, or manner of protected speech." *McCullen v. Coakley*, 573 U.S. 464, 477

(2014) (cleaned up). When such regulations are "justified without reference to the content of the regulated speech," they, too, are subject to intermediate scrutiny. *Hebb v. City of Asheville*, 145 F.4th 421, 432 n.7 (4th Cir. 2025) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

The government's leeway to establish such content-neutral regulations is even greater for speech to and from minors. The government lacks "a free-floating power to restrict the ideas to which children may be exposed," but it does have broad authority to regulate *when* and *how* that speech occurs. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 789, 794–95 (2011). "[T]he protection of minors" is, after all, "one of government's most profound obligations." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1495 (11th Cir. 1990).

In passing the Parental Control Provision to fulfill that profound obligation to protect minors, the Commonwealth did not restrict any content "because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Instead, the Provision's one-hour default applies "without reference to the content of the

regulated speech." *Id.* at 164 (cleaned up); *see also Courthouse News Serv. v. Smith*, 126 F.4th 899, 909 (4th Cir. 2025) (same).

### 1.    SB 854 does not regulate the content on social media platforms

In considering Florida's more restrictive law governing children's access to social media platforms, both the district court and the Eleventh Circuit preliminarily agreed that intermediate scrutiny is the proper standard. *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 4:24-cv-438-MW/MAF, --- F.Supp.3d ----, 2025 WL 1570007, at *13 (N.D. Fla. June 3, 2025); *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *3 (11th Cir. Nov. 25, 2025). The Florida law completely "restricts social media platforms' ability to contract with children under a certain age if those platforms include certain addictive features," regardless of parental consent. 2025 WL 3458571, at *4. Both courts reasoned that, although that law implicated the First Amendment, it was content neutral. *Id.* at *3. The law could be justified without reference to content: *i.e.*, because "the use of push notifications, infinite scroll, auto-play video, live-streaming, and displays of personal interactive metrics is addictive to children and causes them to spend more time on the platforms than is healthy." 2025 WL 1570007, at *14;

*see also* 2025 WL 3458571, at *4.  And the implicated "speech generated by users on social media platforms, can touch on any conceivable topic, message, or idea."  2025 WL 1570007, at *14.

So, too, here.  Nothing about the Parental Control Provision restricts platforms' ability to decide "what third-party speech to display and how to display it" during that default time period.  *Moody*, 603 U.S. at 716.  The Provision does not require platforms to block, filter, or otherwise modify the content or features they make available to children. It thus has no substantive effect on whatever "expressive product[]" platforms create when they curate and disseminate information to their users.  *Moody*, 603 U.S. at 716.  This distinguishes the Provision from other monitoring, filtering, or content-blocking regulations that courts have classified as content based.  *See, e.g., NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1016 (9th Cir. 2025) ("like counts"); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1036 (W.D. Tex. 2024) (monitoring and filtering requirements that "explicitly identif[ied] discrete categories of speech and single[d] them out to be filtered and blocked"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1114–15, 1123 (D. Utah 2024) (setting certain privacy settings, restricting minors'

ability to share content, and disabling certain features).  Again, the Provision imposes no limitation on *what* platforms can say to children.

The Parental Control Provision remains content neutral for the children using the platforms.  It does not single out any subject matter, message, or viewpoint for restriction.  Children may spend their time on social media platforms however they wish, whether "participating in church services," "watching a candidate's launch announcement," "discussing college applications," *cf.* ECF 28 at 17, or using social media for less innocuous purposes.  Because it preserves users' freedom to engage with any content, the Provision poses no risk of "excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).

### 2.    SB 854 distinguishes between speakers based on functional features, not content

Nor do the Provision's terms defining which platforms are considered "social media platforms" render the Provision content based. The Supreme Court has soundly rejected the notion "that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Turner*, 512 U.S. at 660.  "[S]uch scrutiny is unwarranted when the differential

treatment is justified by some special characteristic of the particular speaker being regulated" and the distinction does not reflect a "content preference." *TikTok Inc. v. Garland*, 604 U.S. 56, 72–73 (2025) (*per curiam*) (cleaned up). That is the case here.

