**No. 26-1252**

**UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

NETCHOICE,

*Plaintiff-Appellee*,

v.

JAY JONES, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF VIRGINIA,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:25-cv-02067
Hon. Patricia T. Giles, U.S. District Judge

# APPELLEE'S BRIEF

ERIN E. MURPHY
*Counsel of Record*
JAMES Y. XI
BARRETT L. ANDERSON
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellee*

May 15, 2026

## DISCLOSURE OF CORPORATE AFFILIATIONS

Plaintiff-Appellee NetChoice is a nonprofit entity organized under Section 501(c)(6) of the Internal Revenue Code and has no parent company or stock held by any public corporation.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT OF THE CASE ........ 5

A. Legal and Factual Background ........ 5

B. Procedural History ........ 9

SUMMARY OF ARGUMENT ........ 11

ARGUMENT ........ 14

I. NetChoice Is Likely To Succeed On Its Claim That SB854 Is Unconstitutional On Its Face ........ 14

A. SB854 Triggers First Amendment Scrutiny in All Its Applications ........ 14

B. SB854 Triggers Strict Scrutiny ........ 20

C. SB854 Cannot Survive Any Level of Heightened Scrutiny ........ 29

1. Restricting access to speech is not a permissible means of achieving Virginia's stated interests ........ 29

2. SB854 is not narrowly tailored to achieve Virginia's interests ........ 32

3. SB854 flunks strict scrutiny for additional reasons ........ 39

D. SB854 Is Facially Unconstitutional ........ 42

II. The District Court Did Not Abuse Its Discretion In Finding That The Other Factors Favored Injunctive Relief ........ 54

CONCLUSION ........ 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases**

*Am. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)....53

*Ark. Writers' Project v. Ragland*,
481 U.S. 221 (1987)....36

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)....36

*Billups v. City of Charleston*,
961 F.3d 673 (4th Cir. 2020)....37

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011).... *passim*

*CCIA v. Paxton*,
747 F.Supp.3d 1011 (W.D. Tex. 2024) .... 2, 27

*CCIA v. Uthmeier*,
2025 WL 3458571 (11th Cir. Nov. 25, 2025)....27

*Chamber of Com. v. Lierman*,
151 F.4th 530 (4th Cir. 2025).... *passim*

*Citizens United v. FEC*,
558 U.S. 310 (2010)....24

*City of Austin v. Reagan Nat'l Advert. of Austin*,
596 U.S. 61 (2022).... 21, 24

*Doe v. Burlew*,
165 F.4th 525 (6th Cir. 2026)....51

*Elrod v. Burns*,
427 U.S. 347 (1976)....54

*Encino Motorcars v. Navarro*,
584 U.S. 79 (2018)....22

*Erznoznik v. Jacksonville*,
422 U.S. 205 (1975) ........ *passim*

*Free Speech Coal. v. Paxton,*
606 U.S. 461 (2025) ........ *passim*

*Giovani Carandola v. Bason*,
303 F.3d 507 (4th Cir. 2002) ........ 54

*GLBT Youth v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ........ 51

*Hustler Mag. v. Falwell*,
485 U.S. 46 (1988) ........ 25

*Iancu v. Brunetti*,
588 U.S. 388 (2019) ........ 45, 49, 50

*Interactive Digit. Software Ass'n v. St. Louis Cnty.*,
329 F.3d 954 (8th Cir. 2003) ........ 30

*Loper Bright Ent. v. Raimondo*,
603 U.S. 369 (2024) ........ 23

*McCullen v. Coakley*,
573 U.S. 464 (2014) ........ 29, 37

*Moody v. NetChoice*,
603 U.S. 707 (2024) ........ 5, 30, 42, 43

*Moshoures v. City of N. Myrtle Beach*,
131 F.4th 158 (4th Cir. 2025) ........ 23, 30

*Muldrow v. St. Louis*,
601 U.S. 346 (2024) ........ 22

*NetChoice v. Bonta*,
170 F.4th 744 (9th Cir. 2026) ........ 50

*NetChoice v. Carr*,
789 F.Supp.3d 1200 (N.D. Ga. 2025) ........ 1, 27

*NetChoice v. Fitch*,
145 S.Ct. 2658 (2025) ........................................................................ 27

*NetChoice v. Fitch*,
787 F.Supp.3d 262 (S.D. Miss. 2025) ........................................................ 27

*NetChoice v. Griffin*,
2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ............................................ 1, 27

*NetChoice v. Griffin*,
812 F.Supp.3d 905 (W.D. Ark. 2025) ...................................................... 43, 50

*NetChoice v. Murrill*,
812 F.Supp.3d 594 (M.D. La. 2025) ......................................................... 1, 27

*NetChoice v. Reyes*,
748 F.Supp.3d 1105 (D. Utah 2024) ......................................................... 1, 27

*NetChoice v. Yost*,
716 F.Supp.3d 539 (S.D. Ohio 2024) ........................................................ 27

*NetChoice v. Yost*,
778 F.Supp.3d 923 (S.D. Ohio 2025) ........................................................ 1

*NIFLA v. Becerra*,
585 U.S. 755 (2018) ............................................................................ 29, 33

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ............................................................................ *passim*

*PETA v. N.C. Farm Bureau Fed'n*,
60 F.4th 815 (4th Cir. 2023) ................................................... 37, 38, 39, 48

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ............................................................................ 20

*Reno v. ACLU*,
521 U.S. 844 (1997) ............................................................................ 19, 36

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015) ................................................................ 34

*Schleifer ex rel. Schleifer v. City of Charlottesville*,
159 F.3d 843 (4th Cir. 1998) .......... 29

*Sisters for Life v. Louisville-Jefferson Cnty.*,
56 F.4th 400 (6th Cir. 2022) .......... 53

*Sorrell v. IMS Health*,
564 U.S. 552 (2011) .......... 30

*TikTok v. Garland*,
604 U.S. 56 (2025) .......... 37

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
393 U.S. 503 (1969) .......... 15

*Turner Broad. Sys. v. FCC*,
512 U.S. 622 (1994) .......... 24, 25

*United States v. Playboy Ent. Grp.*,
529 U.S. 803 (2000) .......... 38, 53

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 18, 23, 44, 50

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
425 U.S. 748 (1976) .......... 35

*Washington Post v. McManus*,
944 F.3d 506 (4th Cir. 2019) .......... 30

*Yates v. United States*,
574 U.S. 528 (2015) .......... 22

**Statutes**

Ark. Code §4-88-1401(8)(B) (2023) .......... 22

Fla. Stat. §501.1736(1)(e) .......... 28

Ga. Code Ann. §39-6-1(6)(D) (2024) .......... 22

La. Stat. Ann. §51:1751(12)(b) (2025) .......... 22

Va. Code §59.1-575 .......... *passim*

Va. Code §59.1-577.1(A) ....................10

Va. Code §59.1-577.1(B) .................... 10, 18, 19

Va. Code §59.1-584(C)-(D) ....................10

**Other Authorities**

College Confidential, *The Real Deal on Applying to College*, https://perma.cc/39MA-J8SE....................33

Disney+, *Help Center*, https://perma.cc/K54T-242G ....................28

Elevation Church Network, *FAQs*, https://perma.cc/P2LG-X7WF ....................35

ESPN, *Adjusting Fantasy Alert Preferences*, https://perma.cc/2KPV-WM64 (May 3, 2026) ....................28

Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and Religion*, 75 Emory L.J. (forthcoming 2026), https://perma.cc/LFX6-XMX4 ....................31

Roblox, *Recommendations and Ranking on Roblox*, https://perma.cc/X2YH-CM6V....................28

The Trevor Project, *TrevorSpace Toolkit*, https://perma.cc/4N7R-H2X3 ....................33

## INTRODUCTION

Virginia Senate Bill 854 is one of the latest attempts in a long line of government efforts to restrict new forms of constitutionally protected expression based on concerns about their potential effects on minors. Books, movies, rock music, and video games have all been accused of endangering minors in the past. Today, similar debates rage about "social media." Those debates are important, and the government may certainly participate in them. But the First Amendment does not take kindly to government efforts to resolve them. The Constitution instead leaves the power to decide what speech and how much of it is appropriate for minors where it belongs: with their parents.

Nevertheless, several states have recently enacted statutes restricting minors' access to some of the most popular "social media" services. Courts across the country have held that these laws violate the First Amendment. *See, e.g.*, *NetChoice v. Murrill*, 812 F.Supp.3d 594, 664 (M.D. La. 2025), *appeal filed*, No. 26-30016 (5th Cir.); *NetChoice v. Griffin*, 2025 WL 978607, at *17 (W.D. Ark. Mar. 31, 2025), *appeal filed*, No. 25-1889 (8th Cir.); *NetChoice v. Yost*, 778 F.Supp.3d 923, 947-57 (S.D. Ohio 2025), *appeal filed*, No. 25-3371 (6th Cir.); *NetChoice v. Carr*, 789 F.Supp.3d 1200, 1223-27, 1234 (N.D. Ga. 2025), *appeal filed*, No. 25-12436 (11th Cir.); *NetChoice v. Reyes*, 748 F.Supp.3d 1105, 1120-23, 1134 (D. Utah 2024), *appeal filed*, No. 24-4100 (10th Cir.); *CCIA v. Paxton*, 747 F.Supp.3d 1011, 1032-

34, 1044 (W.D. Tex. 2024), *appeal filed*, No. 24-50721 (5th Cir.). And rightly so. States may certainly take steps to protect minors who use "social media," but requiring minors to obtain parental consent before accessing those websites is not a narrowly tailored means of advancing a legitimate governmental interest. While the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend," it "does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011). Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to proselytize young people." *Id.* They "do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Id.*

Like similar state efforts, SB854 violates the First Amendment. The law bans minors from spending more than an hour a day on a covered "social media" website unless they obtain parental consent. SB854, moreover, does not limit its reach to "social media" as that term is commonly understood. It defines "social media" broadly to reach websites like YouTube, blogging platforms like Dreamwidth, and messaging boards like College Confidential. By restricting the ability of minors (and adults, who must now prove their age) to access these websites, Virginia has

restricted millions of Virginians "from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 107-08 (2017).

Worse still, SB854 does so by drawing a slew of content- and speaker-based distinctions. The Act exempts websites that "consist[] primarily of news, sports, entertainment, ecommerce, or content preselected by the provider … or interactive gaming" content. Va. Code §59.1-575. Minors must obtain parental consent before spending more than an hour watching videos on YouTube, but they can read ESPN to their heart's content or watch hours upon hours of Disney+.

Indeed, throughout this litigation, Virginia has not been coy that the entire point of SB854 is to restrict access to certain websites with *content* and *viewpoints* that Virginia thinks are harmful, and to redirect minors to the Commonwealth's preferred mediums. As Virginia admitted below, it thinks "social media" is particularly harmful because it contains "socially interactive" content that minors find particularly engaging. D.Ct.Dkt.16 at 23. SB854 targets social media websites because minors can go there to see what "friends and classmates think," seek "validation, such as likes or upvotes," and post "content that will garner 'lots of likes/comments.'" J.A.155-156.(¶¶12-13); J.A.160.(¶24). Indeed, Virginia openly touts that its law leaves minors free to gather information from "more traditional sources of information (like the *Washington Post*)," D.Ct.Dkt.16 at 24, and the "*New York Times*," Va.Br.12—fora the Commonwealth apparently prefers. Needless to

say, judgments about the value of different sources of information are "for the individual to make, not for the Government to decree." *Brown*, 564 U.S. at 790. Virginia's government-imposed preference for "traditional sources of information," D.Ct.Dkt.16 at 23, underscores that SB854 is an impermissible attempt "to restrict the ideas to which children may be exposed" in an effort to "protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 794-95.

