No. 26-1252

# In the United States Court of Appeals for the Fourth Circuit

---

NETCHOICE,

*Plaintiff-Appellee,*

v.

JAY JONES, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF VIRGINIA,

*Defendant-Appellant.*

---

On Appeal from the United States District Court for the Eastern District of Virginia, No. 1:25-cv-02067

---

## BRIEF OF AMICUS CURIAE TECHFREEDOM IN SUPPORT OF APPELLEE AND AFFIRMANCE

---

John Anderson Jung
TECHFREEDOM
1500 K Street NW, Floor 2
Washington, DC 20005
(771) 200-4997
ajung@techfreedom.org
*Attorney for Amicus Curiae TechFreedom*

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae TechFreedom certifies under Fed. R. App. P. 26.1 that it has no parent company, it issues no stock, and no publicly held corporation owns a ten-percent or greater interest in it.

/s/ John Anderson Jung

## TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ......................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................2

ARGUMENT ..................................................................................5

I.     Strict Scrutiny Applies. ...........................................................5

     A.     SB 854 Is Speaker- and Content-Based. ...........................6

     B.     SB 854 Places Direct Burdens on Speech. ......................12

II.     Intermediate-Scrutiny Precedents Are Irrelevant....................13

     A.     *Free Speech Coalition v. Paxton.* ......................................13

     B.     *TikTok v. Garland.* ..........................................................19

     C.     *Turner Broadcasting System v. FCC*...............................21

CONCLUSION................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Booksellers Assoc. v. Hudnut,*

    771 F.2d 323 (7th Cir. 1985) .......................................................24

*Barr v. Am. Ass'n of Political Consultants, Inc.,*

    591 U.S. 610 (2020) ..................................................................9

*Brown v. Ent. Merchants Assoc.,*

    564 U.S. 786 (2011) ............................................. 12, 14, 15, 17, 18

*Citizens United v. FEC,*

    558 U.S. 310 (2010) ............................................................. 6, 23

*Erznoznik v. Jacksonville,*

    422 U.S. 205 (1975) .................................................................15

*Free Speech Coalition v. Paxton,*

    145 S. Ct. 2291 (2025) ............................................ 3, 12, 13, 16, 17

*Ginsberg v. New York,*

    390 U.S. 629 (1968) .................................................................17

*Miami Herald Publ'g Co. v. Tornillo,*

    418 U.S. 241 (1974) ..................................................................6

*Minneapolis Star v. Minn. Comm'r of Revenue,*

    460 U.S. 575 (1983) ..................................................................6

## TABLE OF AUTHORITIES
## (Cont.)

**Page(s)**

*Moody v. NetChoice, LLC,*

603 U.S. 707 (2024) .......................................................... 7, 10, 19

*NetChoice, LLC v. Att'y Gen. Fla.,*

34 F.4th 1196 (11th Cir. 2022) ........................................... 7

*Packingham v. North Carolina,*

582 U.S. 98 (2017) ............................................................ 7, 14

*Reed v. Town of Gilbert,*

576 U.S. 155 (2015) ........................................................... 8

*Reno v. ACLU,*

521 U.S. 844 (1997) ........................................................... 6

*TikTok Inc. v. Garland,*

604 U.S. 56 (2025) ............................................................ 3, 20

*Turner Broadcasting System v. FCC,*

512 U.S. 622 (1994) ..................................................... 4, 10, 12, 21

*United States v. Stevens,*

559 U.S. 460 (2010) .......................................................... 20

*Yates v. United States,*

574 U.S. 528 (2015) .......................................................... 11

## TABLE OF AUTHORITIES
### (Cont.)

**Page(s)**

**Statutes**

Va. Code § 59.1-575 ............................................................... 2, 6, 8, 11

Va. Code § 59.1-771.1(B) .................................................................. 2


**Other Authorities**

*The Anxious Generation*, If Books Could Kill (Aug. 8, 2024) ..................................................................................... 5