The General Assembly adopted the one-hour default not "because of disagreement with the message the speech conveys," *Reed*, 576 U.S. at 164 (cleaned up), but rather to address the unique psychological and physical health risks to children posed by prolonged exposure to social media. Nothing about the Parental Control Provision "raise[s] suspicion" that the General Assembly's "objective was, in fact, the suppression of certain ideas." *Turner*, 512 U.S. at 660. Social media platforms employ "new technologies with transformative capabilities," creating a "challenging new context" that "counsels [judicial] caution." *TikTok*, 604 U.S. at 62. Unlike other forums, social media platforms use algorithms and other features like autoplay, infinite scrolling, and push notifications to hook users. J.A. 154–157, 162. Those unique features pose particular dangers to children. The Provision carefully distinguishes forums posing those risks from those that do not.

Because social media platforms, rather than the content of the speech they host, are responsible for the crisis children face, the Provision sets out which platforms are responsible for that harm. The Provision defines a covered platform based on whether it "[c]onnects users in order to allow users to interact socially with each other," and whether it allows users to construct a public or semipublic profile, populate a public list of social connections with other users within the platform, and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users." Va. Code § 59.1-575. Those functional criteria are not focused on the subject matter, message, or viewpoint of the speech itself. *See Hulbert v. Pope*, 70 F.4th 726, 733–34 (4th Cir. 2023). They focus on the features of the platforms that induce minors' addiction.

Nor does the Provision exempt other platforms from coverage based on the content of their speech. Again, the exception turns on form. The Provision explains that:

> No service or application that consists primarily of news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users, and for which any chat, comments, or interactive functionality is incidental to,

> directly related to, or dependent on the provision of such content, or that is for interactive gaming, shall be considered to meet this criterion on the basis of that function alone.

Va. Code § 59.1-575 (emphasis added). The exemption is content-ambivalent; it applies only when content (of any kind) is "preselected by the provider and not generated by users." *Id.* Unlike social media where "chat, comments, or interactive functions" are integral to the very purpose of the platform, the services that fall within the exemption have these interactive functions as only "incidental to," "related to," or "dependent on" the provider-preselected content. That exemption describes "a *form* of expression, not a *subject matter*." *Uthmeier*, 2025 WL 3458571, at \*4 (emphasis in original).

### 3.    The district court erred in finding to the contrary

The district court wrongly concluded that the Parental Control Provision is content-based because, in describing which platforms do not constitute social media platforms, it "favors provider-selected speech over user-generated speech." J.A. 18. But the Provision does not indirectly discriminate against certain content or viewpoints by "favor[ing] provider-generated speech over user-generated speech." J.A. 18. The Commonwealth is focused on regulating "the manner in which expressive

activity occurs, not its content," *Bruni v. City of Pittsburgh*, 941 F.3d 73, 87 (3d Cir. 2019)—the use of "push notifications, infinite scroll, auto-play" and other features that are "addictive to children and cause[] them to spend more time on the platforms than is healthy," *Uthmeier*, 2025 WL 3458571, at *5. That regulation of interactive features "may affect certain speakers and topics more than others, but that is not enough to make it content based." *Id.*

Nor does the Parental Control Provision "overtly make[] a distinction based on the following topics: news, sports, entertainment, and ecommerce," J.A. 16–17, as the district court concluded. The Provision's usage of news, sports, entertainment, and ecommerce as *examples* of "content preselected by the provider" are not content-based carve outs. Grammatically and logically, "content preselected by the provider" is the overarching category subsuming more specific examples. *See Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920).