Virginia insists that time limits on this protected speech are necessary to address "addiction" to "social media," but the Supreme Court has repeatedly explained that the government may not restrict speech just because it is popular. Otherwise, the government could restrict access to the most popular segments of nearly any medium for constitutionally protected speech. Under Virginia's logic, it could restrict minors from spending more than one hour a day playing alluring video games on Xbox Live, watching engaging cartoons on Disney+, reading page-turning novels on Nook, or listening to captivating podcasts on Spotify—all based on its prediction that "too much" of such speech harms minors. The First Amendment does not give Virginia that remarkable—and remarkably dangerous—power.

Even if it did, Virginia has not acted in a narrowly tailored way. SB854 prohibits *all* minors under 16 from spending more than one hour on all manner of websites absent parental consent because (in Virginia's view) *some* minors spend too

much time on them. And it sweeps in websites that there is no basis to think pose any of Virginia's "addiction" concerns, such as College Confidential and Dreamwidth. Virginia has no persuasive explanation for why it must impose such a sweeping restriction to achieve its interests.

With no compelling response to the slew of First Amendment problems with SB854, Virginia devotes the bulk of its brief to arguing that the district court failed to conduct a proper facial analysis. But Virginia relies on a distorted view of what *Moody v. NetChoice*, 603 U.S. 707 (2024), requires. The Court had to assess the full scope of the law's application there because some applications may not have implicated the First Amendment at all. That concern does not arise with a law that, like SB854, on its face restricts access to protected speech, as such laws necessarily implicate the First Amendment in all of their applications. As the district court thus correctly recognized, *Moody* has little relevance here.

## STATEMENT OF THE CASE

### A. Legal and Factual Background.

NetChoice is an Internet trade association whose members operate many online services, including Facebook, YouTube, Dreamwidth, and Reddit (among others). These services "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107; J.A.131-132.(¶¶5-6). "On Facebook, for example,

users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions. J.A.132.(¶6); J.A.79-81.(¶¶4, 7). On Dreamwidth, users can share blog or journal entries or creative work with friends and family. J.A.102-103.(¶¶2-3). And on Reddit, users can join communities dedicated to shared interests and share knowledge with each other. J.A.132.(¶6).

Like adults, minors use these websites to engage in First Amendment activity, be it reading the news, connecting with friends, exploring new interests, following their favorite sports teams, or researching their dream colleges. J.A.42.(¶13). Some use them to hone a new skill, showcase their creative talents, or other forms of expression. Others use them to raise awareness about social causes and participate in public discussions on salient topics of the day. J.A.42.(¶13). Still others use them to build communities and connect with those who share similar interests or experiences, which can be particularly helpful for minors who feel isolated or marginalized or are seeking support from others who understand their experiences. J.A.113-114.(¶32); J.A.131-132.(¶¶5-6).

Just as people inevitably have different opinions about what books, movies, and video games are appropriate for minors, people inevitably have different views about whether and to what degree "social media" is appropriate for minors. But

concerns that new means of communication may be harmful to minors are hardly new. Similar concerns have been raised repeatedly in the past about other types of speech and mediums of expression, from "penny dreadfuls" to "motion pictures" to "comic books" and more. *Brown*, 564 U.S. at 797-98.

While the government can participate in those debates, the Supreme Court has repeatedly rejected government efforts to try to resolve them by decreeing what speech minors may access. After all, "[m]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id*. at 794-95. And while states have an interest in protecting minors from harm, that interest "does not include a free-floating power to restrict the ideas to which [they] may be exposed." *Id.* In a Nation that values the First Amendment, the preferred response is to let parents decide what constitutionally protected speech their children may access, and how and when they may access it.

Parents have many tools at their disposal to control their children's access to speech on the Internet should they choose to do so. Parents can decide whether and when to let their children use computers, tablets, and smartphones. J.A.132.(¶7). And those who choose to do so have many ways to control what their children see and do. Device manufacturers (e.g., Apple, Google) offer settings that parents may use to limit the time that their children spend on applications and websites. J.A.132-

133.(¶8). Many third-party applications allow parents to control and monitor their children's use of Internet-connected devices and online services. J.A.132-133.(¶8). Cell carriers and broadband providers (e.g., Verizon, AT&T, and Comcast Xfinity) provide parents with tools to block apps and websites from their children's devices, ensure that they are texting and chatting with only parent-approved contacts, and restrict screen time during certain hours. J.A.133-134.(¶9). Most wireless routers (e.g., NetGear, TP-Link) contain parental control settings as well. J.A.133-134.(¶9). As do Internet browsers (e.g., Google Chrome, Mozilla Firefox). J.A.134.(¶10).

NetChoice members have also devoted extensive resources to protecting minors who use their services and providing parents with tools to monitor what their children see and do on the Internet. J.A.134-139.(¶¶11-16). Members typically prohibit minors under 13 from accessing their main services, J.A.136.(¶12), though some offer separate experiences geared specifically toward minors under 13, J.A.82-94.(¶¶10-29); J.A.136.(¶12). On YouTube, parents can link their own accounts with their teens' and monitor their activity. J.A.82-85.(¶¶12-15). On Instagram, parents can review their teens' activity and limit their ability to send direct messages. J.A.136.(¶11.d). And on Facebook, parents can see their teens' usage, privacy settings, content preferences, and the people and pages they have blocked. J.A.135.(¶11.c).

NetChoice members also have invested significant time and resources into

curating the content users see on their services. Many members restrict and remove content that they consider objectionable, J.A.91-92.(¶¶23, 26), J.A.137-138.(¶14), such as violent or sexual content, bullying, and harassment, J.A.88-90.(¶19.a-b), J.A.92.(¶25), promote content that they consider valuable, J.A.86.(¶15.a), J.A.93.(¶29), J.A.103.(¶5), attach warning labels or disclaimers to content that violates their policies, J.A.137.(¶14), and suspend or ban users who repeatedly violate their policies. J.A.91-92.(¶24).

### B. Procedural History.

Notwithstanding the long line of cases striking down government efforts to decree what constitutionally protected speech minors may access, Virginia has taken it upon itself to decide what is appropriate for minors on the Internet. In 2025, Virginia enacted SB854, which dramatically restricts minors' access to "social media platforms," significantly curtailing their ability to engage in core First Amendment activities on many of the most popular websites.

The Act defines "social media platform" extremely broadly to include any "public or semipublic Internet-based service or application" that "[c]onnects users in order to allow users to interact socially with each other" and "[a]llows users" to "[c]onstruct a public or semipublic profile," "[p]opulate a public list of other users," and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user

with content generated by other users." Va. Code §59.1-575. This definition sweeps in everything from services like YouTube and Instagram, to blogging websites like Dreamwidth, to messaging boards like College Confidential. At the same time, SB854 excludes any "service or application that consists primarily of news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users," as well as any website that primarily provides "interactive gaming" content. *Id.*

Under SB854, covered "social media platforms" must "use commercially reasonable methods … to determine whether a user is a minor." *Id.* §59.1-577.1(B). A "minor" is someone "younger than 16." *Id.* §59.1-577.1(A). In practical effect, this requirement demands that covered websites verify every user's age. Websites must then "limit a minor's use … to one hour per day, per service or application." *Id.* §59.1-577.1(B). A website cannot adjust that time limit without "verifiable parental consent." *Id.*

SB854 gives the Attorney General enforcement authority. *Id.* §59.1-584(A). Before "initiating any action," the Attorney General must give a covered website "30 days' written notice" of a potential violation. *Id.* If the violation goes uncured, the Attorney General may seek an injunction, "civil penalties of up to $7,500 for each violation," and reasonable fees and expenses. *Id.* §59.1-584(C)-(D). SB854 became law on January 1. *Id.* §§59.1-575, 577.1.

Before SB854 took effect, NetChoice sued and moved for a preliminary injunction prohibiting Virginia from enforcing the law against its members. The district court granted NetChoice's motion. The court held that SB854 triggers strict scrutiny because it discriminates based on content. J.A.14-19. The court held that SB854 fails strict scrutiny because it "burdens more speech than necessary," and because Virginia has less restrictive means to achieve its ends. J.A.21-22. The court held that SB854 is "unconstitutional in every application based on the definitions and exemptions in [its] text." J.A.14. The court also concluded that SB854 would fail even intermediate scrutiny given its abject lack of tailoring. J.A.23-24.

## SUMMARY OF ARGUMENT

The district court correctly held that SB854 violates the First Amendment. The Supreme Court has repeatedly explained that "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. Jacksonville*, 422 U.S. 205, 214 (1975). Just as "the First Amendment strictly limits [the government's] power" when it "undertakes selectively to shield the public from some kinds of speech," it prohibits the government from suppressing speech that is constitutionally protected as to minors "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 209, 213-14. And just as the government may not restrict minors' access to libraries, movies, or video games, it may not restrict their access

to websites that for many are valuable sources for speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Packingham*, 582 U.S. at 107. Simply put, it is not for the government to decide what constitutionally protected speech is appropriate for minors or how much time they may spend engaging in it.

SB854 does just that. By requiring minors under 16 to obtain parental consent to engage in more than one hour per day of constitutionally protected speech on a slew of websites, Virginia has with "one broad stroke" prevented its citizens "from engaging in the legitimate exercise of First Amendment rights." *Id.* at 107-08. Virginia claims that it may do so in service of preventing "addiction" to those websites. But its "addiction" concerns are plainly focused on particular content and viewpoints. After all, Virginia does not restrict access to all websites where minors spend a significant amount of time. SB854 leaves minors free to watch Disney+ or play video games on Xbox Live to their hearts' content, which plenty of minors do. Virginia takes issue only with websites that feature the kinds of content and viewpoints that the Commonwealth distrusts. As Virginia admitted below, it thinks "social media" is particularly harmful because it contains "socially interactive" content that minors find particularly engaging. D.Ct.Dkt.16 at 23. SB854 targets "social media" websites because minors can use them to see what "friends and classmates think," seek "validation, such as likes or upvotes," and post "content that

will garner 'lots of likes/comments.'" J.A.155-156.(¶¶12-13); J.A.160.(¶24). And it considers it a feature, not a bug, that SB854 leaves minors free to spend as much time as they want with "more traditional sources of information (like the *Washington Post*)." D.Ct.Dkt.16 at 24.

There is thus no way to understand SB854 as anything other than an effort "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown*, 564 U.S. at 795. But Virginia does not have a valid interest in "protecting" minors from spending "too much" time engaging with speech—let alone with particular speech it distrusts. Otherwise, the Commonwealth could restrict minors' access to libraries just because some spend (in Virginia's view) too much time reading page-turning novels, or streaming services because some spend too much time watching engaging cartoons. Even if Virginia had such an extraordinary and speech-defying power, it has not acted with the narrow tailoring that the First Amendment demands. SB854 sweeps in everything from Dreamwidth to messaging boards on College Confidential—websites that do not implicate Virginia's stated concerns.

Given the grave First Amendment problems with SB854, it is unsurprising that Virginia fixates on a threshold argument, insisting that the district court failed to conduct a proper facial analysis under the Supreme Court's recent decision in

*Moody*. But Virginia's arguments rest on a fundamental misunderstanding of what plaintiffs must show to establish facial invalidity.

## ARGUMENT

### I. NetChoice Is Likely To Succeed On Its Claim That SB854 Is Unconstitutional On Its Face.

#### A. SB854 Triggers First Amendment Scrutiny in All Its Applications.

1. "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody*, 603 U.S. at 733. And a "fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. Today, those places include the "vast democratic forums of the Internet," including "social media" websites. *Id.* The Supreme Court has therefore held that the First Amendment limits the government's power to restrict access to websites like Facebook and YouTube, even when its ostensible aim is to protect minors. *Id.* at 106-08.