Christopher J. Ferguson, et al., *There Is No Evidence That Time Spent on Social Media Is Correlated With Adolescent Mental Health Problems: Findings From a Meta-Analysis*, 56 Prof. Psych.: Research & Pract. 73 (Feb. 2025) ..................................................................... 4

*Health Advisory on Social Media Use in Adolescence*, Am. Psych. Assoc. (May 2023) .................................................. 5

Mike Masnick, *Two Major Studies, 125,000 Kids: The Social Media Panic Doesn't Hold Up*, Techdirt (Jan. 21, 2026) ...................................................................................... 4

Jacob Mchangama, *Free Speech: A History From Socrates to Social Media* (2022) .................................................... 23

Dan Williams, *Is Social Media Destroying Democracy—Or Giving It to Us Good and Hard?*, Conspicuous Cognition (Oct. 7, 2025) ....................................................... 7, 22, 23

Kim Willsher, *Macron Accused of Authoritarianism After Threat to Cut Off Social Media*, Guardian (July 5, 2023) ...................................................................................... 22

## INTEREST OF AMICUS CURIAE*

TechFreedom is a nonprofit, nonpartisan think tank based in Washington, D.C. It is dedicated to promoting technological progress that improves the human condition. It opposes ever-evolving government meddling in online speech. See, e.g., Br. of TechFreedom, *NetChoice, LLC v. Griffin*, No. 25-1889 (8th Cir., Jan. 27, 2026) (opposing Arkansas social media age-verification law); Br. of TechFreedom, *NetChoice, LLC v. Fitch*, No. 25A97 (U.S., July 24, 2025) (opposing Mississippi social media age-verification law); Br. of TechFreedom, *Bonta v. NetChoice, LLC*, No. 23-2969 (9th Cir., Feb. 14, 2024) (opposing California social media "design" code); Br. of TechFreedom, *Moody v. NetChoice, LLC*, No. 22-277 (U.S., Dec. 7, 2023) (opposing Florida and Texas social media speech codes); Br. of TechFreedom & Prof. Eric Goldman, *Volokh v. James*, No. 23-356 (2d Cir., Sept. 25, 2023) (opposing New York social media "transparency" law).

---

\* No party's counsel authored any part of this brief. No one, apart from TechFreedom and its counsel, contributed money intended to fund the brief's preparation or submission. All parties have consented to the brief's being filed.

- 1 -

## INTRODUCTION AND SUMMARY OF ARGUMENT

In short, he became so absorbed in his books that he spent his nights from sunset to sunrise, and his days from dawn to dark, poring over them; and what with little sleep and much reading his brains got so dry that he lost his wits.

Miguel de Cervantes, *Don Quixote* (1605)

Humans are fascinated by stories and ideas. Perhaps that is why each new medium of communication provokes anxiety about its supposed power to unmoor impressionable minds. Before long, though, the fears about each new medium come to look quaint. Books drive men mad. Pamphlets promote disobedience to authority. Novels seduce the young into idleness. Comic books breed violence. Television breeds violence. Video games breed violence. Every time, we are told that *this* time is different. *This* new medium, unlike the last, is *uniquely* dangerous and corrupting. *This* new medium will rob other people—it is always *other* people, usually children—of reason and virtue.

Now it is social media's turn.

Virginia's Senate Bill 854 requires social media platforms to verify every user's age and to cap minors under 16 at one hour of use per platform per day, subject to parental override. Va. Code § 59.1-771.1(B). The Act exempts platforms whose content is "preselected by the provider and not generated by users." *Id.* § 59.1-575. User-generated speech is age-

- 2 -

gated and on the clock; institutional speech is not. The Act thus picks winners and losers in the marketplace of ideas. It spares powerful, institutional speakers like the *Washington Post* and ESPN while targeting the comparatively powerless—the people for whom social media is the best, or only, outlet to spread a message. The Act presents this and other First Amendment problems: The district court agreed that it is "unconstitutional in every application." Op. 14.

In this brief, we focus on why SB 854 is subject to strict scrutiny. The Act is a textbook speaker- and content-based regulation of speech. It singles out platforms where ordinary people speak to one another, disfavoring peer-to-peer conversations—and the unique topics such conversations raise—in favor of legacy media's curated product. And no matter how loudly Virginia insists otherwise, online age verification, implemented in service of an hourly meter, is a substantial burden on speech. Burdening speech while discriminating against certain speakers triggers strict scrutiny.