Compare the Provision with, for example, one that criminalizes altering "any record, document, or tangible object." *Yates v. United States*, 574 U.S. 528, 544 (2015). "Tangible object" is the general category, and "records" and "documents" are a "subset"—illustrative

- 40 -

examples informing the meaning of "tangible object." *Id.* Because "tangible object" is both the broadest term and ends the list, no magic word—like "other"—is required to indicate its catchall status.

The same is true here. The Parental Control Provision spares no social media platform because users discuss politics and celebrities or sell used furniture to neighbors. And the Provision excludes sites like ESPN, Disney+, Encyclopedia Britannica, Khan Academy, WebMD, and the *Washington Post* not for their subject matter, but because they do not function as social media platforms, regardless of whether they primarily provide "news, sports, entertainment, [and] ecommerce." Va. Code § 59.1-575.

Even if the alternative reading NetChoice pressed and the district court endorsed below has any credence (and it does not), both NetChoice and the district court were bound by the Commonwealth's "limiting construction." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). The Attorney General is the only party that can enforce this statute, and he has reasonably and "in plain terms [ ] interpreted" the Provision to not provide content-based carve outs for news, sports, entertainment, ecommerce, and interactive gaming. *Id.* at 617. That construction must

- 41 -

be respected. *Giovani Carandola, Ltd. v. Fox*, 470 F.3d 1074, 1084 (4th Cir. 2006).

### C. The district court erred in concluding the Parental Control Provision is insufficiently tailored

#### 1. The district court correctly concluded that the Commonwealth's interest in protecting children is compelling

As the district court correctly recognized, Virginia has significant interests in protecting its children from the well-documented epidemic of youth social media addiction and in promoting parental control over children's social media usage. J.A. 20. Like many things, social media can be harmless, even beneficial, in moderation. J.A. 162–163. But when overused by children, it poses "unprecedented dangers." *Moody*, 603 U.S. at 716. Study after study has linked excessive social media usage to poor mental health, J.A. 157–161, prompting the Surgeon General to issue a health advisory on youth social media use and calling on policymakers to "[p]ursue policies that further limit access . . . to social media for all children," J.A. 184. Virginia adopted the Parental Control Provision to protect its children and to empower parents to do the same.

"It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is

- 42 -

'compelling.'" *New York v. Ferber*, 458 U.S. 747, 756–57 (1982) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982)). As the Eleventh Circuit recently recognized in a challenge to Florida's social media law, the State has a "legitimate and substantial interest in regulating young minors' use of platforms employing addictive features." *Uthmeier*, 2025 WL 3458571, at *6 (staying preliminary injunction of law prohibiting children 13 and under from having social media accounts at all and requiring parental approval for 14- and 15-year-olds). And as Governor Youngkin stated when he signed the Parental Control Provision into law, the Provision will result in "[m]ore healthy, safe kids in Virginia." J.A. 243.

The Commonwealth also has a "significant interest" in "strengthening parental responsibility for children." *Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 848 (4th Cir. 1998). Putting parents in the driver's seat, the Parental Control Provision gives parents more tools to protect their children and to foster healthy social media usage. *See* J.A. 243 (noting the Provision "put[s] parents back in control").

### 2.    The Provision readily survives intermediate scrutiny

The Parental Control Provision is sufficiently tailored to address the Commonwealth's compelling interest. The Provision readily survives the intermediate scrutiny applied to content-neutral laws and to laws that only incidentally burden speech, under which "a regulation is adequately tailored so long as the government's interest 'would be achieved less effectively absent the regulation' and the regulation 'does not burden substantially more speech than is necessary to further that interest.'" *Free Speech Coal.*, 606 U.S. at 496 (quoting *TikTok*, 604 U.S. at 76); *see also McCullen*, 573 U.S. at 479–80. The district court erred in concluding otherwise.

The Parental Control Provision effectively advances the government's objective by setting a one-hour default limit per platform, per day, which targets the root of the problem: addicted children's relentless scrolling for hours on end. J.A. 151–154, 160–161, 174, 178. Imposing a parentally adjustable default time limit "alleviates that harm in a direct and material way" by giving parents control without preventing children from engaging in their desired speech. *Courthouse News Serv.*, 126 F.4th at 913 (cleaned up); *see also* J.A. 21 (recognizing that minors that exceed

- 44 -

the default can obtain the same content and messages through other forums).