In *Packingham*, for example, the Court held that a North Carolina law that barred convicted sex offenders from accessing "social media" websites violated the First Amendment. The state tried to justify the law on the ground that it furthered its interest in keeping convicted sex offenders away from minors. While the Court acknowledged the importance of that interest, it nevertheless concluded that the law violated the First Amendment. *Id.* at 107-08. By barring sex offenders from

accessing "social networking" websites, the state had "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 106-07. Such websites, the Court explained, are for many the principal sources for knowing current events, speaking, listening, and "otherwise exploring the vast realms of human thought and knowledge." *Id.* at 107. To "foreclose access to social media" is "to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* at 108.

For the same reasons, the First Amendment constrains the government's authority to restrict minors' access to those websites. The Supreme Court has repeatedly held that "minors are entitled to a significant measure of First Amendment protection," *Erznoznik*, 422 U.S. at 212-13, and "may not be regarded as closed-circuit recipients of only that which the State chooses to communicate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 511 (1969). Just as "the First Amendment strictly limits [the government's] power" to "selectively … shield the public from some kinds of speech," it prohibits the government from suppressing speech "to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 209, 213-14. While "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794-95.

The Court has recognized some narrow exceptions to those principles. But it has emphasized that "only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors]." *Erznoznik*, 422 U.S. at 212-13. The government may, for example, "adjust the boundaries of an existing category of unprotected speech"—like obscenity—to "ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794. After all, something that is not obscene for adults may still be obscene for children. *See Free Speech Coal. v. Paxton* (*FSC*), 606 U.S. 461, 477-87 (2025). But that does not give the government carte blanche to restrict wide swaths of "fully protected speech," *id.* at 484-85, or "create a wholly new category of content-based regulation that is permissible only for speech directed at children," *Brown*, 564 U.S. at 794.

Indeed, outside of those narrow and well-defined circumstances, courts have routinely struck down government efforts to protect minors from purportedly harmful speech on new forms of media—including by requiring minors to obtain parental consent before accessing speech. In *Brown*, for example, the Supreme Court held a California law prohibiting the sale of violent video games to minors facially unconstitutional under the First Amendment. 564 U.S. at 804-05. While California (and the dissent) resisted the notion that "persons under 18 have any constitutional right to speak or be spoken to without their parents' consent," the

Court disagreed. *Id.* at 795 n.3. Of course, "parents have traditionally had the power to control what their children hear and say." *Id.* And the state perhaps "has the power to *enforce* parental prohibitions—to require, for example, that the promoters of a rock concert exclude those minors whose parents have advised the promoters that their children are forbidden to attend." *Id.* "But it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* Otherwise, states could make it "criminal to admit persons under 18 to a political rally without their parents' prior written consent—even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors." *Id.* Such laws "are obviously an infringement" on the First Amendment rights of "young people and those who wish to" engage with them. *Id.* They "do not enforce *parental* authority over children's speech," they "impose *governmental* authority, subject only to a parental veto." *Id.*

2. Given these long-settled principles, it is unsurprising that courts across the country have concluded that state laws restricting minors' access to "fully protected speech," *FSC*, 606 U.S. at 484, on "social media" websites—including laws requiring parental consent to access them—are facially unconstitutional. *See supra*, pp.1-2 (gathering cases). SB854 should meet the same fate.

The first step in a facial analysis is to determine "what [the statute] covers." *Chamber of Com. v. Lierman*, 151 F.4th 530, 536 (4th Cir. 2025). SB854 is a statute

of "alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). It restricts minors under 16 from accessing "a social media platform" for more than "one hour per day" absent "verifiable parental consent to increase or decrease the daily time limit." Va. Code §59.1-577.1(B). The Act defines "social media platform" extremely broadly to include any "public or semipublic Internet-based service or application" that "[c]onnects users in order to allow users to interact socially with each other within such service or application" and "[a]llows users" to "[c]onstruct a public or semipublic profile," "[p]opulate a public list of other users," and "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users." Va. Code §59.1-575. SB854 thus requires minors to obtain parental consent before spending more than an hour a day on all manner of websites, be it "social media" websites like Instagram, video-sharing websites like YouTube, blogging websites like Dreamwidth, or messaging boards like College Confidential.

By restricting minors from accessing websites featuring "fully protected speech," *FSC*, 606 U.S. at 484, Virginia has "prevent[ed] … user[s] from engaging in the legitimate exercise of First Amendment rights," *Packingham*, 582 U.S. at 108. In fact, SB854 even more obviously implicates the First Amendment than the laws invalidated in *Brown* and *Erznoznik*. Those cases at least involved an attempt to

"adjust the boundaries of an existing category of unprotected speech" (namely, obscenity) "to ensure that a definition designed for adults is not uncritically applied to children." *Brown*, 564 U.S. at 794; *see also FSC*, 606 U.S. at 471-74. SB854 does not even endeavor to confine its restrictions to speech that could arguably be said to approach a constitutional line. It instead restricts access to constitutionally protected speech on websites like YouTube and Dreamwidth even if all a minor wants to do is attend church services, participate in the launch of a presidential campaign, or communicate with friends or family for more than one hour a day.

On top of that, by effectively requiring all users to verify their age, SB854 burdens the rights of *adults* to access those websites too. *See* Va. Code 59.1-577.1(B). As the Supreme Court recently reaffirmed, requiring adults to prove their age before accessing speech (even speech that is unprotected as to minors) "is a burden on the exercise of" their First Amendment rights, *FSC*, 606 U.S. at 483. *Contra* Va.Br.26-28, 47-48. By forcing adults to surrender sensitive personal information, such requirements "discourage users from accessing" speech and "completely bar" some adults from doing so. *Reno v. ACLU*, 521 U.S. 844, 856 (1997).

The unique aspects of websites like YouTube and Dreamwidth heighten the First Amendment values at stake. While restrictions on books, movies, and video games prohibit people from receiving speech, SB854 also restricts users from

engaging in speech. SB854's one-hour default also interferes with the rights of NetChoice members to curate and disseminate speech to users. Websites like YouTube and Dreamwidth curate and disseminate speech based on editorial decisions informed by what is appropriate for and likely to be of value and interest to users. J.A.80.(¶5); J.A.82.(¶10); J.A.88-94.(¶¶19-29); J.A.136-138.(¶¶13.a, 14); J.A.103.(¶¶4-5). That is quintessential First Amendment activity. *See Moody*, 603 U.S. at 735-38. By restricting minors' access to members' services to one hour absent parental consent, SB854 interferes with members' First Amendment rights as well. *Contra* Va.Br.30-31.

### B. SB854 Triggers Strict Scrutiny.

Because SB854 restricts access to protected speech, it is subject to at least intermediate scrutiny. *Packingham*, 582 U.S. at 105. But SB854's sweeping restrictions demand strict scrutiny because they are content based. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

SB854 is content based because whether a website is covered by SB854 turns on its content. The law covers websites that "present[] the user with content generated by other users," but exempts any "service or application that consists

primarily of news, sports, entertainment, ecommerce, or content preselected by the provider … or that is for interactive gaming." Va. Code §59.1-575. SB854 covers YouTube, Reddit, Dreamwidth, College Confidential, and others because they do not consist primarily of news, sports, entertainment, ecommerce, interactive gaming content, or content preselected by the provider. But it exempts ESPN Fantasy Football because it consists primarily of "sports" content, Roblox because it consists primarily of "interactive gaming" content, the *Washington Post* because it consists primarily of "news" content, and Disney+ because it consists primarily of "content preselected by the provider." SB854 "overtly makes a distinction based on" content. J.A.16. That "overt subject-matter discrimination" renders the law "facially content based." *City of Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 74 (2022).

Virginia claims that the exemption for services that feature "primarily" "content preselected by the provider" is based on "*form* of expression," not "*subject matter*." Va.Br.38-39. That does not explain the exemptions for "news, sports, entertainment, ecommerce," and "interactive gaming" content, which are clearly based on "subject matter." Virginia says that those are just "*examples* of 'content preselected by the provider.'" Va.Br.40. But the statute says "news, sports, entertainment, ecommerce, *or* content preselected by the provider … *or* that is for interactive gaming." Va. Code §59.1-575 (emphasis added). The use of the disjunctive "or" means that those carveouts are distinct from the carveout for

"content preselected by the provider." *See Encino Motorcars v. Navarro*, 584 U.S. 79, 87 (2018). If Virginia wanted to offer "news, sports, entertainment," and "ecommerce" as "*examples* of 'content preselected by the provider,'" Va.Br.40, it could have said "news, sports, entertainment, ecommerce, *or other* content preselected by the provider"—as other states have. *See, e.g.*, Ga. Code Ann. §39-6-1(6)(D) (2024) ("News, sports, entertainment, or other content that is preselected by the provider"); La. Stat. Ann. §51:1751(12)(b)(iv) (2025) (same); Ark. Code §4-88-1401(8)(B)(iv) (2023) (same). Inserting "other" into SB854 would impermissibly "add words" to "the statute." *Muldrow v. St. Louis*, 601 U.S. 346, 355 (2024).

Virginia points to *Yates v. United States*, 574 U.S. 528 (2015), to try to support its reading of the exemptions, but *Yates* does not help. There, the Supreme Court interpreted the phrase "knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object" in the Sarbanes-Oxley Act. *Id.* at 531. The Court applied principle of *noscitur a sociis* (a word is known by the company it keeps) to hold that the phrase "tangible object" refers "not to any tangible object, but specifically to the subset of tangible objects involving records and documents." *Id.* at 543-44. That reasoning has no relevance here. Virginia is not asking this Court to limit the broad and general exception for "content preselected by the provider" to a subset of preselected content involving "news, sports, entertainment," and "ecommerce." Instead, it seeks to qualify the

broad exceptions for "news, sports, entertainment," and "ecommerce" with the phrase "content preselected by the provider." But there is no way to read that phrase as qualifying the distinct exemptions for "news, sports, entertainment," and "ecommerce" content. And even if one could, that would not solve the exemption for "interactive gaming" content, which is not in the same "list." *Contra* Va.Br.40-41.

Virginia urges this Court to defer to its so-called "limiting construction" because the "Attorney General is the only party that can enforce this statute." Va.Br.41-42. But Virginia does not offer a *limiting* construction; it offers a more *expansive* construction that would extend SB854's reach by reducing the scope of its carveouts. Moreover, federal courts are "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Moshoures v. City of N. Myrtle Beach*, 131 F.4th 158, 166 (4th Cir. 2025). Courts cannot rewrite a statute just because the state thinks that makes it easier to defend. *See Erznoznik*, 422 U.S. at 216-17; *cf. Loper Bright Ent. v. Raimondo*, 603 U.S. 369, 400 (2024). Indeed, rewriting SB854 would constitute a "serious invasion of the legislative domain," and "sharply diminish" Virginia's "incentive to draft a narrowly tailored law in the first place." *Stevens*, 559 U.S. at 481.

In all events, even if one could read the statute as merely favoring provider-generated speech over user-generated speech, that would make no difference. A

"regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin*, 596 U.S. at 74. That is what SB854 does. Virginia concedes that provider-generated speech is a speaker-based distinction, Va.Br.36, and the Supreme Court has repeatedly warned that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Laws that "discriminate among media," moreover, "often present serious First Amendment concerns," particularly where the discrimination risks "distort[ing] the market for ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994). Those concerns are on full display here, as SB854's speaker-based distinctions are a means to control content. Indeed, Virginia has offered no coherent explanation for why it would favor provider-generated speech over user-generated speech save concerns about the content of each group's speech.