Supreme Court precedents applying intermediate scrutiny are of no help to Virginia. *Free Speech Coalition v. Paxton*, 145 S. Ct. 2291 (2025), concerned pornography obscene to minors, a category of speech historically unprotected for children and, going forward, only partially protected for adults. *TikTok Inc. v. Garland*, 604 U.S. 56 (2025), was a

national-security case, addressed in an emergency posture, that the Court itself stressed was "narrow" and limited to a foreign-adversary-controlled platform. And *Turner Broadcasting System v. FCC*, 512 U.S. 622 (1994), concluded that the speaker-based distinction before it was not content-based for reasons that are not present here. None of these cases give Virginia cover to age-verify, meter, and ration the sixty-first minute of fully protected social-media speech.

Make no mistake: Virginia's alarmism about the harms and perils of social media is overwrought. Virginia is partaking in the latest in a long line of tech-driven moral panics. As with past panics, rhetoric has run far ahead of the evidence. See, e.g., Mike Masnick, *Two Major Studies, 125,000 Kids: The Social Media Panic Doesn't Hold Up*, Techdirt (Jan. 21, 2026), tinyurl.com/47jtmew7 (summarizing two large recent cohort studies, one finding that social-media use and well-being are not linear—i.e., moderate social-media use, among minors, is better than either heavy use or no use—and another finding no correlation between social-media use and teen mental health); Christopher J. Ferguson, et al., *There Is No Evidence That Time Spent on Social Media Is Correlated With Adolescent Mental Health Problems: Findings From a Meta-Analysis*, 56 Prof. Psych.: Research & Pract. 73 (Feb. 2025), tinyurl.com/u59d766v ("[O]ur findings indicate that the current research

- 4 -

literature is unable to provide strong evidence for a clinically relevant link between time spent on social media and mental health issues in youth."); *Health Advisory on Social Media Use in Adolescence*, Am. Psych. Assoc. (May 2023), tinyurl.com/mwea7a84 ("Using social media is not inherently beneficial or harmful to young people."); *The Anxious Generation*, If Books Could Kill (Aug. 8, 2024), tinyurl.com/5xmesjzv ("Essentially, the research is all over the place. At just the most basic level, are kids who are on their phones less happy than kids who are not on their phones? We can't even really say anything definitive. And to the extent that we do find associations, they're extremely small.").

But even if social media were as risky as Virginia suggests (to repeat: that is not what the data shows), Virginia would still have to comply with the First Amendment. SB 854 does not do so.

## ARGUMENT

### I.    Strict Scrutiny Applies.

SB 854 singles out speech based on who is speaking and what topics are addressed and directly burdens that speech. As the district court correctly held, the Act is subject to—and fails to withstand—strict scrutiny. Op. at 16-22.

## A.    SB 854 Is Speaker- and Content-Based.

The First Amendment "prohibit[s] . . . restrictions distinguishing among different speakers." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Such distinctions "are all too often"—as here—"simply a means to control content." *Id.* See also *Minneapolis Star v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591-92 (1983).

SB 854 targets "social media platforms"—platforms that "connect users" and enable them to "interact socially with each other." Va. Code § 59.1-575. The statute exempts platforms whose content is "preselected by the provider and not generated by users." *Id.* It governs only havens for user-generated speech—"vast democratic forums" where everyday people post content, view others' posts, and connect with each other. *Reno v. ACLU*, 521 U.S. 844, 868 (1997).

Before social media, public discourse was dominated by large corporate newspapers and broadcasters. There was much concern about "the concentration of control of media." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 249 (1974). "The power to inform the American people and shape public opinion" rested "in a few hands." *Id.* at 250. Social media disrupted this paradigm. It enables ordinary people to reach one another directly, thereby opening public debate to a much wider range of viewpoints.