At the same time, the Parental Control Provision does not burden substantially more speech than necessary. The Provision does not bar any child from any social media platform, nor does it bar them from any features or content on those platforms. It just places the decision of how much time children can spend on social media in parents' hands. *Compare Packingham v. North Carolina*, 582 U.S. 98, 107–08 (2017) (striking down law completely prohibiting sex offenders from accessing any social media sites), *with Uthmeier*, 2025 WL 3458571, at *9 (concluding statute banning children's access to social media without parental approval was likely sufficiently tailored).

In finding to the contrary, the district court effectively applied strict scrutiny by another name. *Compare, e.g.*, J.A. 23 (relying on *Brown*, 564 U.S. at 805, to find the Provision insufficiently tailored), *with Uthmeier*, 2025 WL 3458571, at *7 & n.10 (explaining that "cases centered on impermissible content-based restrictions," like *Brown*, are "inapplicable to an intermediate scrutiny analysis"). J.A. 21, 23. For instance, the district court concluded the Provision is overinclusive and "covers a

significant amount of protected speech" based on a handful of hypothetical scenarios that NetChoice' conjured up—*e.g.*, that the Provision might have the effect of preventing some children from viewing online church services or scientific programming that lasted more than an hour. J.A. 23.

But intermediate scrutiny does not demand that a statute limit its reach to "only unprotected speech," or that it be "the least intrusive means of achieving the desired end." *Uthmeier*, 2025 WL 3458571, at *6, *8 (cleaned up). A statute may cover protected speech so long as it does not "burden s*ubstantially* more speech than is necessary" to address the problem. *Free Speech Coal.*, 606 U.S. at 496 (quoting *TikTok*, 604 U.S. at 76) (emphasis added); *see Grayned v. City of Rockford*, 408 U.S. 104, 120 (1972) (upholding statute prohibiting picketing near schools even though it "prohibits some picketing that is neither violent nor physically obstructive" and "[s]uch expressive conduct may be constitutionally protected at other places or other times").

NetChoice's hypotheticals provide no basis to believe that the Parental Control Provision burdens substantially more speech than necessary. Indeed, nothing in the record suggests that the Provision

- 46 -

"blocks minors' access" to any speech or that minors "would be barred from watching an online church service" or "science or history programming." J.A. 21. All they have to do is get their parents' permission to watch more than an hour. And they have to get that permission only once—by having their parent change a base setting. This is at most an incidental burden on speech, and as far from a ban on speech as possible without completely giving up on protecting children at all. Moreover, even in the hypothetical where a child's parents do not change the default time limit, the child can look to other, less addictive forms of media for online church or educational programming. These supposed burdens do not prevent the Provision from being sufficiently tailored. *See Uthmeier*, 2025 WL 3458571, at *6–8.

The district court made further errors in its tailoring analysis, like deeming the Provision overinclusive because "its age verification burdens adults' . . . rights to access protected speech." J.A. 23. The Supreme Court rejected that position just last Term in *Free Speech Coalition*. Age verification is a "modest" and common tool used to "protect[] children" while "allowing adults full access to the content in question." 606 U.S. at

- 47 -

496 (upholding age verification for adults accessing pornography as "sufficiently tailored"); *see supra* at 26–28.

Finally, the district court wrongly considered the Provision to be underinclusive because it does not address digital gaming, citing extra-record studies suggesting that gaming can be addictive, too. J.A. 23–24. But a State need not "address all aspects of a problem in one fell swoop." *Free Speech Coal.*, 606 U.S. at 498 (cleaned up). Social media poses particular harms to children, and the Commonwealth acted to resolve that problem. Virginia cannot be blamed for not regulating all other addictive products in the same statute.