To be sure, websites focused on user-generated speech may contain some of the same content as websites focused on provider-generated speech. But certain content and viewpoints are far more likely to proliferate on the former than the latter. For example, ESPN and Reddit both include content about sports. But while ESPN publishes news about sports, Reddit will include all sorts of other content and viewpoints about the topic—everything from memes to parodies to unfiltered

discussion among fans praising their favorite teams, trash-talking opposing teams, and reacting to the latest highlight. Hulu and Dreamwidth might both include content related to politics. But only the latter will include the diverse viewpoints and perspectives that proliferate when users debate with other users on the hottest topics of the day. In fact, "social media" is popular in part because it provides a forum for less filtered discussions and a broader array of subjects and viewpoints than are typically reflected in the "traditional sources of information (like the *Washington Post*)," D.Ct.Dkt.16 at 24, and "the *New York Times*," Va.Br.12, that Virginia apparently prefers.

Virginia's candid admission that SB854 preferences "traditional sources of information" is proof positive of its serious constitutional problems. Just as "esthetic and moral judgments about art and literature" are "for the individual to make, not the Government to decree," *Brown*, 564 U.S. at 790, so too are judgments about the relative value of "traditional" sources of information and innovative ones, *Hustler Mag. v. Falwell*, 485 U.S. 46, 55 (1988). Channeling minors to "traditional" sources of information like the *Washington Post* and the *New York Times* and away from upstarts like contributors to YouTube and Dreamwidth "distort[s] the market for ideas" in a manner that the First Amendment prohibits. *Turner*, 512 U.S. at 660.

Virginia tries to justify SB854's speaker discrimination on the ground that "social media" websites pose "unique psychological and physical health risks to

children." Va.Br.37. But as Virginia made clear throughout this litigation, the reason it thinks "social media" websites present those risks is because of the *content* and *viewpoints* they feature. According to Virginia, SB854 applies to "social media" websites but not "Disney+ and other entertainment platforms" because "social media" includes "*socially interactive*" content. D.Ct.Dkt.16 at 23 (emphasis added); *see id.* (explaining that Virginia "determined that binge watching *Bluey* does not pose the same mental health concerns"). And the declaration Virginia submitted asserts that "social media" websites are harmful in part because they include content expressing what "friends and classmates think," "validation, such as likes or upvotes" that "keep[] children posting and checking for social approval," exposure to "negative social interactions" like "cyberbullying" and "self-comparison," and "content that will garner 'lots of likes/comments.'" J.A.155-156.(¶¶12-13); J.A.160.(¶24). To be clear, NetChoice members strive to remove or restrict access to content that may be harmful to minors (including bullying). J.A.137-138.(¶14); J.A.89-90.(¶19.b); J.A.92.(¶25). But Virginia's argument underscores that the entire point of SB854's speaker-based distinctions is to limit minors' exposure to particular content and viewpoints that it thinks proliferate on "social media."

It is thus no surprise that courts considering similarly-worded exemptions

have repeatedly concluded that they are content based.[1] Virginia ignores all those decisions in favor of the Eleventh Circuit's divided and non-precedential stay decision in *CCIA v. Uthmeier*, 2025 WL 3458571, at *4 (11th Cir. Nov. 25, 2025). That decision is wrong. *Id.* at *15-16 (Rosenbaum, J., dissenting). But *Uthmeier* has little to say about whether SB854 is content based, as the stay panel expressly distinguished "other laws" as "entirely distinct from HB3." *Id.* at *9 n.12. Although the Florida law at issue there suffers from its own content-based problems, it "does not contain the same plethora of exemptions" for news, sports, entertainment, ecommerce, or interactive gaming content that SB854 contains. *Carr*, 789 F.Supp.3d at 1222. And it singles out particular "addictive" features for regulation, which SB854 does not do.

Virginia nevertheless claims that SB854 singles out "social media" websites because they use "functional features" that "pose particular dangers to children," such as "algorithms," "autoplay, infinite scrolling, and push notifications."

---

[1] *See, e.g.*, *Murrill*, 812 F.Supp.3d at 644-47; *Carr*, 789 F.Supp.3d at 1218-23; *Reyes*, 748 F.Supp.3d at 1121-23; *Paxton*, 747 F.Supp.3d at 1032-34; *NetChoice v. Yost*, 716 F.Supp.3d 539, 556-58 (S.D. Ohio 2024); *Griffin*, 2025 WL 978607, at *9-10. *NetChoice v. Fitch*, 787 F.Supp.3d 262 (S.D. Miss. 2025), also held that a similarly worded exception is content based. *Id.* at 275. Although the Fifth Circuit stayed the injunction in that case pending appeal, it provided no reasoning for its decision. And while the Supreme Court denied NetChoice's request to vacate the stay, Justice Kavanaugh noted that the "Mississippi law is likely unconstitutional." *NetChoice v. Fitch*, 145 S.Ct. 2658, 2658 (2025) (Kavanaugh, J., concurring in the denial of the application to vacate stay).

Va.Br.37.[2] But unlike Florida's law, SB854 does not even try to confine its reach to websites that utilize those features, which is likely why Virginia admits elsewhere that SB854 "does not require platforms to block, filter, or otherwise modify the … features they make available to children." Va.Br.35.[3] SB854 regulates "social media platforms" regardless of whether they use "algorithms," "autoplay, infinite scrolling," or "push notifications." *See* J.A.103.(¶4) (explaining that "Dreamwidth does not have a mobile application," does not offer "infinite scroll," and offers only "limited forms of content recommendation systems"). And it exempts a slew of websites (like Disney+, ESPN Fantasy Football, NYTimes, and Roblox) that utilize those features. *See* Disney+, *Help Center*, https://perma.cc/K54T-242G (last visited May 13, 2026) (autoplay); ESPN, *Adjusting Fantasy Alert Preferences*, https://perma.cc/2KPV-WM64 (May 13, 2026) (push notifications); Roblox, *Recommendations and Ranking on Roblox*, https://perma.cc/X2YH-CM6V (last visited May 13, 2026) (algorithms). Such over and underinclusiveness "raises serious doubts about whether the government is in

[2] Virginia forfeited this argument in district court, where it argued that SB854 singles out social media websites because they are "socially interactive," not because they use particular features like infinite scroll and push notifications. PI.Op.23. Virginia abandons its "socially interactive" argument on appeal, likely because the exemption for "interactive gaming" fatally undermines its assertion that SB854 distinguishes between interactive and non-interactive websites. J.A.18, J.A.24.

[3] *See* Fla. Stat. §501.1736(1)(e).

fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA v. Becerra*, 585 U.S. 755, 773-74 (2018). And even if SB854 regulated "features," Virginia may not utilize those features as proxies for disfavored content and viewpoints. *See Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024) (the government "cannot do indirectly what she is barred from doing directly").

### C. SB854 Cannot Survive Any Level of Heightened Scrutiny.

SB854 cannot satisfy any level of heightened scrutiny, let alone strict scrutiny. Strict scrutiny requires Virginia to demonstrate that SB854 is "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). Intermediate scrutiny requires Virginia to demonstrate that SB854 is "narrowly tailored to serve a significant governmental interest," *Packingham*, 582 U.S. at 105-06, that is "unrelated to the suppression of free speech." *FSC*, 606 U.S. at 471. And Virginia's chosen solution may not "burden substantially more speech than necessary to further those interests." *Id.* SB854 flunks both levels of scrutiny.

#### 1. Restricting access to speech is not a permissible means of achieving Virginia's stated interests.

Citing a pre-*Brown* case, Virginia argues that SB854 serves its "significant interest" in "strengthening parental responsibility for children." Va.Br.43 (quoting *Schleifer ex rel. Schleifer v. City of Charlottesville*, 159 F.3d 843, 848 (4th Cir. 1998)). But Virginia ignores the doubts that both the Supreme Court and this Court

have since cast on whether "punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802; *see Moshoures*, 131 F.4th at 169; *cf. Washington Post v. McManus*, 944 F.3d 506, 515-16 (4th Cir. 2019). If it were, that "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors],'" *Brown*, 564 U.S. at 802, as it would "invite legislatures to undermine the first amendment rights of minors willy-nilly under the guise of promoting parental authority," *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 960 (8th Cir. 2003).

Virginia pivots to arguing that SB854 serves its interest in protecting minors from "social media addiction." Va.Br.42. But Virginia's asserted interest in preventing "addiction" to mediums for *protected speech* is "very much related to the suppression of free expression." *Moody*, 603 U.S. at 740. Just as Virginia may not restrict access to Disney+ because some shows contain "catchy jingles" that minors find engaging, *Sorrell v. IMS Health*, 564 U.S. 552, 578 (2011), Virginia cannot restrict access to "social media" because it contains (according to Virginia) too many engaging "stimuli," "distractions," "rewards," "colors," and "sounds," J.A.156.(¶14). "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 577-78.

Burdening access to protected speech that citizens find especially interesting is especially inconsistent with the First Amendment.

Indeed, if Virginia could restrict access to mediums of expression that it deems too engaging, then it is hard to see why that power would be limited to restricting access to "social media." Virginia is hardly the first state to try to restrict access to new mediums of expression on the theory that they harm minors. *See Brown*, 564 U.S. at 797. Under Virginia's view, states could seemingly prohibit minors from spending more than one hour a day playing alluring video games on Xbox Live, watching engaging cartoons on Disney+, or listening to captivating podcasts on Spotify—so long as it predicted that engaging in that core First Amendment activity can be "addicting" and/or harmful.

Virginia notably never disputes that its theory would vest the government with that remarkable (and alarming) power. Va.Br.32-42. And "what is good for First Amendment rights of speech must be good for First Amendment rights of religion." *Brown*, 564 U.S. at 795 n.3. Under Virginia's logic, then, it could prohibit minors from attending church or reading religious tracts for more than an hour a day without their parents' consent so long as it believed (as plenty of people do) that certain religions or religious practices can be "addictive" and/or harmful. *See* Eugene Volokh, *Addiction to Constitutionally Protected Activity: Speech, Press, and Religion*, 75 Emory L.J. (forthcoming 2026) (manuscript at 2-9),

https://perma.cc/LFX6-XMX4. Such laws "are obviously an infringement upon the religious freedom of young people and those who wish to proselytize young people." *Brown*, 564 U.S. at 795 n.3. That Virginia's position would usher them all in confirms that its professed interests are inextricably intertwined with the suppression of First Amendment activity.

**2. SB854 is not narrowly tailored to achieve Virginia's interests.**

In all events, SB854 is not narrowly tailored to achieve (let alone the least restrictive means of achieving) any legitimate interest Virginia could assert. Virginia's law "straddles the fence" between "helping concerned parents control their children" and addressing what it thinks is a "serious social problem." *Brown*, 564 U.S. at 805. As a means of assisting concerned parents, SB854 "burden[s] substantially more speech than necessary," *FSC*, 606 U.S. at 471, as "it abridges the First Amendment rights of young people whose parents" think social media is harmless, or even an affirmatively good thing for their children. *Brown*, 564 U.S. at 805. "Not all of the children who are forbidden" to spend more than an hour a day on social media without parental consent "have parents who *care* whether" they do so. *Id.* at 804. "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents *ought* to want." *Id.* That is "not the narrow

tailoring to 'assisting parents' that restriction of First Amendment rights requires." *Id.*[4]

As a means of protecting minors from alleged "addiction," Va.Br.42, SB854 likewise "burden[s] substantially more speech than necessary." *FSC*, 606 U.S. at 471. SB854 restricts access to all manner of protected First Amendment activity that has no conceivable connection to any of the harms Virginia identifies. Unlike other state laws, SB854 does not confine its reach to websites on which minors spend a significant amount of time, or utilize features that Virginia thinks are "addictive."[5] SB854 appears to sweep in everything from Dreamwidth to Pinterest to messaging boards on College Confidential (a community of current and aspiring college students), *see* College Confidential, *The Real Deal on Applying to College*, https://perma.cc/39MA-J8SE (last visited May 13, 2026), and Trevor Space (a community for LGBTQ individuals ages 13-24), *see* The Trevor Project, *TrevorSpace Toolkit*, https://perma.cc/4N7R-H2X3 (last visited May 13, 2026), even though there is no basis to think that those websites pose any of its "addiction"

[4] Virginia insists that the district court erred by citing *Brown*, a strict-scrutiny case, in its intermediate-scrutiny analysis. But the Supreme Court has made clear that intermediate scrutiny requires narrow tailoring too, *see Packingham*, 582 U.S. at 105-06, and *Brown*'s discussion of narrow tailoring is relevant to that inquiry—as both the Supreme Court and this Court have recognized in relying on it in intermediate-scrutiny cases. *See NIFLA*, 585 U.S. at 773-74; *Lierman*, 151 F.4th at 542.