- 6 -

The Supreme Court has acknowledged that "social media" is now the most important place "for the exchange of views" among "private citizen[s]." *Packingham v. North Carolina*, 582 U.S. 98, 103, 105 (2017). Social media "is different from traditional media outlets" in that "every user . . . can be both speaker and listener." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1204 (11th Cir. 2022), vacated on other grounds, 603 U.S. 707 (2024). Social media platforms foster "different sorts of online communities" with diverse "values and viewpoints." *Id.* at 1205.

Virginia's problem with social media is that people like the specific speech they see there. On social media, ordinary people interact directly with one another: They can see what their peers and friends say and they can respond. Teens would see different speech if they spent all their time on the *New York Times* app; but most of them do not, presumably because that speech is not what they want. Teens flock to social media because that is where they can find the content they want—their peers' posts about school, gossip about celebrities, influencers' takes on the news, other young people's opinions on self-help and spirituality, and on and on. See Dan Williams, *Is Social Media Destroying Democracy—Or Giving It to Us Good and Hard?*, Conspicuous Cognition (Oct. 7, 2025), tinyurl.com/4vax24wc ("Social media . . . amplifies ideas that elites previously excluded from mainstream discourse.").

Though Virginia will not admit it, the state implicitly concedes that its speaker-based distinction is also content-based. It sought to exempt "binge watching Bluey" from SB 854 because, as the district court observed, the General Assembly "concluded that user-generated content is more harmful." Op. at 18. That premise is questionable. If teens shifted their screentime away from social media, why should *that* not be a source of concern? Is "doomscrolling on Instagram," Op. at 18, really more harmful than reading the same celebrity gossip on TMZ? In any event, what matters is that Virginia sees user-generated posts as *different*—in its eyes, more controversial—than provider-selected content.

SB 854 is content-based not only through its disparate treatment of user-generated speech, but also through its explicit carveouts for platforms that "primarily" host favored speech (even if those platforms contain social-media-like features). Va. Code § 59.1-575. The Act excuses from regulation platforms that host speech about "news, sports, entertainment, [or] ecommerce," as well as platforms devoted to "interactive gaming." *Id.* See Op. at 18. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Carving out news, sports, entertainment,

ecommerce, and interactive gaming is "as content-based as it gets." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 619 (2020).

Even within the subcategory of social speech, Virginia cannot help but play favorites. As NetChoice observes, the separate carveout for "interactive gaming" shows that Virginia is not really concerned with the harms of online social interaction as such. Appellee's Br. 28 n.2. What the Act disfavors, at bottom, is not social interaction, but social interaction that dares to touch on the *wrong topics*. It leaves immersive, interactive gaming untouched while rationing the forums where ordinary users discuss news, politics, culture, and other matters of public concern.

In distinguishing between provider-generated and user-generated speech, Virginia claims to be focusing not on content, but on "the manner" in which speech is presented. Appellant's Opening Brief (AOB) 39. But this dichotomy is illusory. The "manner" in which speech is presented—through a static institutional page or through an interactive social-media feed—is integral to the content of the speech itself. It is as though a state said that all stories may be told, but that plays in a theater must be capped at one hour a night because live performances are too powerful, harmful, or addictive. The elocution of the stage performers, their exaggerated movements, their dramatic gestures, their eye-contact with the audience—these are themselves expressive choices. Similarly, a news

- 9 -

story conveyed through a person's commentary in a short-form video differs from a news story conveyed through a legacy-media article precisely *because of the form*. Virginia singles out the form whose substantive content it disfavors.

Virginia's invocation of "functional features"—push notifications, autoplay, infinite scroll—fares no better. AOB 37. Those features are editorial choices, every bit as much as a newspaper's choice of headline size and article placement. *Moody v. NetChoice, LLC*, 603 U.S. 707, 716, 731 (2024) (platforms' decisions "about what third-party speech to display and how to display it" are "expressive choices" protected by the First Amendment). The whole point of SB 854 is that, in Virginia's view, those editorial choices succeed too well in attracting and holding minors' attention. A law that singles out a platform because of its editorial choices is emphatically content-based: "speaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994).