### 3. The Parental Control Provision survives even strict scrutiny

The Parental Control Provision would also survive strict scrutiny, which requires that a law be "the least restrictive means of achieving a compelling state interest." *McCullen*, 573 U.S. at 478. In concluding that the Provision was not the least restrictive means available to address the Commonwealth's compelling interest, the district court waved away the Commonwealth's focus on what would be "effective" to address the harms to children. That, too, was error.

- 48 -

The district court dismissed the Commonwealth's argument that "current parental controls were not working because parents were not taking advantage of them." J.A. 22. It concluded that "the question is not whether [the Provision] would be effective, but whether there are less restrictive alternatives," J.A. 22, citing *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000). J.A. 22.

*Playboy* does not support that conclusion, and indeed undermines it. There, the challenged law required cable television operators who provide channels "primarily dedicated to sexually-oriented programming" either to "fully scramble or otherwise fully block" those channels, or to limit their transmission to the hours between 10 p.m. and 6 a.m., when children are less likely to watch. *Playboy Ent. Grp.*, 529 U.S. at 806. Following a trial, a three-judge district court concluded that "a regime in which viewers could order signal blocking on a household-by-household basis presented an effective, less restrictive alternative." *Id.* at 807. On appeal, the Supreme Court agreed that the alternative restriction was "less restrictive" than the one the government imposed, and that "the Government cannot ban speech if" a less restrictive alternative "is a feasible *and effective* means of furthering its compelling

- 49 -

interests." *Id.* at 815 (emphasis added). The Supreme Court further specified: "This is not to say that the absence of an effective [alternative] will in all cases suffice to support a law restricting the speech in question; but if a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id. Playboy* therefore strongly suggests that, in at least some cases, the absence of an effective alternative *would* suffice to support a law restricting speech.

That is the case here. The district court faulted Virginia for not trying other means to resolve the problem, reasoning that "parents have ample tools to limit minors' access to social media" and suggesting that the Commonwealth "work with companies and launch advertising campaigns to ensure parents know how to use the current tools effectively." J.A. 22. The Eleventh Circuit rejected that exact argu-ment. *Uthmeier*, 2025 WL 3458571, at *8. Here, the General Assembly passed the Parental Control Provision (with Meta's support) in an atmosphere where existing tools parents already had were not working to protect Virginia's children. J.A. 154–162.

The evidence showed that, despite Virginia's efforts, "both parents and children struggle" to use platform-implemented controls. J.A. 161–

162. That was not for lack of trying by the Commonwealth. For instance, in 2024, the Governor issued an executive order directing the Secretary of Education, Secretary of Health and Human Resources, Superintendent of Public Instruction, the Virginia Department of Education, and the State Health Commissioner to issue guidance establishing cell phone-free education policies and procedures in Virginia's K-12 public schools. J.A. 196–199. Later that year, the Governor created the Reclaiming Childhood Task Force to disseminate information to parents about tools to promote healthy social media and phone usage for youth. J.A. 201–205. And in 2025, Virginia published a Social Media & Mental Health Toolkit that included strategies for parental guidance and oversight, as well as tools for educators and schools to address student mental health risks. J.A. 212–235.

Because those efforts were ineffective in alleviating the crisis facing Virginia's youth, the General Assembly took the next step of passing the Parental Control Provision. Rather than banning speech altogether, the Provision incentivizes social media platforms to make the controls that they claim already exist more available to parents. *See* J.A. 132–139. NetChoice's General Counsel and Director of Strategy Initiatives

testified that NetChoice members already "give parents, as the proper decisionmakers, an array of tools to guide and oversee their children's online access," including "set[ting] screen limits."  J.A. 134–138.  Absent the Parental Control Provision, platforms' profit incentive means maximizing kids' time on the platform and designing control features that are hard for parents to find and use.  One can reasonably expect platforms to make that feature more prominent if the default is set to one hour.  The Provision therefore provides the least restrictive means available to make parental controls effective.