[5] *See* Fla. Stat. §501.1736(1)(e); Ark. Code §4-88-1502(a).

concerns. In short, SB854 flunks narrow tailoring because its "wide sweep precludes access to a large number of websites that are most unlikely" to trigger Virginia's stated concerns. *Packingham*, 582 U.S. at 114 (Alito, J., concurring). Even under intermediate scrutiny, Virginia "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Reynolds v. Middleton*, 779 F.3d 222, 230 (4th Cir. 2015).

Virginia insists that SB854 is narrowly tailored because it does not ban access altogether, but imposes a one-hour limit that parents can override. Va.Br.3, 47, 53. But Virginia does not seriously dispute that the limit restricts minors from accessing wide swaths of protected speech. SB854, for instance, would bar 15-year-olds from spending more than one hour a day watching online church services or Fourth Circuit arguments on YouTube without first obtaining parental consent, even if the minor does not spend time on YouTube otherwise. It would require 15-year-olds to obtain parental consent before spending more than an hour a day discussing college applications on College Confidential. And it would require 15-year-olds to obtain parental consent before spending more than an hour a day debating politics on Dreamwidth. While Virginia insists that teenagers can always "get their parents' permission to watch more than an hour," Va.Br.47, that does not help minors whose parents are not available to provide consent, or who are not comfortable with the sharing of personal information that doing so entails. That is why *Brown* rejected

the notion that the government may "prevent children from hearing or saying anything *without their parents' prior consent.*" 564 U.S. at 795 n.3.

Virginia claims that minors can "look to other, less addictive forms of media" not covered by the statute, Va.Br.46-47—perhaps "traditional sources of information (like the *Washington Post*)," D.Ct.Dkt.16 at 24, and "the *New York Times*," Va.Br.12. But the entire thrust of Virginia's justification for the law is that there are certain kinds of content and viewpoints that are more likely to proliferate on "social media" than on its preferred mediums. J.A.160.(¶24). Perhaps a minor could "look to other … media for online church or educational programming," Va.Br.47, but those websites may not offer the same socially interactive content and viewpoints that "social media" offers. *See* Elevation Church Network, *FAQs*, https://perma.cc/P2LG-X7WF (last visited May 13, 2026) (explaining that "for real time participation and response, you will need to watch our Worship Experiences live through YouTube or Facebook"). And even if they did, there is "no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 757 n.15 (1976). Just as Virginia could not justify restrictions on disfavored newspapers by noting that the same subjects may be covered in its preferred newspapers, *see Ark. Writers' Project v. Ragland*,

481 U.S. 221, 231 (1987), it may not justify restrictions on "social media" by noting that "traditional sources of information" might cover similar topics.

SB854 also has the practical effect of hindering adults' access to "social media" websites, even though Virginia has no legitimate reason to do so. *See Ashcroft v. ACLU*, 542 U.S. 656, 663 (2004); *Reno*, 521 U.S. at 856-57. Virginia claims that *FSC* "rejected" the notion that "age verification burdens adults' … rights to access protected speech." Va.Br.47. To the contrary, the Supreme Court squarely held that "age verification necessarily" "burden[s]" an "adult's First Amendment right to access speech." *FSC*, 606 U.S. at 495. To be sure, in *FSC* that burden received only intermediate scrutiny, because (unlike here) it was "incidental to the statute's regulation of activity that is *not protected by the First Amendment*"—i.e., minors accessing "speech that is obscene" to them. *Id.* at 482 (emphasis added). But even in that context, the Court held in no uncertain terms that imposing age verification "burdens adults' … rights to access … speech." *Id.* at 495. If requiring adults to verify their age before accessing speech that is *unprotected* as to minors burdens their First Amendment rights, requiring adults to verify their age before accessing speech that is *constitutionally protected* as to adults and minors alike burdens their First Amendment rights *a fortiori*. *Contra* Va.Br.27-28. Far from helping Virginia, *FSC* underscores why SB854 is not narrowly tailored. Unlike Texas, which sought to protect minors from content that is *obscene* to them by

targeting only websites with a substantial amount of obscene content, Virginia has burdened minors' (and adults') access to the most popular "social media" websites regardless of whether they trigger its stated concerns.

On top of that, Virginia has "too readily forgone options that could serve its interests just as well, without substantially burdening" protected speech. *McCullen*, 573 U.S. at 490. True, Virginia does not have to use the "least intrusive means" of achieving its interests to survive intermediate scrutiny. Va.Br.46. But it still must show "that—before enacting the speech-restricting law—it 'seriously undertook to address the problem with less intrusive tools readily available to it,'" *Billups v. City of Charleston*, 961 F.3d 673, 688 (4th Cir. 2020), and that "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier," *McCullen*, 573 U.S. at 494-95. In fact, it is a "nonnegotiable requirement in this Circuit" that, under "intermediate scrutiny," the government must present "'actual evidence' in the legislative record that lesser restrictions will not do." *PETA v. N.C. Farm Bureau Fed'n*, 60 F.4th 815, 831-32 (4th Cir. 2023). Virginia has fallen short of that bar. SB854 contains no factual findings suggesting that the many existing tools parents have at their disposal (including tools to limit how much time minors may spend on "social media") are ineffective. *See TikTok v. Garland*, 604 U.S. 56, 78 (2025) (per curiam) (noting that the government's chosen means should be "grounded on reasonable factual findings

supported by evidence that is substantial for a legislative determination"). And Virginia has not identified *any* discussion of existing parental tools or their efficacy in "the legislative record." *PETA*, 60 F.4th at 831-32.[6]

Virginia's attempts to backfill that deficiency do not suffice. *See Billups*, 961 F.3d at 689-90 (rejecting "post-hoc justifications"). It cites two short paragraphs in one of its declarations claiming that "parents and children struggle to implement and adhere to these voluntary controls." J.A.161-162.(¶26); *see* Va.Br.50-51. But to the extent Virginia is worried that not enough parents "know about" those tools, J.A.162.(¶27), then it must explain why a campaign promoting them would be ineffective. *See United States v. Playboy Ent. Grp.*, 529 U.S. 803, 823 (2000). And to the extent Virginia fears that efforts to "implement controls" may "lead to family conflict," J.A.162.(¶27), it is unclear how SB854 is supposed to help. If anything, requiring minors to ask their parents for permission every time they wish to spend more than an hour a day on everything from YouTube to Dreamwidth to College Confidential would seem to exacerbate "family conflict."

Even if the existing tools were ineffective, J.A.162.(¶27), Virginia does not explain why parents cannot just refuse to give minors Internet-connected devices in

---

[6] Virginia repeatedly references Meta's support for SB854. Va.Br.10. But that just underscores that companies routinely innovate and develop new tools to help parents control what their minors see and do on the Internet. *See Brown*, 564 U.S. at 803.

the first place. After all, Virginia itself bans minors from using smartphones during instruction time in schools. J.A.198-199. And Virginia's "Social Media and Mental Health Toolkit" recommends that parents impose "daily limits" and "screen-free zones." J.A.220. Virginia points to no "actual evidence in the legislative record" why such measures "will not do." *PETA*, 60 F.4th at 831-32. And if Virginia shares its expert's view that parents do not utilize existing tools because they "suffer from social media addiction themselves," J.A.162.(¶27), that just underscores that SB854 does not really support "what some parents of the restricted children actually want." *Brown*, 564 U.S. at 804. Instead, SB854 imposes "what the State thinks parents *ought* to want." *Id.*

### 3. SB854 flunks strict scrutiny for additional reasons.

Virginia argues that SB854 survives strict scrutiny too. Virginia declined to develop (and thus forfeited) that argument in district court. D.Ct.Dkt.16 at 18 n.6. For good reason. Strict scrutiny "is the most demanding test known to constitutional law," and "is fatal in fact absent truly extraordinary circumstances." *FSC*, 606 U.S. at 484-85. For all the reasons explained above, SB854 is not even close to the "least restrictive means of achieving a compelling state interest." *Id.* at 471.

SB854 flunks strict scrutiny for additional reasons too. While intermediate scrutiny "imposes no freestanding underinclusiveness limitation," *id.* at 498, underinclusiveness "alone" can be "enough to defeat" a law under strict scrutiny

since it "raises serious doubts about whether the government is in fact pursuing the interest it invokes," *Brown*, 564 U.S. at 802; *see Erznoznik*, 422 U.S. at 215. Here, SB854 is wildly underinclusive when judged against Virginia's justifications. The law exempts websites with primarily "interactive gaming" content, even though "digital gaming has severe addiction-forming properties"—so much so that "the World Health Organization … includes gaming disorder in its International Classification of Diseases." J.A.24. It excludes websites like Disney+, Hulu, and ESPN Fantasy Football, even though they include "features" (e.g., "algorithms," "autoplay," and "push notifications") that (according to Virginia) "pose particular dangers to children." Va.Br.37. And just as the law in *Brown* was "seriously underinclusive" because California was "perfectly willing" to allow minors to play violent video games "so long as one parent … says it's OK," 564 U.S. at 802, Virginia is willing to let minors access supposedly harmful websites so long as one parent says it is okay—and even to spend 24 hours a day on "social media platforms" without such permission so long as they keep changing services every hour. "That is not how one addresses a serious social problem." *Id.*

On top of that, strict scrutiny demands "an 'actual problem' in need of solving." *Id.* at 799. If Virginia wants to restrict minors' access to "social media" websites, it must provide firm "proof"—not just "predictive judgment"—of a "direct

causal link" between those websites and "harm to minors." *Id.* Mere "correlation" will not do. *Id.* at 800.

Virginia's evidence falls far short of that high bar. Its primary authority, a report from the U.S. Surgeon General, notes several potential "benefits of social media use among children and adolescents," including providing "positive community and connection with others who share identities, abilities and interests," "access to important information," "a space for self-expression," and a place for teens to "form and maintain friendships online and develop social connections." J.A.175. And while the report acknowledges that "social media," like all technologies, has potential risks, it cautions that "robust independent safety analyses on the impact of social media on youth have not yet been conducted," that "[m]ore research is needed to fully understand the impact of social media," and that "[m]ost prior research to date has been correlational," J.A.173, J.A.180.[7] That is hardly the conclusive proof of a direct causal link that the First Amendment demands. If history

[7] That accords with Virginia's other proffered papers. One explains that it is "impossible to establish causality" using "existing studies." J.A.267. Another explains that "the vast majority of work done in this domain has been correlational in design, which does not allow for causal inferences." J.A.284. And while Virginia's expert speculates that the "relationship between excessive social media usage and mental health illnesses is not simply correlative," J.A.159.(¶22), in the next paragraph of her declaration, she quotes the Surgeon General's statement that, "[a]t this time, we do not yet have enough evidence to determine if social media" harms adolescents, J.A.160.(¶23).

is any indication, that demand for proof is wise. After all, many forms of new media, from comic books to dime novels to television and music lyrics, have been accused of harming minors in the past, only to have the perceived threat ultimately prove unfounded. *See Brown*, 564 U.S. at 797.