Virginia claims that SB 854's explicit carveouts for news, sports, entertainment, and ecommerce are merely "examples" of "content preselected by the provider." AOB 40. For support, it invokes the

- 10 -

*noscitur-a-sociis* canon. *Id.* (citing *Yates v. United States*, 574 U.S. 528 (2015)). This argument fails twice over. *First*, it simply defies what the law says. SB 854 carves out a "service or application that consists primarily of news, sports, entertainment, ecommerce, *or* content preselected by the provider." Va. Code § 59.1-575 (emphasis added). The disjunctive "or" does real work: news, sports, entertainment, and ecommerce are not subspecies of "preselected" content; they are separate categories. *Second*, even on Virginia's preferred reading, the legislature's decision to mention news, sports, entertainment, and ecommerce cannot plausibly be cast as content-blind. On the contrary, its explicit listing of these favored topics gives the game away. Virginia plainly means to exempt the institutional outlets—the *New York Times*, ESPN, Vogue, eBay—where ordinary users *cannot* sound off on the issues of the day before a wide audience. Virginia does not resist this conclusion; it *leans into* it, acknowledging that ESPN and Disney+ may speak to minors at unlimited length, while average users on Instagram or TikTok may not. AOB 41.

Because it targets speech using speaker- and content-based distinctions, SB 854 is subject to strict scrutiny.

### B.     SB 854 Places Direct Burdens on Speech.

SB 854 also triggers strict scrutiny by directly burdening speech. *First*, the Act burdens the "freedom of young people and those who wish to [speak to] young people," *Brown v. Ent. Merchants Assoc.*, 564 U.S. 786, 795 n.3 (2011), by capping each minor's daily access to each social media platform at sixty minutes. Regulations that "suppress, disadvantage, or impose differential burdens upon speech because of its content" are subject to "the most exacting scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994).

*Second*, SB 854 mandates age verification. "[S]ubmitting to age verification is a burden on the exercise of" users' First Amendment rights. *Free Speech Coalition v. Paxton*, 145 S. Ct. 2291, 2309 (2025). And because that burden is here imposed in a speaker- and content-based way—and on speech that, unlike the content at issue in *Free Speech Coalition*, is fully protected (see below)—the age-verification requirement, too, triggers strict scrutiny.

Virginia insists that the Act imposes no real burden because parents may override the one-hour cap. AOB 1, 30. But a government mandate "subject only to parental veto" enforces not "*parental* authority," but "*governmental* authority." *Brown*, 564 U.S. at 795 n.3. Virginia understates the burden of changing the one-hour default: To do so,

- 12 -

parents must verify their age *and* the parental relationship with the minor user. Virginia's default rule burdens speech merely by virtue of being a default rule that burdens speech.

## II.     Intermediate-Scrutiny Precedents Are Irrelevant.

Virginia invokes three Supreme Court decisions—*Free Speech Coalition, TikTok,* and *Turner*—that applied intermediate scrutiny. But its reliance on these decisions is misplaced. Each involved circumstances far removed from SB 854's broad regulation of fully protected social-media speech.

### A.     *Free Speech Coalition v. Paxton.*

Virginia relies heavily on *Free Speech Coalition,* 145 S. Ct. 2291, to argue for intermediate scrutiny. AOB 27, 28, 32, 44, 46, 47, 48. But that decision concerned age-gating only for content obscene to minors. It has nothing to say about SB 854, which attempts to age-gate, meter, and ration vast quantities of fully protected speech on social media.

To understand *Free Speech Coalition*'s limits, it is useful to examine two other key Supreme Court rulings—one about social media, the other about the rights of minors.

*Packingham v. North Carolina* involved a North Carolina law that made it a crime for a registered sex offender "to access a commercial

social networking Web site." 582 U.S. 98, 101 (2017). The Court held that this law violated the First Amendment.