## III.    The district court erred in concluding that the remaining preliminary injunction factors favored NetChoice

The district court's irreparable harm, balance of equities, and public interest analysis all turned on the existence of a violation of NetChoice members' and users' First Amendment rights.  J.A. 24.  Because the Parental Control Provision does not violate the First Amendment, the district court's assessment of those preliminary factors was also erroneous.  *See, e.g.*, *Miranda*, 34 F.4th at 365 ("Without [an] alleged constitutional injury," NetChoice suffers no "irreparable harm.").

The balance of equities and the public interest support the Commonwealth, not NetChoice.  At most, the Provision imposes inciden-

- 52 -

tal burdens on the speech of platforms and children. Again, this is a default, modifiable time limit, not a ban. And any "compliance costs [NetChoice] might incur do not outweigh the State's interest in enforcing its lawful regulation," *Uthmeier*, 2025 WL 3458571, at \*9, particularly given NetChoice's insistence that its members *already* offer "an array of tools to guide and oversee their children's online access," J.A. 134–137.

The Commonwealth, in contrast, suffers irreparable harm from the district court's injunction, because it is currently prevented from enforcing its bipartisan and unanimously adopted statute protecting its children. The Provision went into effect on January 1, 2026, but social media platforms declined to comply. Before the preliminary injunction, the Attorney General sent compliance letters to several platforms. *See* Va. Code § 59.1-584(A). Those enforcement efforts are now at a standstill. Preventing Virginia from enforcing its law "clearly inflicts irreparable harm on the [Commonwealth]." *Abbott v. Perez*, 585 U.S. 579, 602–03 & n.17 (2018). Indeed, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012)

(Roberts, C. J., in chambers)).  And this is not just any law.  The Provision is intended to serve one of the Commonwealth's most important responsibilities—protecting its children.  *See Ginsberg v. New York*, 390 U.S. 629, 640 (1968) (recognizing the "transcendent interest in protecting the welfare of children" (cleaned up)).

The Parental Control Provision is needed to abate a skyrocketing youth mental health crisis.  *See* J.A. 157–161.  Virginia's interest "in applying the law to its residents and in being permitted to protect its children from health risks weigh heavily in [its] favor."  *Uthmeier*, 2025 WL 3458571, at \*10 (cleaned up).  Platforms' concerns for their bottom lines do not outweigh Virginia's duty to protect its children or the public's interest in the prompt execution of a democratically enacted law protecting the Commonwealth's most vulnerable.

## CONCLUSION

This Court should vacate the district court's preliminary injunction and remand.

## REQUEST FOR ORAL ARGUMENT

The Attorney General of Virginia respectfully submits that oral argument would assist this Court in deciding the constitutional and other consequential questions that this case presents about Virginia's ability to empower parents to protect their children from an unprecedented youth public health crisis.

Respectfully Submitted,

*/s/ Tillman J. Breckenridge*

BENJAMIN L. HATCH
McGuireWoods LLP
World Trade Center
101 West Main Street
Suite 9000
Norfolk, Virginia 23510
T: 757.640.3727
F: 757.640.3947

ERIN B. ASHWELL
JOHN D. ADAMS
McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
T:804.775.1002
F: 804.775.2002

April 15, 2026

JAY JONES
  *Attorney General*

TILLMAN J. BRECKENRIDGE
  *Solicitor General*

TRISTON C. O'SAVIO
  *Assistant Solicitor General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), I certify that this Brief of Appellant is proportionately spaced and contains 10,452 words excluding parts of the document exempted by Rule 32(f).

/s/ Tillman J. Breckenridge
TILLMAN J. BRECKENRIDGE
  *Solicitor General*

## CERTIFICATE OF SERVICE

I certify that on April 15, 2026, the Brief of Appellant was served on all parties or their counsel of record through the CM/ECF system.

/s/ Tillman J. Breckenridge
TILLMAN J. BRECKENRIDGE
  *Solicitor General*