### D. SB854 Is Facially Unconstitutional.

With little to say on the merits, Virginia argues that the district court misapplied the standard for facial challenges by failing to "parse and weigh the law's full set of applications" under *Moody*. Va.Br.22. That contention is puzzling. The district court held that "SB 854 is unconstitutional in every application." J.A.14. If SB854 has "no constitutional applications," then it "has no plainly legitimate sweep." *Lierman*, 151 F.4th at 542.

Virginia nevertheless faults the court for not "cataloging the law's applications and showing the unconstitutional ones 'substantially outweigh' constitutional ones." Va.Br.23. But Virginia's argument misunderstands what *Moody* demands. *Moody* requires courts to "assess the state laws' scope," decide "which of the laws' applications violate the First Amendment," and "measure them against the rest." 603 U.S. at 724-25. That analysis may be more application-specific in some cases, as not all laws implicate the First Amendment in all their applications. In *Moody* itself, for instance, there was uncertainty about whether the laws at issue regulated protected expression in all their applications since (unlike SB854) they did not

restrict *access* to protected speech, but restricted the ability of covered services to remove certain user speech or users. *See* 603 U.S. at 728-31; *NetChoice v. Griffin*, 812 F.Supp.3d 905, 919 (W.D. Ark. 2025) (explaining the "important difference" between the two). The law thus may not have implicated the First Amendment in all its applications given that not all services covered by the law necessarily engaged in protected speech when curating and disseminating third-party speech, *see Moody*, 603 U.S. at 725 (explaining that the laws arguably covered Uber and Venmo), which rendered the facial analysis more complicated.

The same concern does not arise when (as here) a statute on its face "regulates speech" by restricting access to it in "all of its applications," and the "lack of tailoring to the state's claimed goals is present in every case." *Lierman*, 151 F.4th at 538, 542-43. If Virginia passed a law restricting minors from reading books for more than one hour a day, a challenger would not have to produce a massive record about every minor and every book the law covers to show that the statute is facially unconstitutional. That would be true even though some books inevitably contain material that is *unprotected* as to minors, as the law would still implicate speech in all of its applications, and the lack of tailoring would be glaring no matter what level of scrutiny applied.

The Supreme Court's decision in *Stevens* is illustrative. There, the Court held a federal statute criminalizing the "depiction of animal cruelty" facially

unconstitutional under the First Amendment. 559 U.S. at 474. The Court first "construe[d] the challenged statute" and concluded that it created "a criminal prohibition of alarming breadth." *Id.* The statute's definition of "depiction of animal cruelty" covered "any … depiction" in which "a living animal is intentionally maimed, mutilated, tortured, wounded, or killed." *Id.* The statute thus by its very terms covered protected First Amendment activity, including "hunting-related depictions in which a living animal is intentionally killed." *Id.* at 476. While the government tried to save the statute from facial invalidation by arguing that it had at least some constitutional applications—namely, so-called "crush videos and depictions of animal fighting"—the Court rejected that argument, concluding that the "impermissible applications" of the statute "far outnumber any permissible ones." *Id.* at 481. The Court did not require the challenger to make an in-depth evidentiary showing about the exact size of "the market for other [lawful] depictions," or hypothesize all the possible potential applications, before holding the law facially invalid. *Id.* at 481-82. It sufficed that the challenger identified a universe of unconstitutional applications on the face of the statute that "far outnumber[ed] any permissible" constitutional applications identified by the government. *Id.* If the government wanted to ban crush and animal fighting videos, it could come back with a narrower law that targeted those things alone. *Id.*

*Iancu v. Brunetti*, 588 U.S. 388 (2019), is much the same. There, the Supreme Court held the Lanham Act's bar on the registration of "immoral" or "scandalous" trademarks unconstitutional on its face. The government tried to save the statute from facial invalidation by insisting that it could constitutionally be applied to "lewd, sexually explicit, or profane marks." *Id.* at 398. The Court rejected that argument. Even apart from its viewpoint discrimination, the statute was facially unconstitutional because the "immoral or scandalous bar is substantially overbroad." *Id.* at 399. The Court did not require the challenger to provide "proof of the universe of [trademarks] covered … [and] whether the [trademark] at issue is expressive, commercial, or unprotected altogether." Va.Br.24. Nor did the Court catalog whether application of the statute to each trademark was "'realistic' rather than 'fanciful.'" Va.Br.24. It sufficed to show that "[t]here are a great many immoral and scandalous ideas in the world … and the Lanham Act"—on its face—"covers them all." *Iancu*, 588 U.S. at 399. Again, if the government wanted to bar only "lewd, sexually explicit, or profane marks," *id.* at 398, it could pass a law that did so.

This Court has applied the same approach post-*Moody*. In *Lierman*, the Court held a Maryland law banning internet companies from disclosing to digital advertisers how a state tax affected pricing facially unconstitutional. 151 F.4th at 534. The Court did not demand a comprehensive factual record about online digital advertising; indeed, since the case reached this Court on the plaintiffs' appeal of the

district court's grant of the state's motion to dismiss, there was no factual record whatsoever. *Id.* at 540-42. The Court instead found facial invalidation warranted because the statute, on its face, "regulates speech" in "all of its applications," and the "lack of tailoring to the state's claimed goals is present in every case." *Id.* at 538, 542-43. The lack of a "connection to the interest Maryland invoke[d]" meant that the challenged law had "no plainly legitimate sweep"; the constitutional deficiencies were "present in every case." *Id.* at 542.

The district court's order is fully consistent with those principles. SB854 implicates the First Amendment in all its applications because it always and everywhere restricts access to speech. And its content- and speaker-based restrictions are unconstitutional in all their applications since they are always and everywhere insufficiently tailored to advance any permissible interest. Indeed, Virginia barely tries to identify any application in which they might *not* raise the problems the district court identified. It identifies no covered service, for instance, on which protected First Amendment activities do not proliferate. Nor could it; by its very terms, SB854 applies *only* to websites that "[c]onnect[] users in order to allow users to interact socially with each other" and allow them to "[c]reate or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed," Va. Code §59.1-575—i.e., *websites where users engage in speech*. To be sure, there may be some unprotected speech on those

services, just as there is bound to be some unprotected speech in parks, on sidewalks, at parades, or in virtually any other place where people gather to speak. But that does not change the fact that Virginia is restricting access to services where people in the main engage in *protected* speech. And whether applied to YouTube, Dreamwidth, College Confidential, or any other regulated service, SB854 not only burdens speech by restricting minors from accessing that service, but burdens far more speech than could possibly be justified by Virginia's professed interests.

If Virginia's approach were the law, then cases like *Brown*, *Packingham*, and *Erznoznik*—all of which struck down laws on their face—would have come out the other way. In *Brown*, for instance, the Court did not demand "proof of the universe of [video games covered] or what speech they convey," or "consider how many parents" would agree to purchase violent video games for their children, or examine whether "intrepid teens" could access the games another way. Va.Br.24-25. Even though some video games likely included speech that is unprotected as to minors, *see Brown*, 564 U.S. at 857 (Breyer, J., dissenting) (describing video game with obscenity); *id.* at 818-19 (Alito, J., concurring) (same), the Court did not "catalog[] and analyze[]" the entire universe of games. Va.Br.23. It sufficed to show that the statute on its face restricted access to an entire category of speech that was not itself unprotected, and that the state could not justify such a sweeping restriction.

In *Packingham*, too, the Court did not find it necessary to catalog every potential application of the statute; indeed, it did not even need to "decide the precise scope." 582 U.S. at 106. Even assuming the law applied only to "social networking sites as commonly understood," the statute "enact[ed] a prohibition unprecedented in the scope of First Amendment speech it burdens." *Id.* at 107. The Court did not need to consider whether the law could be constitutionally applied to, e.g., "an adult previously convicted of molesting children from visiting a dating site for teenagers," or a "site where minors communicate with each other about personal problems." *Id.* at 118 (Alito, J., concurring). The statute was unconstitutional on its face because it was not limited to those applications—it swept broadly to include all "social networking sites" and potentially more. *Id.* at 106-07; *id.* at 114-17 (Alito, J., concurring); *see PETA*, 60 F.4th at 834 (characterizing *Packingham* as a facial challenge case).

And in *Erznoznik*, the Court did not catalog the entire universe of potential applications of the city ordinance prohibiting drive-in theaters from showing films containing nudity. While the Court did not dispute that the city could have constitutionally applied the statute to films "deemed obscene … as to minors," *Erznoznik*, 422 U.S. at 213, it held the ordinance unconstitutional on its face because it was "demonstrably overbroad," *id.* at 216. "The ordinance," the Court explained, "is not directed against sexually explicit nudity, nor is it otherwise limited." *Id.* at

213. Rather, the statute by its terms "sweepingly forbids display of all films containing any uncovered buttocks or breasts, irrespective of context or pervasiveness," including "a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous." *Id.* at 213. The Court did not ask for proof that drive-in theaters wanted to show films displaying those things. Nor did it make the challenger catalog all the potential films that the ordinance barred drive-in theaters from showing. *Contra* Va.Br.23-25. It sufficed to show that the ordinance was directed not at unprotected speech but by design swept in films that were protected by the First Amendment. *See Erznoznik*, 422 U.S. at 213.

Thus, the proper question is not (as Virginia claims) whether SB854 "would operate to prevent swaths of teenagers from viewing religious, science, or history programming on social media platforms," Va.Br.24, but whether SB854, "interpreted fairly," singles out for restriction a category of activity that is protected by the First Amendment. *Iancu*, 588 U.S. at 398.[8] Because there is no denying that the universe of websites SB854 regulates are, as a category, websites where minors and adults alike engage in constitutionally protected speech, Virginia must identify enough

[8] Elsewhere, Virginia appears to agree that a detailed factual record is not necessary to determine the statute's sweep, as it concedes that "many" of SB854's "applications are readily apparent from the text of the law." Va.Br.26.

constitutional applications to outweigh the many glaringly unconstitutional ones. *See id.* at 398-99.[9]

None of Virginia's cases is to the contrary. In *NetChoice v. Bonta*, 170 F.4th 744 (9th Cir. 2026), the Ninth Circuit held that NetChoice failed to prove its facial challenge because the law's coverage definition, which applied to any "business that provides an online service, product, or feature likely to be accessed by children," swept in many websites that did not necessarily "publish content," like "ride sharing services, electronic ticketing services, and financial transaction services." *Id.* at 758. The Ninth Circuit thus could not determine whether "the full range of activities" covered by the statute involved protected speech. *Id.* at 763. Here, by contrast, SB854 restricts First Amendment rights in every application, as the statute restricts users from accessing *only* websites where users engage in speech. *See* Va. Code §59.1-575. That "important difference," *Griffin*, 812 F.Supp.3d at 919-20, is likely why the Ninth Circuit expressly distinguished laws like SB854, *see Bonta*, 170 F.4th at 759 n.7.

[9] While NetChoice bears the ultimate burden of proving that the unconstitutional applications of SB854 substantially outweigh the constitutional ones, Virginia must first point to *some* constitutional applications. Virginia did not even try to do so in district court, and it is not *the plaintiff*'s burden to hypothesize potential constitutional applications for the Commonwealth. *See Stevens*, 559 U.S. at 481-82.

*GLBT Youth v. Reynolds*, 114 F.4th 660 (8th Cir. 2024), and *Doe v. Burlew*, 165 F.4th 525 (6th Cir. 2026), are even further afield. In *GLBT Youth*, the district court identified constitutional and unconstitutional applications, but failed to explain why the unconstitutional ones substantially outweighed the constitutional ones. 114 F.4th at 670. That case has no application here, where the district court held that SB854 is unconstitutional in *all* its applications, J.A.14, and Virginia did not identify any constitutional applications. *See supra* p.50 n.9. *Doe* involved a facial challenge to a statute banning convicted sex offenders from creating anonymous accounts on social media. The Sixth Circuit vacated the injunction because the district court failed to consider whether convicted sex offenders have a First Amendment right to "peruse the internet anonymously"—and thus failed to assess whether a "great deal" of the law's applications may not "implicate the First Amendment at all." *Doe*, 165 F.4th at 534. Again, Virginia cannot identify any applications of SB854 that do not implicate the First Amendment, because the statute restricts minors from accessing *only* websites where they engage in speech. *See supra* pp.46-47.