In the modern world, the Court explained, among "the most important places . . . for the exchange of views" are the "vast democratic forums of the Internet"—and of "social media in particular." *Id.* at 103 (cleaned up). Social media "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* at 105. And everyone—"even convicted criminals"—can benefit from "access to the world of ideas" that exists online. *Id.* To "foreclose access to social media altogether," therefore, is "to prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* The Court concluded that, even under intermediate scrutiny (which the Court assumed, without deciding, applied), the North Carolina law impermissibly burdened adult sex offenders' right to send and receive speech.

At issue in *Brown v. Entertainment Merchants Assoc.*, 564 U.S. 786 (2011), was a California law that restricted the sale or rental of violent video games to minors. While it did "not mean to demean or disparage the concerns" behind the state's effort to protect children, the Court readily struck the law down. *Id.* at 802.

- 14 -

At the heart of California's statute was the assumption that minors are second-class citizens under the First Amendment. But this, the Court held, is incorrect. "[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Id.* at 793 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-213 (1975)). Although a state may protect minors from material that is obscene as to them, the Court observed, "that does not" mean the state has "a free-floating power to restrict ideas to which children may be exposed." *Id.* at 794-95. "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable to them." *Id.* at 795. This remains true even if the speech is interactive ("the player [of a video game] participates in the violent action on screen") or disgusting (there exists, in the game, "a racial or ethnic motive for [the] violence"). *Id.* at 799. Nor may the censorship be laundered through a parental-consent mandate (which is ultimately just a government mandate "subject only to parental veto"). *Id.* at 795 n.3. Thus, the Court concluded that California's law was subject to, yet miserably failed, strict scrutiny.

- 15 -

Back to *Free Speech Coalition*. A Texas law requires age verification on any commercial website more than one-third of which is speech obscene to minors. The Court upheld this law under intermediate scrutiny.

*Free Speech Coalition* addressed precisely the category of speech—material obscene to minors—that *Brown* noted is amenable to special treatment. Minors have no right to view such material. And such material, *Free Speech Coalition* concluded, is "only partially" protected for adults. 145 S. Ct. at 2315. This means that the Court's First Amendment analysis will wholly differ depending on whether the speech at issue is what is found on social media (with its "vast democratic forums" that minors have a "significant" interest in seeing) or is instead what is found on pornographic websites (with their content that minors have no right, and adults, henceforth, only a "partial" right, to see).

How does the analysis differ? *Free Speech Coalition* revealed two key distinctions. *First*, for content obscene to minors, age-verification laws are now treated as akin to regulations on expressive conduct. *Id.* at 2315. When content obscene to minors is at issue, the state's regulatory power "*necessarily includes* the power to require proof of age." *Id.* at 2306 (emphasis added). In the context of adult content, in other words, an age-verification "statute can readily be understood as an effort to restrict

minors' access" to speech unprotected as to them. *Id*. at 2309. In the context of social media, by contrast, *no such assumption applies*. Restrictions in that realm remain, as they have always been, presumptively unconstitutional direct regulations on speech. See *Brown*, 564 U.S. 786.

*Second*, for content obscene to minors, a "burden" on speech is now qualitatively distinct, under the First Amendment, from a "ban" on speech. "When the First Amendment *partially* protects speech"—as is henceforth the case with, and only with, content obscene to minors—"the distinction between a ban and lesser burdens is" now "meaningful." *Free Speech Coal.*, 145 S. Ct. at 2315 n.12. *But* "for *fully protected speech*," now as ever, "the distinction between bans and burdens makes no difference to the level of [First Amendment] scrutiny." *Id*. Even after *Free Speech Coalition*, therefore, restrictions placed on *fully protected* social-media speech amount to a *burden* that triggers *strict scrutiny*.