Virginia's belated efforts to remedy that deficiency are unavailing. Va.Br.26. Virginia first suggests that SB854 is constitutional as applied to adults because *FSC* held that "requiring adults to verify their ages is a constitutionally allowable incidental burden on speech." Va.Br.26. But *FSC* did not hold that age verification is *always* a permissible incidental burden on speech. It just held that the particular

age-verification requirement at issue *there* was subject to (and passed) intermediate scrutiny because it was "incidental to the statute's regulation of activity that is *not* protected by the First Amendment"—namely, "minors … accessing speech that is obscene from their perspective." *FSC*, 606 U.S. at 478, 483 (emphasis added). The key question under *FSC*, then, is whether age verification is being used to restrict minors' access to protected or unprotected speech. And here, it is unquestionably being used to restrict access to protected speech. *FSC* thus does not help Virginia, as the sole reason the Court applied intermediate scrutiny and sustained the burden on adults' speech there does not exist here. If anything, *FSC* makes clear that burdening adults' rights (and the rights of NetChoice members) *on top of* the free speech rights of minors exacerbates the constitutional problem; it does not somehow save the statute from facial invalidation.

To the extent Virginia suggests that SB854 is constitutional as applied to minors who are able to obtain parental consent and adults who are able to verify their age, Va.Br.28-29, that makes no sense. Those are not situations in which the law permissibly burdens First Amendment rights. They are just situations in which parties manage to overcome the burdens the law imposes. A law that required people to pay a $100 fee to engage in speech would be just as unconstitutional as applied to people able to pay the fee. Some minors were undoubtedly able to access violent video games in *Brown*. But California's law was nevertheless facially

unconstitutional because it burdened protected speech on its face and flunked First Amendment scrutiny. So too with SB854.

To the extent what Virginia is really saying is that SB854 must have constitutional applications because it imposes only minor "burdens" on accessing speech, Va.Br.26-30, that is an argument about whether the law satisfies First Amendment scrutiny, not about whether it has constitutional applications. After all, "content-based burdens must satisfy the same rigorous scrutiny as its content-based bans" since the "distinction between laws burdening and laws banning speech is but a matter of degree." *Playboy*, 529 U.S. at 812. So even if SB854 imposed only minor "burdens," *but see supra* pp.18-20, Virginia would still have to explain why those burdens satisfy strict scrutiny. It does not, because it cannot: No matter the application, restricting minors (and adults, who must prove their age) from accessing protected First Amendment speech is not a permissible means of achieving Virginia's interests. *See supra* pp.29-31. And the "lack of tailoring" remains "present in every case," *Lierman*, 151 F.4th at 542. *See supra* pp.45-46. "Narrow tailoring turns on whether a law sweeps more broadly than necessary, not on whether its yoke is heavy or light." *Sisters for Life v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 407 (6th Cir. 2022); *see also Am. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615-16 (2021).

## II. The District Court Did Not Abuse Its Discretion In Finding That The Other Factors Favored Injunctive Relief.

The district court did not abuse its discretion in concluding that the other factors weigh in favor of granting a preliminary injunction. Virginia does not seriously dispute that NetChoice's members would suffer irreparable harm without an injunction. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). And the harm is not just to members, but to minors who will be cut off from vital channels of communication. SB854 would also impose significant unrecoverable compliance costs on NetChoice's members if it took effect. Complying with its requirements would require significant changes to existing services and impose costs that could not be recouped. *See* J.A.96.(¶40); J.A.114.(¶33); J.A.147.(¶14); J.A.151.(¶24). And the threat of enforcement is not hypothetical. Virginia already initiated "enforcement efforts," and it has made clear that it would pursue enforcement immediately if this Court were to vacate the preliminary injunction. Va.Br.17, 19-20, 53.

On the other hand, maintaining the status quo will cause little if any harm to Virginia. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). And despite its

claims of "irreparable harm each day that the Commonwealth is unable to enforce" SB854, Va.Br.20, Virginia has not proceeded as if its interests demand immediate enforcement. The legislature delayed SB854's effective date by eight months. After the district court enjoined the law, Virginia waited ten days to seek a stay with this Court, bypassing the district court in violation of basic procedural rules. After the Court denied the motion, Virginia waited another five days to refile in district court. Virginia did not even seek to expedite this appeal. None of that reflects an urgent need to begin enforcing a law that strikes at the heart of the First Amendment.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

May 15, 2026

s/Erin E. Murphy
ERIN E. MURPHY
*Counsel of Record*
JAMES Y. XI
BARRETT L. ANDERSON
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1. This response brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,999 words including footnotes and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman size 14-point font with Microsoft 2016.

May 15, 2026

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy

# ADDENDUM

# TABLE OF CONTENTS

Va. Code §59.1-575 .......... 1a

Va. Code §59.1-577.1 .......... 9a

Va. Code §59.1-584 .......... 10a

Code of Virginia
Title 59.1. Trade and Commerce
Chapter 53. Consumer Data Protection Act

# § 59.1-575. (Effective until January 1, 2026) Definitions

As used in this chapter, unless the context requires a different meaning:

"Affiliate" means a legal entity that controls, is controlled by, or is under common control with another legal entity or shares common branding with another legal entity. For the purposes of this definition, "control" or "controlled" means (i) ownership of, or the power to vote, more than 50 percent of the outstanding shares of any class of voting security of a company; (ii) control in any manner over the election of a majority of the directors or of individuals exercising similar functions; or (iii) the power to exercise controlling influence over the management of a company.

"Authenticate" means verifying through reasonable means that the consumer, entitled to exercise his consumer rights in § 59.1-577, is the same consumer exercising such consumer rights with respect to the personal data at issue.

"Biometric data" means data generated by automatic measurements of an individual's biological characteristics, such as a fingerprint, voiceprint, eye retinas, irises, or other unique biological patterns or characteristics that is used to identify a specific individual. "Biometric data" does not include a physical or digital photograph, a video or audio recording or data generated therefrom, or information collected, used, or stored for health care treatment, payment, or operations under HIPAA.

"Business associate" means the same meaning as the term established by HIPAA.

"Child" means any natural person younger than 13 years of age.

"Consent" means a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer. Consent may include a written statement, including a statement written by electronic means, or any other unambiguous affirmative action.

"Consumer" means a natural person who is a resident of the Commonwealth acting only in an individual or household context. It does not include a natural person acting in a commercial or employment context.

"Controller" means the natural or legal person that, alone or jointly with others, determines the purpose and means of processing personal data.

"Covered entity" means the same as the term is established by HIPAA.

"Decisions that produce legal or similarly significant effects concerning a consumer" means a decision made by the controller that results in the provision or denial by the controller of financial and lending services, housing, insurance, education enrollment, criminal justice, employment opportunities, health care services, or access to basic necessities, such as food and water.

"De-identified data" means data that cannot reasonably be linked to an identified or identifiable natural person, or a device linked to such person. A controller that possesses "de-identified data"

shall comply with the requirements of subsection A of § 59.1-581.

"Health record" means the same as that term is defined in § 32.1-127.1:03.

"Health care provider" means the same as that term is defined in § 32.1-276.3.

"HIPAA" means the federal Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.).

"Identified or identifiable natural person" means a person who can be readily identified, directly or indirectly.

"Institution of higher education" means a public institution and private institution of higher education, as those terms are defined in § 23.1-100.

"Nonprofit organization" means any corporation organized under the Virginia Nonstock Corporation Act (§ 13.1-801 et seq.) or any organization exempt from taxation under § 501(c)(3), 501(c)(6), or 501(c)(12) of the Internal Revenue Code, any political organization, any organization exempt from taxation under § 501(c)(4) of the Internal Revenue Code that is identified in § 52-41, and any subsidiary or affiliate of entities organized pursuant to Chapter 9.1 (§ 56-231.15 et seq.) of Title 56.

"Online service, product, or feature" means any service, product, or feature that is provided online. "Online service, product, or feature" does not include telecommunications service, as defined in 47 U.S.C. § 153, broadband Internet access service, as defined in 47 C.F.R. § 54.400, or delivery or use of a physical product.

"Personal data" means any information that is linked or reasonably linkable to an identified or identifiable natural person. "Personal data" does not include de-identified data or publicly available information.

"Political organization" means a party, committee, association, fund, or other organization, whether or not incorporated, organized and operated primarily for the purpose of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any federal, state, or local public office or office in a political organization or the election of a presidential/vice-presidential elector, whether or not such individual or elector is selected, nominated, elected, or appointed.

"Precise geolocation data" means information derived from technology, including but not limited to global positioning system level latitude and longitude coordinates or other mechanisms, that directly identifies the specific location of a natural person with precision and accuracy within a radius of 1,750 feet. "Precise geolocation data" does not include the content of communications or any data generated by or connected to advanced utility metering infrastructure systems or equipment for use by a utility.

"Process" or "processing" means any operation or set of operations performed, whether by manual or automated means, on personal data or on sets of personal data, such as the collection, use, storage, disclosure, analysis, deletion, or modification of personal data.

"Processor" means a natural or legal entity that processes personal data on behalf of a controller.

"Profiling" means any form of automated processing performed on personal data to evaluate, analyze, or predict personal aspects related to an identified or identifiable natural person's

economic situation, health, personal preferences, interests, reliability, behavior, location, or movements.

"Protected health information" means the same as the term is established by HIPAA.

"Pseudonymous data" means personal data that cannot be attributed to a specific natural person without the use of additional information, provided that such additional information is kept separately and is subject to appropriate technical and organizational measures to ensure that the personal data is not attributed to an identified or identifiable natural person.

"Publicly available information" means information that is lawfully made available through federal, state, or local government records, or information that a business has a reasonable basis to believe is lawfully made available to the general public through widely distributed media, by the consumer, or by a person to whom the consumer has disclosed the information, unless the consumer has restricted the information to a specific audience.

"Sale of personal data" means the exchange of personal data for monetary consideration by the controller to a third party. "Sale of personal data" does not include:

1. The disclosure of personal data to a processor that processes the personal data on behalf of the controller;

2. The disclosure of personal data to a third party for purposes of providing a product or service requested by the consumer;

3. The disclosure or transfer of personal data to an affiliate of the controller;

4. The disclosure of information that the consumer (i) intentionally made available to the general public via a channel of mass media and (ii) did not restrict to a specific audience; or

5. The disclosure or transfer of personal data to a third party as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the controller's assets.

"Sensitive data" means a category of personal data that includes:

1. Personal data revealing racial or ethnic origin, religious beliefs, mental or physical health diagnosis, sexual orientation, or citizenship or immigration status;

2. The processing of genetic or biometric data for the purpose of uniquely identifying a natural person;

3. The personal data collected from a known child; or

4. Precise geolocation data.

"State agency" means the same as that term is defined in § 2.2-307.

"Targeted advertising" means displaying advertisements to a consumer where the advertisement is selected based on personal data obtained from that consumer's activities over time and across nonaffiliated websites or online applications to predict such consumer's preferences or interests. "Targeted advertising" does not include:

1. Advertisements based on activities within a controller's own websites or online applications;

2. Advertisements based on the context of a consumer's current search query, visit to a website, or online application;

3. Advertisements directed to a consumer in response to the consumer's request for information or feedback; or

4. Processing personal data processed solely for measuring or reporting advertising performance, reach, or frequency.

"Third party" means a natural or legal person, public authority, agency, or body other than the consumer, controller, processor, or an affiliate of the processor or the controller.

2021, Sp. Sess. I, cc. 35, 36;2022, cc. 451, 452;2024, cc. 840, 844.