In short, *Free Speech Coalition* has nothing to say about SB 854. The decision aligns perfectly with *Brown*: only categories of historically unprotected speech—such as fraud, incitement, or obscenity—are outside the First Amendment. And "the obscenity exception does not," *Brown* said, "cover whatever a legislature finds shocking, but only depictions of 'sexual conduct.'" 564 U.S. at 793. So unlike in *Ginsberg v. New York*, 390

- 17 -

U.S. 629 (1968)—a precedent, relied on heavily by *Free Speech Coalition*, involving material obscene to minors sold at brick-and-mortar stores—California's video-game law tried "to create a wholly new category" of unprotected speech (violent speech directed at children). 564 U.S. at 794. Allowing a legislature to do this—even for minors—would, *Brown* concluded, contravene "the judgment of the American people, embodied in the First Amendment, that the benefits of its restrictions on the Government outweigh the costs." *Id.* at 792 (cleaned up). Creating a new category was improper in *Brown*, as to violence in video games, and it would be improper here, as to the content on social media. *Free Speech Coalition*—which dealt with a category of speech that is historically unprotected—changes nothing.

Like H.B. 1181, Virginia's SB 854 requires age verification. But there the resemblance ends. Virginia does not target a category of speech unprotected for minors. It targets the vast universe of non-obscene speech available on social media. Virginia may not invoke *Free Speech Coalition*'s analysis of "incidental burdens on speech." AOB 32. That analysis has no purchase for a law that sweeps far beyond speech obscene to minors. Social media is full of "protected speech" for "all users." Op. at 16-17. Extending *Free Speech Coalition*'s framework to social media would do what *Brown* forbade: create "a wholly new category" of speech

- 18 -

unprotected as to minors, one based not on history and tradition (the only proper source of such categories) but on legislative anxiety.

### B.    *TikTok v. Garland.*

Virginia also relies on *TikTok v. Garland*, AOB 37, 44, 46. Under *TikTok*, in Virginia's view, a law is subject to intermediate scrutiny whenever the state can point to something other than speech as the basis for its regulation. In *TikTok*, this "something else" was the statute's "focus" on "control by a foreign government." Here, Virginia contends, the "something else" is SB 854's focus on social media's unique features.

This move fails on its own terms. As shown above, the "unique features" in question are themselves editorial choices fully protected by the First Amendment. *Moody*, 603 U.S. 707. Virginia's "something else" is not distinct from speech; it *is* speech.

In any event, Virginia's reading of *TikTok* is far too broad. The Court did not let the government point to just one thing (let alone any old thing), apart from speech, as an excuse for regulating speech. In explaining its decision to apply intermediate, rather than strict, scrutiny, the Court invoked not only TikTok's "susceptibility to foreign control," but also TikTok's "scale," the "vast swaths of sensitive data" it collects, the "Government's national security concerns," and the "expedited time

- 19 -

allowed" for the Court's "consideration" of the case. *TikTok Inc. v. Garland*, 604 U.S. 56, 63 (2025). Naturally, given how many factors played a dispositive role in its decision, the Court repeatedly "emphasize[d] the inherent narrowness" of its "holding." *Id.* at 73. To drive the point home, the Court wrote: "A law targeting *any other speaker* would by necessity entail a distinct inquiry and separate considerations." *Id.* (emphasis added).

Nor is Virginia's claim that social media poses unique new "dangers"—autoplay, infinite scroll, push notifications—an escape hatch from strict scrutiny. AOB 37. "The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." *United States v. Stevens*, 559 U.S. 460, 470 (2010). The First Amendment itself is a judgment that the dangers of government censorship outweigh the supposed dangers of more speech. *Id.* "Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." *Id.*

*TikTok* is best understood as a one-off. It has nothing to say about whether strict scrutiny applies here (as it does).

## C.    *Turner Broadcasting System v. FCC.*

Finally, Virginia invokes *Turner Broadcasting System v. FCC*, AOB 36, 37. But its reliance on *Turner*, too, is misguided. As we have explained, SB 854 discriminates between platforms based on whose content they carry—providers' preselected content on one side, user-generated content on the other—as well as through explicit content-based exceptions.

*Turner* was the rare case where the speaker-based distinction had nothing to do with content. The distinction in the law before it, the Court concluded, was "based upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry." *Turner*, 512 U.S. 622, 645 (1994). That is, "broadcasters, which transmit over the airwaves, [we]re favored, while cable programmers, which do not, [we]re disfavored." *Id.* The law revealed no "preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Id.* at 658.