This section has more than one version with varying effective dates. Scroll down to see all versions.
The chapters of the acts of assembly referenced in the historical citation at the end of this section(s) may not constitute a comprehensive list of such chapters and may exclude chapters whose provisions have expired.

# § 59.1-575. (Effective January 1, 2026) Definitions

As used in this chapter, unless the context requires a different meaning:

"Affiliate" means a legal entity that controls, is controlled by, or is under common control with another legal entity or shares common branding with another legal entity. For the purposes of this definition, "control" or "controlled" means (i) ownership of, or the power to vote, more than 50 percent of the outstanding shares of any class of voting security of a company; (ii) control in any manner over the election of a majority of the directors or of individuals exercising similar functions; or (iii) the power to exercise controlling influence over the management of a company.

"Authenticate" means verifying through reasonable means that the consumer, entitled to exercise his consumer rights in § 59.1-577, is the same consumer exercising such consumer rights with respect to the personal data at issue.

"Biometric data" means data generated by automatic measurements of an individual's biological characteristics, such as a fingerprint, voiceprint, eye retinas, irises, or other unique biological patterns or characteristics that is used to identify a specific individual. "Biometric data" does not include a physical or digital photograph, a video or audio recording or data generated therefrom, or information collected, used, or stored for health care treatment, payment, or operations under HIPAA.

"Business associate" means the same meaning as the term established by HIPAA.

"Child" means any natural person younger than 13 years of age.

"Consent" means a clear affirmative act signifying a consumer's freely given, specific, informed, and unambiguous agreement to process personal data relating to the consumer. Consent may include a written statement, including a statement written by electronic means, or any other unambiguous affirmative action.

"Consumer" means a natural person who is a resident of the Commonwealth acting only in an

individual or household context. It does not include a natural person acting in a commercial or employment context.

"Controller" means the natural or legal person that, alone or jointly with others, determines the purpose and means of processing personal data.

"Covered entity" means the same as the term is established by HIPAA.

"Decisions that produce legal or similarly significant effects concerning a consumer" means a decision made by the controller that results in the provision or denial by the controller of financial and lending services, housing, insurance, education enrollment, criminal justice, employment opportunities, health care services, or access to basic necessities, such as food and water.

"De-identified data" means data that cannot reasonably be linked to an identified or identifiable natural person, or a device linked to such person. A controller that possesses "de-identified data" shall comply with the requirements of subsection A of § 59.1-581.

"Health record" means the same as that term is defined in § 32.1-127.1:03.

"Health care provider" means the same as that term is defined in § 32.1-276.3.

"HIPAA" means the federal Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d et seq.).

"Identified or identifiable natural person" means a person who can be readily identified, directly or indirectly.

"Institution of higher education" means a public institution and private institution of higher education, as those terms are defined in § 23.1-100.

"Nonprofit organization" means any corporation organized under the Virginia Nonstock Corporation Act (§ 13.1-801 et seq.) or any organization exempt from taxation under § 501(c)(3), 501(c)(6), or 501(c)(12) of the Internal Revenue Code, any political organization, any organization exempt from taxation under § 501(c)(4) of the Internal Revenue Code that is identified in § 52-41, and any subsidiary or affiliate of entities organized pursuant to Chapter 9.1 (§ 56-231.15 et seq.) of Title 56.

"Online service, product, or feature" means any service, product, or feature that is provided online. "Online service, product, or feature" does not include telecommunications service, as defined in 47 U.S.C. § 153, broadband Internet access service, as defined in 47 C.F.R. § 54.400, or delivery or use of a physical product.

"Parent" means a parent or legal guardian of a child or minor.

"Personal data" means any information that is linked or reasonably linkable to an identified or identifiable natural person. "Personal data" does not include de-identified data or publicly available information.

"Political organization" means a party, committee, association, fund, or other organization, whether or not incorporated, organized and operated primarily for the purpose of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any federal, state, or local public office or office in a political organization or the election of a

presidential/vice-presidential elector, whether or not such individual or elector is selected, nominated, elected, or appointed.

"Precise geolocation data" means information derived from technology, including but not limited to global positioning system level latitude and longitude coordinates or other mechanisms, that directly identifies the specific location of a natural person with precision and accuracy within a radius of 1,750 feet. "Precise geolocation data" does not include the content of communications or any data generated by or connected to advanced utility metering infrastructure systems or equipment for use by a utility.

"Process" or "processing" means any operation or set of operations performed, whether by manual or automated means, on personal data or on sets of personal data, such as the collection, use, storage, disclosure, analysis, deletion, or modification of personal data.

"Processor" means a natural or legal entity that processes personal data on behalf of a controller.

"Profiling" means any form of automated processing performed on personal data to evaluate, analyze, or predict personal aspects related to an identified or identifiable natural person's economic situation, health, personal preferences, interests, reliability, behavior, location, or movements.

"Protected health information" means the same as the term is established by HIPAA.

"Pseudonymous data" means personal data that cannot be attributed to a specific natural person without the use of additional information, provided that such additional information is kept separately and is subject to appropriate technical and organizational measures to ensure that the personal data is not attributed to an identified or identifiable natural person.

"Publicly available information" means information that is lawfully made available through federal, state, or local government records, or information that a business has a reasonable basis to believe is lawfully made available to the general public through widely distributed media, by the consumer, or by a person to whom the consumer has disclosed the information, unless the consumer has restricted the information to a specific audience.

"Sale of personal data" means the exchange of personal data for monetary consideration by the controller to a third party. "Sale of personal data" does not include:

1. The disclosure of personal data to a processor that processes the personal data on behalf of the controller;

2. The disclosure of personal data to a third party for purposes of providing a product or service requested by the consumer;

3. The disclosure or transfer of personal data to an affiliate of the controller;

4. The disclosure of information that the consumer (i) intentionally made available to the general public via a channel of mass media and (ii) did not restrict to a specific audience; or

5. The disclosure or transfer of personal data to a third party as an asset that is part of a merger, acquisition, bankruptcy, or other transaction in which the third party assumes control of all or part of the controller's assets.

"Sensitive data" means a category of personal data that includes:

1. Personal data revealing racial or ethnic origin, religious beliefs, mental or physical health diagnosis, sexual orientation, or citizenship or immigration status;

2. The processing of genetic or biometric data for the purpose of uniquely identifying a natural person;

3. The personal data collected from a known child; or

4. Precise geolocation data.

"Social media platform" means a public or semipublic Internet-based service or application that has users in the Commonwealth and that meets the following criteria:

1. Connects users in order to allow users to interact socially with each other within such service or application. No service or application that exclusively provides email or direct messaging services shall be considered to meet this criterion on the basis of that function alone; and

2. Allows users to do all of the following:

a. Construct a public or semipublic profile for purposes of signing into and using such service or application;

b. Populate a public list of other users with whom such user shares a social connection within such service or application; and

c. Create or post content viewable by other users, including content on message boards, in chat rooms, or through a landing page or main feed that presents the user with content generated by other users. No service or application that consists primarily of news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users, and for which any chat, comments, or interactive functionality is incidental to, directly related to, or dependent on the provision of such content, or that is for interactive gaming, shall be considered to meet this criterion on the basis of that function alone.

"State agency" means the same as that term is defined in § 2.2-307.

"Targeted advertising" means displaying advertisements to a consumer where the advertisement is selected based on personal data obtained from that consumer's activities over time and across nonaffiliated websites or online applications to predict such consumer's preferences or interests. "Targeted advertising" does not include:

1. Advertisements based on activities within a controller's own websites or online applications;

2. Advertisements based on the context of a consumer's current search query, visit to a website, or online application;

3. Advertisements directed to a consumer in response to the consumer's request for information or feedback; or

4. Processing personal data processed solely for measuring or reporting advertising performance, reach, or frequency.

"Third party" means a natural or legal person, public authority, agency, or body other than the consumer, controller, processor, or an affiliate of the processor or the controller.

"User" means a person not acting as an agent of a controller or processor.

2021, Sp. Sess. I, cc. 35, 36;2022, cc. 451, 452;2024, cc. 840, 844;2025, c. 703.

This section has more than one version with varying effective dates. Scroll down to see all versions.
The chapters of the acts of assembly referenced in the historical citation at the end of this section(s) may not constitute a comprehensive list of such chapters and may exclude chapters whose provisions have expired.

Code of Virginia
Title 59.1. Trade and Commerce
Chapter 53. Consumer Data Protection Act

# § 59.1-577.1. (Effective January 1, 2026) Social media platforms; responsibilities and prohibitions related to minors

A. For purposes of this section, "minor" means any natural person younger than 16 years of age.

B. Any controller or processor that operates a social media platform shall (i) use commercially reasonable methods, such as a neutral age screen mechanism, to determine whether a user is a minor and (ii) limit a minor's use of such social media platform to one hour per day, per service or application, and allow a parent to give verifiable parental consent to increase or decrease the daily time limit.

C. Information collected for the purpose of determining a user's age shall not be used for any purpose other than age determination and provision of age-appropriate experiences. For purposes of this section, any controller or processor that operates a social media platform shall treat a user as a minor if the user's device communicates or signals that the user is or shall be treated as a minor, including through a browser plug-in or privacy setting, device setting, or other mechanism.

D. Nothing in this section shall be construed as requiring any controller or processor that operates a social media platform to give a parent who grants verifiable parental consent pursuant to subsection B any additional or special access to or control over the data or accounts of the minor.

E. No controller or processor that operates a social media platform shall withhold, degrade, lower the quality of, or increase the price of any online service, product, or feature to a user due to the controller or processor not being permitted to provide use of such social media platform beyond the one hour per day, per service or application, daily time limit under subsection B. However, nothing in this section shall be construed as (i) requiring a social media platform to provide an online service, product, or feature that requires the personal information of a known minor or (ii) prohibiting a social media platform from offering a different price, rate, level, quality, or selection of goods or services to a known minor, including offering goods or services for no fee, if such behavior is reasonably related to the exercise of rights pursuant to or compliance with the requirements of this chapter.

2025, c. 703.

The chapters of the acts of assembly referenced in the historical citation at the end of this section(s) may not constitute a comprehensive list of such chapters and may exclude chapters whose provisions have expired.

Code of Virginia
Title 59.1. Trade and Commerce
Chapter 53. Consumer Data Protection Act

# § 59.1-584. Enforcement; civil penalty; expenses

A. The Attorney General shall have exclusive authority to enforce the provisions of this chapter.

B. Prior to initiating any action under this chapter, the Attorney General shall provide a controller or processor 30 days' written notice identifying the specific provisions of this chapter the Attorney General alleges have been or are being violated. If within the 30-day period the controller or processor cures the noticed violation and provides the Attorney General an express written statement that the alleged violations have been cured and that no further violations shall occur, no action shall be initiated against the controller or processor.

C. If a controller or processor continues to violate this chapter following the cure period in subsection B or breaches an express written statement provided to the Attorney General under that subsection, the Attorney General may initiate an action in the name of the Commonwealth and may seek an injunction to restrain any violations of this chapter and civil penalties of up to $7,500 for each violation under this chapter. All civil penalties, expenses, and attorney fees collected pursuant to this chapter shall be paid into the state treasury and credited to the Regulatory, Consumer Advocacy, Litigation, and Enforcement Revolving Trust Fund.

D. The Attorney General may recover reasonable expenses incurred in investigating and preparing the case, including attorney fees, in any action initiated under this chapter.

E. Nothing in this chapter shall be construed as providing the basis for, or be subject to, a private right of action for violations of this chapter or under any other law.

2021, Sp. Sess. I, cc. 35, 36;2022, cc. 451, 452.

The chapters of the acts of assembly referenced in the historical citation at the end of this section(s) may not constitute a comprehensive list of such chapters and may exclude chapters whose provisions have expired.