Virginia claims that nothing in SB 854 suggests the General Assembly wanted to suppress certain ideas. AOB 37. But as we have explained, Virginia singled out social media—as opposed to "ESPN, Disney+, Encyclopedia Britannica, Khan Academy, WebMD, and the *Washington Post*," AOB 41—because of the user-generated content on

- 21 -

social media platforms. Users go to social media, rather than to other websites, precisely because social media contains speech that is interesting, controversial, generated by peers, or otherwise distinctly attractive.

While *Turner* concluded that the content on cable channels and over-the-air channels was equivalent, the content on Facebook and the *Washington Post* is not. A newspaper presents a finite, curated product reflecting the editorial judgments of a single institutional speaker. A social media platform hosts an open forum in which millions of ordinary users speak to one another directly, respond to each other (and to institutional speakers) in real time, and collectively shape the flow of discourse. The subject matter inevitably diverges: newspapers select what editors deem newsworthy; social media reflects what millions of users want to talk about. "Social media welcomes [new] voices into the conversation." Dan Williams, *Is Social Media Destroying Democracy—Or Giving It to Us Good and Hard?*, Conspicuous Cognition (Oct. 7, 2025), tinyurl.com/4vax24wc.

If further proof were needed that this distinction is real, consider that European governments have repeatedly threatened to ban or heavily regulate X (the former Twitter), while no one proposes banning *The Times* in Britain or *Le Monde* in France. See, e.g., Kim Willsher, *Macron*

- 22 -

*Accused of Authoritarianism After Threat to Cut Off Social Media*, Guardian (July 5, 2023), tinyurl.com/3w8jwme4. The powers-that-be understand that social media offers a distinct form of content (some would say "disinformation"; others, "the people talking back").

SB 854 is all about content. It hinders the diverse, comparatively unfiltered speech of ordinary users—and especially young people—in favor of the curated product presented by legacy media. That is the very definition of content discrimination.

*     *     *

Thanks to social media, the "public" is "no longer a passive recipient" of information. Jacob Mchangama, *Free Speech: A History From Socrates to Social Media* 389 (2022). "Social media has democratised the public sphere," providing a platform "for brilliant, heterodox thinkers who would never have achieved prominence through more traditional routes." Williams, supra. Under the First Amendment, the state may not use regulation to "jealously guard[] the crumbling pillars of privileged access" to public attention. Mchangama, supra, at 389. The Supreme Court has "consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers." *Citizens United v. FEC*, 558 U.S. 310, 352 (2010).

- 23 -

In the end, Virginia's problem is with the power of speech itself—it prefers content provided by institutional media over that provided by ordinary users on social media. Minors spend time on social media because, when they are there, they see speech they are *interested in seeing*. Virginia is concerned that the speech is *too powerful*. It thinks minors are like Don Quixote, transfixed by the power of stories and ideas. This problem—if it is one—is not for Virginia to fix. Under the First Amendment, the *strong effects* of speech are an *inherent part* of speech—not a ground for regulation. "Any other answer leaves the government in control of all of the institutions of culture, the great censor and director of which thoughts are good for us." *Am. Booksellers Assoc. v. Hudnut*, 771 F.2d 323, 330 (7th Cir. 1985) (Easterbrook, J.).

## CONCLUSION

The order granting a motion for preliminary injunction should be affirmed.

- 24 -

- 25 -

May 22, 2026                          Respectfully submitted,

                                      /s/ John Anderson Jung
                                      John Anderson Jung
                                      TECHFREEDOM
                                      1500 K Street NW, Floor 2
                                      Washington, DC 20005
                                      (771) 200-4997
                                      ajung@techfreedom.org
                                      *Attorney for Amicus Curiae*
                                      *TechFreedom*

## CERTIFICATE OF COMPLIANCE

I certify:

This brief complies with the type-volume limits of Fed R. App. P. 29(a)(5) because it contains 4,981 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced serif typeface, in 14-point font, using Microsoft Office 365.

/s/ John Anderson Jung

- 26 -

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2026, I electronically filed the foregoing brief with the Clerk of the United States Court of Appeals for the Fourth Circuit through the Court's CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ John Anderson Jung