Case No. 26-1252

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

NETCHOICE,

*Plaintiff-Appellee,*

v.

JAY JONES, in his official capacity as Attorney General of the Commonwealth of Virginia,

*Defendant-Appellant.*

_____

On Appeal from the U.S. District Court for the Eastern District of Virginia
Hon. Patricia Tolliver Giles, US District Court Judge

_____

**BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, CENTER FOR DEMOCRACY & TECHNOLOGY, ELECTRONIC FRONTIER FOUNDATION, FREEDOM TO READ FOUNDATION, FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION, LGBT TECH, AND WOODHULL FREEDOM FOUNDATION IN SUPPORT OF PLAINTIFF-APPELLEE AND AFFIRMANCE**

_____

Cody Venzke
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
915 15th St. NW
Washington, DC 20005
Email: cvenzke@aclu.org
Tel.: (202) 457-0800
*Licensed only in California.*
*Application pending in the District of Columbia.*

Vera Eidelman
Esha Bhandari
AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
125 Broad Street, 18 Fl.
New York, NY 10004
Email: veidelman@aclu.org
Email: ebhandari@aclu.org
Tel.: (212) 549-2500

Matthew Callahan, VSB No. 99823
ACLU OF VIRGINIA FOUNDATION
P.O. Box 26464
Richmond, VA 23261
Email: mcallahan@acluva.org
Tel.: (804) 523-2146

Aaron Mackey
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, California 94109
Email: amackey@eff.org
Tel.: (415) 436-9333

*Counsel for Amici Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __26-1252__          Caption: __NetChoice v. Jones__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__ACLU, ACLU of Virginia, CDT, EFF, Freedom to Read Foundation, FIRE, LGBT Tech, and Woodhull__
(name of party/amicus)

__Freedom Foundation__

 who is _____amici curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Esha Bandari                          Date:        5/22/2026

Counsel for: Amici curiae

- 2 -

Print to PDF for Filing

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................. ii

STATEMENT OF INTEREST OF AMICI ............................................................. 1

INTRODUCTION ................................................................................................... 4

ARGUMENT ........................................................................................................... 7

    I.  SB 854 REGULATES PROTECTED SPEECH ........................................... 7

        A. Minors and Adults Rely on Social Media to Engage in a
           Diverse Range of Protected Expression .............................................. 7

        B. The First Amendment Protects the Vast Majority of Social
           Media Activity for Minors and Adults Alike .................................... 12

    II.  SB 852's CONTENT-BASED RESTRICTIONS VIOLATE
       MINORS' AND ADULTS' FIRST AMENDMENT RIGHTS ............... 14

        A. SB 854 Impermissibly Prohibits Minors from Accessing and
           Engaging in Protected Speech on Certain Topics Without
           Parental Consent ................................................................................ 14

        B. SB 854 Also Burdens the First Amendment Rights of Adults
           and Minors by Imposing Age Verification ...................................... 17

           1. Many verification requirements will either chill or
              entirely block access to lawful speech .............................. 18

           2. Online age verification impermissibly burdens the
              right to speak and access information anonymously
              online ................................................................................ 20

           3. Many age verification systems put internet users'
              sensitive data at risk .......................................................... 21

    III. THE DISTRICT COURT APPROPRIATELY ORDERED
        FACIAL RELIEF .................................................................................. 24

CONCLUSION ...................................................................................................... 27

i

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Gonzales*,
    478 F. Supp. 2d 775 (E.D. Pa. 2007)......................................................21

*ACLU v. Mukasey*,
    534 F.3d 181 (3d Cir. 2008) ...................................................................21

*ACLU v. Reno,*
    31 F. Supp. 2d 473 (E.D. Pa. 1999).........................................................2

*ACLU v. Reno*,
    929 F. Supp. 824 (E.D. Pa. 1996).............................................................2

*American Amusement Machine Association v. Kendrick*,
    244 F.3d 572 (7th Cir. 2001) ...................................................................14

*American Association of Police Consultants, Inc. v. FCC*,
    923 F.3d 159 (4th Cir. 2019) ...................................................................25

*American Booksellers Foundation v. Dean*,
    342 F.3d 96 (2d Cir. 2003) ................................................................ 18, 20

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)..................................................................................17

*Barr v. American Association of Police Consultants, Inc.*,
    591 U.S. 610 (2020)..................................................................................25

*Brown v. Entertainment Merchants Association*,
    564 U.S. 786 (2011)............................................................... *passim*

*City of Austin v. Reagan National Advertising of Austin, LLC*,
    596 U.S. 61 (2022)....................................................................................14

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975).......................................................................... 13, 16

*Free Speech Coalition, Inc. v. Paxton*,
　606 U.S. 461 (2025) .................................................................... *passim*

*In re Anonymous Online Speakers*,
　661 F.3d 1168 (9th Cir. 2011) ................................................... 20, 21

*Johnson v. United States*,
　576 U.S. 591 (2015) .........................................................................26

*Mahanoy Area School District v. B.L.*,
　594 U.S. 180 (2021) ........................................................................1, 7

*McIntyre v. Ohio Elections Commission*,
　514 U.S. 334 (1995) ..........................................................................20

*Moody v. NetChoice, LLC*,
　603 U.S. 707 (2024) ..................................................................... 24, 25

*NetChoice v. Carr*,
　789 F. Supp. 3d 1200 (N.D. Ga. 2025) ...............................................6

*NetChoice, LLC v. Bonta*,
　113 F.4th 1101 (9th Cir. 2024) ..........................................................26

*NetChoice, LLC v. Bonta*,
　170 F.4th 744 (9th Cir. 2026) ...................................................... 2, 26

*NetChoice, LLC v. Bonta*,
　770 F. Supp. 3d 1164 (N.D. Cal. 2025) ..............................................6

*NetChoice, LLC v. Bonta*,
　170 F.4th 744 (9th Cir. 2026) .............................................................6

*NetChoice, LLC v. Griffin*,
　No. 23-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ..............6

*NetChoice, LLC v. Reyes*,
　748 F. Supp. 3d 1105 (D. Utah 2024) .................................................6

*NetChoice, LLC v. Yost*,
　778 F. Supp. 3d 923 (S.D. Ohio 2025) ...............................................6

iii

*Packingham v. North Carolina,*
    582 U.S. 98 (2017)................................................................................. 1, 5, 7

*PSINet, Inc. v. Chapman,*
    167 F. Supp. 2d 878 (W.D. Va. 2001)...............................................22

*PSINet, Inc. v. Chapman,*
    362 F.3d 227 (4th Cir. 2004) ................................................ 18, 21, 22

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015)..............................................................................24

*Reno v. ACLU,*
    521 U.S. 844 (1997)..................................................................... *passim*

*Secretary of State of Maryland v. Joseph H. Munson Co, Inc.*
    467 U.S. 947 (1984)..............................................................................26

*Snyder v. Phelps,*
    562 U.S. 443 (2011)................................................................................7

*State v. Weidner,*
    611 N.W.2d 684 (Wis. 2000)................................................................21

*Tinker v. Des Moines Independent Community School District,*
    393 U.S. 503 (1969)................................................................................1

*Volokh v. James,*
    148 F.4th 71 (2d Cir. 2025) ..................................................................2

*Volokh v. James,*
    267 N.E.3d 1245 (N.Y. 2025)...............................................................3

*West Virginia State Board of Education v. Barnette,*
    319 U.S. 624 (1943)..............................................................................13

**Statutes**

Driver Privacy Protection Act, 18 U.S.C. §§ 2721–25.........................................22

Va. Code § 59.1-575 .............................................................................. 5, 14

iv

Va. Code § 59.1-577.1……………………………………………………………17

**Other Authorities**

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'*
     BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954 ...............11

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep
     Dive into the Technology of Corporate Surveillance*, EFF Deeplinks Blog
     (Dec. 2, 2019), https://perma.cc/7B5F-S376....................................................23

Brief for FIRE as Amicus Curiae Supporting Respondents,
     *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (Nos. 22-277, 22-555).............3

Brief for FIRE et al. as Amici Curiae Supporting Petitioner,
     *Anthropic PBC v. U.S. Department of War* (D.C. Cir. filed Apr. 22, 2026)
     (No. 26-1049)........................................................................................................3

Brief for FIRE et al. as Amici Curiae Supporting Petitioners,
     *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (No. 24-656)..................................3

Brooke Auxier, *Social Media Continue to Be Important Political Outlets for
     Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020),
     https://perma.cc/DT56-RGG5..............................................................................10

Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their
     Cultures*, Travel & Leisure (Oct. 21, 2022), https://perma.cc/N7PT-Z784 .......10

Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew
     Rsch. Ctr. (Sept. 17, 2024), https://perma.cc/Y8FW-FLVA................................8

Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a
     Clear Net Benefit*, N.Y. Times (May 24, 2023), https://perma.cc/A4TK-
     ED3R....................................................................................................................11

Dan Goodin, *Discord Says Hackers Stole Government IDs of 70,000 Users*,
     Ars Technica (Oct. 9, 2025), https://perma.cc/98KD-4YDX..............................23

*Digital Advertising in the United States – Statistics & Facts*, Statista (May
     20, 2025), https://perma.cc/Y9P9-VZB7...........................................................22

Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), https://perma.cc/DX44-R46A................................................................8

Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (July 25, 2021), https://perma.cc/8HEX-JJAY........................................10

Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings from Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://perma.cc/6FC6-L3MA ...................................................................9

Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, 41 Canadian J. on Aging 26 (2022), https://perma.cc/J7NL-3UKZ ................................................................11

Federal Trade Commission, *Complying with COPPA: Frequently Asked Questions* (July 2020), https://perma.cc/9QWV-GD8T ....................................17

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://perma.cc/3SBJ-4K5R ................................................................10

*France Opens Formal Probe Into Teenage Suspect in Massive ID Data Breach*, Reuters (Apr. 30, 2026), https://perma.cc/5DHR-A5F4......................23

J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr. (Mar. 1, 2022), https://perma.cc/7J6K-2HTW ................................................................11

Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minor*s, EFF Deeplinks Blog (Mar. 15, 2024), https://perma.cc/SGL7-3YY7.................................................................9

Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, 17 Persps. Psych. Sci. 662 (2022), https://perma.cc/N8VQ-8A4N................................................................................................11

Jillian Andres Rothschild et al., Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2 (2024), https://perma.cc/DL9A-5T8L.......................................................................... 18, 19

vi

Joely Johnson Mork, *Teen's Online Church Draws Young People from Around the World*, Faith & Leadership (Aug. 23, 2016), https://perma.cc/63CJ-VCS3 ...............................................................10

Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://perma.cc/9AWZ-9QDA ........................10

Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev. 626 (2023), https://perma.cc/YHH8-VQC7............11

Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://perma.cc/5BUP-J96F ...................................................20

Mary Madden et al., Common Sense & Hopelab*, A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* (2024), https://perma.cc/4FXU-664F ...................................................................8

Matt Burgess, *When Face Recognition Doesn't Know Your Face Is a Face*, Wired (Oct. 15, 2025), https://perma.cc/9DEK-4HDW ....................................19

Michael J. Hanmer & Samuel B. Novey, Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* (2023), https://perma.cc/X7JS-J7R7 ...............................................................................................................19

Nick Evershed & Josh Nicholas, *Social Media Ban Trial Data Reveals Racial Bias in Age Checking Software: Just How Inaccurate Is It?*, The Guardian (Sept. 18, 2025), https://perma.cc/LX46-34S8..................................19

Pieter Arntz, *Age Verification Vendor Persona Left Frontend Exposed, Researchers Say*, Malwarebytes Labs (Feb. 20, 2026), https://perma.cc/94A9-7C82..................................................................23

*Project: The Robloxian Christians*, Exponential, https://perma.cc/T3DH-HDFB ..........................................................................................................10

Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://perma.cc/C434-65F4...........................................11

vii

Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn from Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1 (2020), https://perma.cc/V2KA-JFF2 .....................................................9

Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020), https://perma.cc/36HP-CVC3 ..............................................................10

Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* (2011), https://perma.cc/RR56-VE2H .................................23

Rindala Alajaji, *Age Verification, Estimation, Assurance, Oh My! A Guide to the Terminology*, EFF Deeplinks Blog (Oct. 30, 2025), https://perma.cc/G644-WKZZ. ............................................................19

Samuel Bestvater et al., *Americans' Views of and Experiences with Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://perma.cc/CQF7-E6DE........................................................................9

Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations 98 (Feb. 2017), https://perma.cc/B9Q4-RRNR .................................................21

Tracy Kitten, Javelin, *Child Identity Fraud: A Web of Deception and Loss* (2021), https://perma.cc/Z9P4-2U4B ..............................................24

Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44 (2018), https://perma.cc/8ZS7-UV77 ...............................................................11

Victoria Rideout et al., Common Sense, *The Common Sense Census: Media Use by Tweens and Teens* 41 (2021), https://perma.cc/2MUC-WT78................9

## STATEMENT OF INTEREST OF AMICI[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonpartisan, nonprofit organization. The American Civil Liberties Union of Virginia is a state affiliate of the ACLU. Both organizations are dedicated to the principles of liberty and equality embodied in the Constitution and our nation's civil rights laws, including freedom of speech. They frequently advocate for First Amendment rights online, *see, e.g.*, *Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *Packingham v. North Carolina*, 582 U.S. 98 (2017) (amicus), *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461 (2025) (counsel), and the free speech rights of young people, *see, e.g.*, *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180 (2021) (counsel); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) (counsel).

The Center for Democracy & Technology ("CDT") is a non-profit public interest organization. For thirty years, CDT has represented the public's interest in an open, decentralized Internet and worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and courts in support of First Amendment rights on the Internet, including limits on

---

[1] Pursuant to Federal Rule of Appellate Procedure Rule 29(a)(4)(E), amici certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. The parties have consented to the filing.

1

governmental authority to compel or silence speech, and in support of privacy protections for online users.

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization with more than 30,000 active members that has worked for 35 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for both in courts and legislatures across the country. EFF has challenged laws that burden internet users' rights by requiring online services to verify users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F. Supp. 824 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno,* 31 F. Supp. 2d 473 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act).

The Foundation for Individual Rights and Expression ("FIRE") is a nonpartisan nonprofit that defends the rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended these rights nationwide without regard to speakers' views, through public advocacy, strategic litigation, and participation as amicus curiae in cases involving expressive rights, including in the digital realm. *See, e.g*., *NetChoice, LLC v. Bonta*, 170 F.4th 744 (9th Cir. 2026); *Volokh v. James*, 148 F.4th 71 (2d Cir. 2025), *certifying questions to* N.Y. Ct. App., 267 N.E.3d 1245 (N.Y.

2

2025) *accepting certified question*; *see also* Br. for FIRE et al. as Amici Curiae Supp. Pet'r, *Anthropic PBC v. U.S. Dep't of War* (D.C. Cir. filed Apr. 22, 2026) (No. 26-1049); Br. for FIRE et al. as Amici Curiae Supp. Pet'rs, *TikTok Inc. v. Garland*, 604 U.S. 56 (2025) (No. 24-656); Br. for FIRE as Amicus Curiae Supp. Resp'ts, *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) (Nos. 22-277, 22-555).

The Freedom to Read Foundation ("FTRF") is a nonprofit organization established to foster libraries as institutions that fulfill the promise of the First Amendment; support the rights of libraries to include in their collections and make available to the public any work they may legally acquire, including a broad array of authors and viewpoints; establish legal precedent for the freedom to read of all persons; and protect the public against efforts to suppress or censor speech.

LGBT Tech is a nonprofit organization dedicated to promoting technology adoption and advocacy within the lesbian, gay, bisexual, transgender, queer, and questioning ("LGBTQ+") community. LGBT Tech encourages the adoption and use of cutting-edge, new and emerging technologies by providing information, education, and strategic outreach. An important function of LGBT Tech is to advocate for policies that benefit the LGBTQ+ community, including by filing amici curiae briefs. LGBT Tech has a significant interest in the outcome of this case and believes that LGBTQ+ individuals, including LGBTQ+ youth, should be

able to engage in fully protected expression, free from governmental interference. Specifically, LGBT Tech recognizes that online platforms are crucial for LGBTQ+ individuals, especially youth, to access vital information, community support, and resources that may not be available in their immediate physical environments.

The Woodhull Freedom Foundation ("Woodhull") is a non-profit organization that works to advance the recognition of sexual freedom, gender equality, and free expression. Woodhull's mission is focused on affirming sexual freedom as a fundamental human right. Woodhull has participated in litigation as a party or amicus in cases across the country dealing with free expression. Woodhull is particularly focused on governmental attempts to censor or burden access to online speech, as sexually themed expression is often a target of such efforts. Woodhull is concerned that if the challenged law is not enjoined, the First Amendment will be weakened, and the government will be permitted to engage in unlawful censorship of protected expression.

## **INTRODUCTION**

People rely on social media to keep up to date on the news, engage with elected officials and religious leaders, connect with friends, create art, and build movements. Social media allows minors and adults to discover new perspectives, discuss social and political issues, and develop a better understanding of others' beliefs. In the words of the Supreme Court, it holds "vast democratic forums" with

the "potential to alter how we think, express ourselves, and define who we want to be." *Packingham v. North Carolina*, 582 U.S. 98, 104, 106 (2017) (first citation omitted). That social media also carries content that many find noxious, inaccurate, and offensive does not diminish its First Amendment protection.

Virginia Senate Bill 854 ("SB 854") violates the First Amendment rights of minors and adults to access and engage in protected speech online by (1) requiring every "social media platform" to verify the age of all users, and (2) requiring anyone deemed to be under the age of 16 to demonstrate that they have parental consent to access the platform for more than one hour per day. It applies to platforms that allow social interaction—but not if they "consist[ ] primarily of news, sports, entertainment, ecommerce, or content . . . not generated by users." Va. Code § 59.1-575. All minors under 16 who cannot obtain parental consent or are unable to prove it will have their access curtailed to an extremely limited amount of time. And anyone over 16 who cannot verify their age or is unwilling to do so will be similarly restricted. By imposing age verification on all users, SB 854 will erase people's ability to speak anonymously online and increase the risks of privacy invasions and data breaches.

Because SB 854 is a content-based law that applies to speech that is protected for both adults and minors, it is subject to strict scrutiny and the limited holding of *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461 (2025) does not

5

control. Central to the Supreme Court's analysis in that case was its assessment that the law at issue targeted sexual material that is "harmful to minors," a category of speech that minors have no First Amendment right to view. *Paxton*, 606 U.S. at 473–74, 481. Because Texas could lawfully restrict minors' access to that sexual material, any impact on adults was merely "incidental" and subject to intermediate scrutiny. *Id.* at 483. SB 854, however, directly targets speech that is protected for both adults and minors, including the plethora of political, religious, artistic, and educational content available on social media. The burdens imposed by SB 854 are consequently in no way "incidental" and the analysis in *Paxton* is inapposite.

While Virginia has a legitimate interest in protecting minors from harm, "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011). In part for this reason, courts, including the district court below, have struck down similar social media restrictions around the country.[2]

---

[2] *See NetChoice, LLC v. Griffin*, No. 23-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025), *appeal docketed*, No. 25-1889 (8th Cir. May 2, 2025); *NetChoice v. Carr*, 789 F. Supp. 3d 1200 (N.D. Ga. 2025), *appeal docketed*, No. 12436 (11th Cir. July 16, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025), *appeal docketed*, No. 25-3371 (6th Cir. May 13, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025), *aff'd in part*, 170 F.4th 744 (9th Cir. 2026); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024), *appeal docketed sub nom. NetChoice, LLC v. Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024).

Finally, because the law fails strict scrutiny in all applications, the district court was correct in striking it down on its face, without requiring a record of the impermissibility of every possible application.

This Court should affirm.

## ARGUMENT

### I.    SB 854 REGULATES PROTECTED SPEECH.

#### A.    Minors and Adults Rely on Social Media to Engage in a Diverse Range of Protected Expression.

Social media plays a crucial role in the exercise of First Amendment rights today. Social media platforms are "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," and creates "places where [people] can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104, 107.

Valuable, positive expression and connection regularly take place on social media. At the same time, people can share distressing information or engage in negative interactions—and that does not make the content any less protected. *See, e.g., Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (speech is protected even if deeply offensive to listeners); *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021) (minors have a right to engage in profane speech on social media). The presence of upsetting content is not unique to social media and, just as the government could not ban minors from reading newspapers (which contain

7

distressing news) or showing up at town hall meetings (which might have heated

public debate), the government cannot ban minors from accessing protected

expression online simply because of its communicative impact. *See Brown*, 564

U.S. at 790 (holding that the First Amendment applies to new forms of

communication regardless of their aesthetic and moral value).

Young people, like adults, use social media for speech that is plainly

protected by the Constitution—gathering news, political expression and advocacy,

artistic creation, religious worship, and cultivating life-saving connections.

Users routinely get their news online. For instance, 80% of Black young

people, 69% of Latino young people, and 65% of white young people rely on

social media to stay informed.[3] And 54% of American adults "at least sometimes"

get their news from social media.[4]

Social media is also central to political movements, from the Tea Party[5] to

---

[3] Mary Madden et al., Common Sense & Hopelab, *A Double-Edged Sword: How Diverse Communities of Young People Think About the Multifaceted Relationship Between Social Media and Mental Health* 17 (2024), https://perma.cc/4FXU-664F.

[4] Christopher St. Aubin & Jacob Liedke, *News Platform Fact Sheet*, Pew Rsch. Ctr. (Sept. 17, 2024), https://perma.cc/Y8FW-FLVA.

[5] Douglas A. Blackmon et al., *Birth of a Movement*, Wall St. J. (Oct. 29, 2010), https://perma.cc/DX44-R46A.

#MeToo.[6] Nearly half of American social media users say they have been politically active on social media, whether by participating in a political group, encouraging others to act, looking up rallies or protests, or using hashtags to show support for a cause.[7]

Social media is also a site of artistic creation. In one study, 71% of teens reported that social media is "a place where they can show their creative side."[8] "In any given day, about one in 10 tweens and teens will use their digital devices to create some type of art or music."[9] In addition, minors and young adults report that the internet helps them learn about art and music.[10]

Places of worship use social media to share information about events,

---

[6] Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn from Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect 1, 4 (2020), https://perma.cc/V2KA-JFF2.

[7] Samuel Bestvater et al., *Americans' Views of and Experiences with Activism on Social Media*, Pew Rsch. Ctr. (June 29, 2023), https://perma.cc/CQF7-E6DE.

[8] Emily A. Vogels & Risa Gelles-Watnick, *Teens and Social Media: Key Findings from Pew Research Center Surveys*, Pew Rsch. Ctr. (Apr. 24, 2023), https://perma.cc/6FC6-L3MA.

[9] Victoria Rideout et al., Common Sense, *The Common Sense Census: Media Use by Tweens and Teens* 41 (2021), https://perma.cc/2MUC-WT78.

[10] Jason Kelley, *Thousands of Young People Told Us Why the Kids Online Safety Act Will Be Harmful to Minor*s, EFF Deeplinks Blog (Mar. 15, 2024), https://perma.cc/SGL7-3YY7.

9

livestream services, and foster community, including with young people.[11] One

young person even created "The Robloxian Christians," a place for kids on a

gaming platform to pray for one another and talk about their faith.[12] It is now a

"youth-led virtual church ministry serving upwards of 40,000 young people from

over 85 countries."[13]

Finally, social media enables individuals whose voices might otherwise not

be heard to make vital and even lifesaving connections, and to share their unique

perspectives.[14] For example, people with disabilities use social media to build

community, reduce isolation and stigma, and educate others.[15] Survivors of

domestic violence rely on the accessibility and anonymity of online communities

---

[11] Rebecca Heilweil, *Religious Leaders Are Becoming Content Creators to Keep Their Followers Engaged*, Vox (Sept. 18, 2020), https://perma.cc/36HP-CVC3; Elizabeth Dias, *Facebook's Next Target: The Religious Experience*, N.Y. Times (July 25, 2021), https://perma.cc/8HEX-JJAY.

[12] Joely Johnson Mork, *Teen's Online Church Draws Young People from Around the World*, Faith & Leadership (Aug. 23, 2016), https://perma.cc/63CJ-VCS3.

[13] *Project: The Robloxian Christians*, Exponential, https://perma.cc/T3DH-HDFB.

[14] *See*, *e.g.*, Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://perma.cc/DT56-RGG5; Carrie Back, *How Indigenous Creators Are Using TikTok to Share Their Cultures*, Travel & Leisure (Oct. 21, 2022), https://perma.cc/N7PT-Z784.

[15] Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue (Sept. 22, 2022), https://perma.cc/3SBJ-4K5R; Kait Sanchez, *How a Teen Punk Led a Movement for Disabled People Online*, Verge (July 27, 2021), https://perma.cc/9AWZ-9QDA.

to seek advice and resources.[16] Social media use has been shown to reduce loneliness, social isolation, and depression in rural and elderly populations, both of which face limited mobility and decreased ability to socialize in person.[17] And many young LGBTQ+ people who face discrimination and judgment offline turn to social media for community and support.[18]

Social media thus helps adults and minors develop their own ideas, learn to express themselves, and engage productively with others.[19]

---

[16] Tully O'Neill, *"Today I Speak": Exploring How Victim-Survivors Use Reddit*, 7 Int'l J. for Crime, Just. & Soc. Democracy 44, 44–45 (2018), https://perma.cc/8ZS7-UV77; *see also*, *e.g.*, J.L. Heinze, *Online Communities for Survivors: Websites and Resources Offering Support and Health*, Nat'l Sexual Violence Res. Ctr. (Mar. 1, 2022), https://perma.cc/7J6K-2HTW.

[17] Keith N. Hampton & Inyoung Shin, *Disconnection More Problematic for Adolescent Self-Esteem Than Heavy Social Media Use: Evidence from Access Inequalities and Restrictive Media Parenting in Rural America*, 41 Soc. Sci. Comput. Rev. 626 (2023), https://perma.cc/YHH8-VQC7; Erica Chen et al., *Online Social Networking and Mental Health Among Older Adults: A Scoping Review*, 41 Canadian J. on Aging 26, 26–27 (2022), https://perma.cc/J7NL-3UKZ.

[18] *See* Claire Cain Miller, *For One Group of Teenagers, Social Media Seems a Clear Net Benefit*, N.Y. Times (May 24, 2023), https://perma.cc/A4TK-ED3R; Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,'* BBC (Nov. 28, 2020), https://www.bbc.com/news/av/uk-55079954.

[19] *See* Rainier Harris, *How Young People Use Social Media to Engage Civically*, PBS (Nov. 5, 2020), https://perma.cc/C434-65F4; Jessica L. Hamilton et al., *Re-Examining Adolescent Social Media Use and Socioemotional Well-Being Through the Lens of the COVID-19 Pandemic*, 17 Persps. Psych. Sci. 662, 671 (2022), https://perma.cc/N8VQ-8A4N.

**B.** **The First Amendment Protects the Vast Majority of Social Media Activity for Minors and Adults Alike.**

Although Virginia seeks to justify SB 854 through its concerns about the impact of social media on minors, outside of the narrow category of sexually explicit content that is "harmful to minors," that is not a valid basis for regulation. People under the age of 18 generally enjoy the same First Amendment rights as adults, and the Supreme Court has expressly held that the government cannot "create a wholly new category of content-based regulation that is permissible only for speech directed at children." *Brown*, 564 U.S. at 793–94 (rejecting government's argument that it can regulate violent speech communicated to minors just as it can sexual speech that is harmful to minors).

The Supreme Court's recent decision in *Paxton* is not to the contrary and cannot save SB 854. There, the Supreme Court held that a law that aimed to block minors' access to content that is obscene as to minors was subject to intermediate scrutiny only because "[h]istory, tradition, and precedent recognize" that minors have no First Amendment right to access such sexually explicit speech. *Paxton*, 606 U.S. at 472.[20] The Court concluded that the law's age verification requirements

---

[20] The Supreme Court left open the question of precisely whose perspective matters when it comes to defining "harmful to minors" content, suggesting for example that, at a minimum, it would make no sense to assess obscenity from the perspective of a pre-adolescent, who would lack any "concept of sexuality." *Paxton*, 606 U.S. at 481 n.7.

12

were thus "an exercise of Texas's traditional power to prevent minors from accessing speech that is obscene from their perspective"—i.e., *unprotected* as to minors—and its "burden [on] adults' rights . . . ha[d] 'only an incidental effect on protected speech.'" *Id.* at 478 (citation omitted). The Court repeatedly disclaimed any application of its decision to regulations of "fully protected speech." *Id.* at 484, 485, 493 n.12, 494 n.13.

Beyond that historic exception for sexual speech, the Court has been emphatic that minors' First Amendment rights are on par with adults: That a speaker or listener is young is no reason to diminish their rights, but calls instead "for scrupulous protection of [their] Constitutional freedoms . . . if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). For that reason, the Supreme Court has repeatedly struck down legislation imposing age limitations on new mediums notwithstanding societal fears about the impact on children, from violent video games, *see Brown*, 564 U.S. at 789, to non-obscene sexual expression online, *Reno*, 521 U.S. at 874, to drive-in movies, *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975). Even where the laws are "intended to regulate [only] expression accessible to minors," they are "overbroad" if they reach beyond speech that is obscene as to minors. *Id.* at 214.

13

As the Seventh Circuit explained in striking down a ban on violent video games, "[minors] must be allowed the freedom to form their political views on the basis of uncensored speech *before* they turn eighteen, so that their minds are not a blank when they first exercise the franchise." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001). Otherwise, they "are unlikely to become well-functioning, independent-minded adults and responsible citizens," because "[t]o shield children right up to the age of 18 from exposure to [troubling or potentially harmful ideas] would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it." *Id.*

## II. SB 852'S CONTENT-BASED RESTRICTIONS VIOLATE MINORS' AND ADULTS' FIRST AMENDMENT RIGHTS.

### A. SB 854 Impermissibly Prohibits Minors from Accessing and Engaging in Protected Speech on Certain Topics Without Parental Consent.

SB 854 is subject to strict scrutiny as a content-based regulation of speech— "that is, . . . it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). SB 854 specifically excludes platforms that primarily carry "news, sports, entertainment, ecommerce, or content preselected by the provider and not generated by users." Va. Code § 59.1-575. And its requirement of parental consent for any more than one hour of use fails strict scrutiny.

14

Virginia cannot avoid strict scrutiny by framing SB 854 as an aid to parental consent. Virginia contends that the parental consent requirement merely empowers parents "to decide the amount of time that their children can spend accessing each social media platform" and so is subject only to intermediate scrutiny. Appellant's Br. at 30 ("Br."). This argument is misplaced, as *Brown* highlights. In that case, the Supreme Court struck down a law that prohibited selling or renting violent video games to minors—in effect, like SB 854, allowing parents to choose what speech minors can access.

There, the state had "claim[ed] that the Act is justified in aid of parental authority." *Brown*, 564 U.S. at 802. While recognizing the "legitima[cy]" of this aim, the Court held that, to satisfy the First Amendment, the government's means "must be . . . neither seriously underinclusive nor seriously overinclusive"—and the statute failed on that front. *Id.* at 805. The law was underinclusive in part "because it permits a parental . . . veto" of the law's restrictions. *Id.* If the material is indeed "dangerous [and] mind-altering," the Court explained, it did not make sense to "leave [it] in the hands of children so long as one parent . . . says it's OK." *Id.* at 802. The law was also overinclusive because it "abridges the First Amendment rights of young people whose parents . . . think violent video games are a harmless pastime." *Id.* at 805. "While some of the legislation's effect may indeed be in support of what some parents of the restricted children actually want,

15

its entire effect is only in support of what the State thinks parents *ought to* want."

*Id*. at 804; *cf. Reno*, 521 U.S. at 878.

The Court thus rejected the idea "that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent,*" for "[s]uch laws do not enforce *parental* authority over children's speech and religion; they impose *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. The Court also expressed "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802. "Accepting that position would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212–13).

Each of those holdings governs here: To the extent SB 854 is an attempt to protect minors under 16 from harm, it is "seriously underinclusive . . . because it permits a parental . . . veto." *Id.* at 805. To the extent that SB 854 is an attempt to "assist[ ] concerned parents," it is "seriously overinclusive because it abridges the First Amendment rights of young people whose parents . . . think [social media use is] a harmless pastime." *Id*. And it also raises First Amendment concerns because it seeks to punish third parties "*just in case* their parents disapprove." *Id*. at 802.

16

**B.      SB 854 Also Burdens the First Amendment Rights of Adults and Minors by Imposing Age Verification.**

SB 854 requires social media services to implement age verification via undefined "commercially reasonable methods." Va. Code § 59.1-577.1. This means that every user—adult and minor alike—will have to undergo age verification. Common methods include checking government IDs, collecting biometric information to estimate users' ages, and querying commercial databases.[21] This, too, violates the First Amendment by directly burdening the rights of all social media users. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Paxton*, 606 U.S. at 483 (recognizing that "submitting to age verification is a burden on the exercise of [First Amendment] right[s]").

Virginia relies on *Paxton* to argue that *any* age verification is subject to intermediate scrutiny at most and survives it. Br. at 28. For the reasons detailed above, neither *Paxton* nor intermediate scrutiny governs—but, even if intermediate

---

[21] The permission in the statute to employ a "neutral age screen mechanism" does not meaningfully reduce the burdens it imposes on the exercise of constitutional rights. Va. Code § 59.1-577.1(B). As an initial matter, "neutral age screen mechanism" is undefined, leaving its interpretation—and enforcement—in the first instance to the Attorney General. Presuming that a "neutral age screen" means "a system that allows a user freely to enter month and year of birth"—something that is not reflected in the statute—it would still involve collecting and retaining information users would otherwise not share. Fed. Trade Comm'n, *Complying with COPPA: Frequently Asked Questions* (July 2020), https://perma.cc/9QWV-GD8T. And because individuals could easily input a false date, such a requirement could not satisfy intermediate, much less strict, scrutiny.

17

scrutiny were appropriate here, age verification for social media use would fail it. Because the regulated content is protected for all ages, *see supra* Section I.B, it is unclear how age verification relates to any legitimate government interest, much less advances a significant one.

### 1. Many verification requirements will either chill or entirely block access to lawful speech.

Should social media services implement verification via government-issued identification to comply with SB 854, it will "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of identification. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004); *see also Reno*, 521 U.S. at 856; *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003) (invalidating age-assurance requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites"). The same will be true for any child under 16 of such an adult, who will struggle to prove their relationship to their parents or guardian.

About 15 million adult U.S. citizens do not have a driver's license, and about 2.6 million do not have any form of government-issued photo ID.[22] Estimates show another 28.6 million adult citizens use government IDs that lack

---

[22] Jillian Andres Rothschild et al., Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2 (2024), https://perma.cc/DL9A-5T8L.

their current names or addresses.[23]

Using biometric data, such as scanning users' faces, is no better. Biometric analysis to determine a user's age is inherently imprecise, as the technology essentially guesses a user's age based on the information it has collected.[24] The imprecision means that SB 854 will block adults who are mis-categorized as minors and allow minors to access social media because the system guesses that they are adults.[25] These systems are also more likely to misidentify ages for specific demographics, including people of color, people with disabilities, and people whose faces are not detected by the system, failing a wide range of internet users.[26]

---

[23] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, Univ. Md. Ctr. for Democracy & Civic Engagement, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies* 5 (2023), https://perma.cc/X7JS-J7R7 ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

[24] *See* Rindala Alajaji, *Age Verification, Estimation, Assurance, Oh My! A Guide to the Terminology*, EFF Deeplinks Blog (Oct. 30, 2025), https://perma.cc/G644-WKZZ.

[25] *See id*. (explaining how biometric systems usually group users into age ranges, such as between age 15 and 19).

[26] *See* Nick Evershed & Josh Nicholas, *Social Media Ban Trial Data Reveals Racial Bias in Age Checking Software: Just How Inaccurate Is It?*, The Guardian (Sept. 18, 2025), https://perma.cc/LX46-34S8; Matt Burgess, *When Face Recognition Doesn't Know Your Face Is a Face*, Wired (Oct. 15, 2025), https://perma.cc/9DEK-4HDW.

**2.    Online age verification impermissibly burdens the right to speak and access information anonymously online.**

Having to provide identifying information to services seeking to comply with SB 854—whether for age verification or to check parental relationships and consent—would also impermissibly burden the First Amendment right to anonymity. *See Am. Booksellers Found.*, 342 F.3d at 99 (age verification "require[s] that website visitors forgo the anonymity otherwise available on the internet").

A reported 86 percent of internet users have taken steps online to minimize their digital footprints, and 55 percent have done so to "avoid observation by specific people, organizations, or the government."[27] Anonymity is a time-honored, historic tradition that is "protected by the First Amendment"—no matter whether its use is "motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995). "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th

---

[27] Lee Rainie et al., *Anonymity, Privacy, and Security Online*, Pew Rsch. Ctr. (Sept. 5, 2013), https://perma.cc/5BUP-J96F.

20

Cir. 2011).

Without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236–37; *see also Reno*, 521 U.S. at 856. The same is true for minors who must obtain parental consent, and it may well cause parents to refuse permission to access certain social media simply because they fear that a record of such access might reflect poorly on their children or them. The absence of anonymity will chill users' ability to dissent, discuss "sensitive, personal, controversial, or stigmatized content," or seek medical or psychiatric help online.[28] *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007); *see also State v. Weidner*, 611 N.W.2d 684, 690 (Wis. 2000) (age verification "constitutes an encroachment into the personal lives of those who use the internet precisely because it affords anonymity").

### 3. Many age verification systems put internet users' sensitive data at risk.

Even when users are comfortable foregoing anonymity, legitimate "concern[s] about security on the Internet and . . . [fears] of fraud and identity theft" may dissuade them from accessing social media. *Gonzales*, 478 F. Supp. 2d at 806; *see also ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008); *PSINet, Inc.*

---

[28] *See, e.g.*, Sarah Kendal et al., *How a Moderated Online Discussion Forum Facilitates Support for Young People with Eating Disorders*, 20 Health Expectations 98, 99 (Feb. 2017), https://perma.cc/B9Q4-RRNR.

*v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas'" online).

The personal data that platforms may be required to collect is sensitive and often immutable. *See, e.g.*, Driver Priv. Prot. Act, 18 U.S.C. §§ 2721–25. Whereas usernames, passwords, and even credit card information can easily be changed, the types of information used in age screens or age verification such as date of birth, name, biometrics, and home address are much more permanent.

Although Virginia ostensibly enacted SB 854 out of concern for minors' wellbeing, the law's online age verification regime will make minors and adults less safe given the realities of online advertising and data insecurity. Personal information collected online sells for astonishing profits.[29] Because all online data is transmitted through intermediaries, the information a user shares to verify identity or parental relationship can be transmitted beyond the site or its age

---

[29] *See Digital Advertising in the United States – Statistics & Facts*, Statista (May 20, 2025), https://perma.cc/Y9P9-VZB7 (the U.S. digital advertising market boasted a revenue of $347 billion in 2024).

verification providers.[30]

At a minimum, the data will present a potential target for data thieves. Age verification data is emerging as an attractive target for hackers. In October 2025, hackers stole the government IDs of 70,000 individuals used to verify their age for the social media applications Discord.[31] Similarly, the frontend of one age verification service was left exposed on a federal server,[32] and the French agency responsible for handling age verification was hacked, resulting in the data of millions of affected French people being put up for sale.[33]

Compounding this concern, minors are attractive targets for identity theft due to their "uniquely valuable" unused Social Security numbers.[34] A 2021 study found that one in 50 U.S. children were victims of identity fraud, and one in 45

---

[30] *See* Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive into the Technology of Corporate Surveillance*, EFF Deeplinks Blog (Dec. 2, 2019), https://perma.cc/7B5F-S376.

[31] Dan Goodin, *Discord Says Hackers Stole Government IDs of 70,000 Users*, Ars Technica (Oct. 9, 2025), https://perma.cc/98KD-4YDX.

[32] Pieter Arntz, *Age Verification Vendor Persona Left Frontend Exposed, Researchers Say*, Malwarebytes Labs (Feb. 20, 2026), https://perma.cc/94A9-7C82.

[33] *France Opens Formal Probe Into Teenage Suspect in Massive ID Data Breach*, Reuters (Apr. 30, 2026), https://perma.cc/5DHR-A5F4.

[34] Richard Power, Carnegie Mellon CyLab, *Child Identity Theft: New Evidence Indicates Identity Thieves Are Targeting Children for Unused Social Security Numbers* 3 (2011), https://perma.cc/RR56-VE2H ("A child's identity is a blank slate, and the probability of discovery is low, as the child will not be using it for a long period of time.").

children had personal information exposed in a data breach.[35] The risk of data

breach is likely to chill constitutionally protected expression.

## III. THE DISTRICT COURT APPROPRIATELY ORDERED FACIAL RELIEF.

Separate from arguing that SB 854 survives First Amendment scrutiny,

Virginia contends that the District Court erred in striking down SB 854 on its face,

even though it concluded that the law was "unconstitutional in every conceivable

application." Br. at 22–23 (quoting JA 305–306). Relying on *Moody*, Virginia

makes the sweeping argument that, "[n]o matter the substantive basis of a First

Amendment challenge . . . and no matter the tier of scrutiny, the plaintiff must

follow the procedural framework of cataloging the law's applications and showing

the unconstitutional ones 'substantially outweigh' constitutional ones." *Id.* at 23

(quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024)).

That is incorrect. Courts—including the Supreme Court and this Court—

regularly strike down content-based laws on their face without engaging in such a

tortured assessment. *See, e.g., Reed v. Town of Gilbert*, 576 U.S. 155, 165, 166,

171–72 (2015) (striking down law that is "content based on its face" because it

failed strict scrutiny without any overbreadth analysis); *Brown*, 564 U.S. at 805

---

[35] Tracy Kitten, Javelin, *Child Identity Fraud: A Web of Deception and Loss* 5 (2021), https://perma.cc/Z9P4-2U4B.

(affirming injunction against enforcement of content-based law because it failed strict scrutiny); *Am. Ass'n of Pol. Consultants, Inc. v. FCC*, 923 F.3d 159, 170 (4th Cir. 2019), *aff'd sub nom. Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610 (2020) (severing content-based provision of law in its entirety from otherwise constitutional regulation because it failed strict scrutiny).

*Moody* did not purport to change this. Instead, it affirmed that a facial challenge will succeed where there is "no set of circumstances . . . under which the [law] would be valid." 603 U.S. at 723 (citation omitted). And it then went on to explain that, where a plaintiff cannot meet that high standard, the doctrine of substantial overbreadth offers an alternative, "*lowered*" bar in First Amendment cases. *Id.* (emphasis added). Because of the need to "provide[ ] breathing room for free expression," substantial overbreadth imposes a "less demanding" standard, pursuant to which a plaintiff need not show that *every* application of the law is unconstitutional, but only that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (citations omitted). In other words, substantial overbreadth offers an alternative route to invalidating even laws that have some permissible scope; it is not another

25

hoop that plaintiffs challenging laws that fail strict scrutiny must jump through.[36]

Indeed, the Supreme Court rejected a version of Virginia's argument 40 years ago in *Secretary of State of Maryland v. Joseph H. Munson Co, Inc*. 467 U.S. 947, 964 (1984). In that case, the government contended that the Supreme Court could only facially invalidate the law at issue—which it claimed had permissible applications—if it first assessed it for substantial overbreadth, but the Court disagreed. It held that the law was properly subject to facial invalidation because it "impose[d] a direct restriction on protected First Amendment activity" and "the defect in the statute [wa]s that the means chosen to accomplish the State's objectives [we]re too imprecise, so that *in all its applications* the statute creates an unnecessary risk of chilling free speech." *Id.* at 966, 967–68 (emphasis added) (footnote omitted). *Cf. Johnson v. United States*, 576 U.S. 591, 602–03 (2015) (holding that facial invalidation on vagueness grounds is proper even when "there is some conduct" to which the law's application would be "clear[]").

---

[36] Virginia's reliance on *NetChoice, LLC v. Bonta* ("*Bonta II*"), 170 F.4th 744 (9th Cir. 2026), *see* Br. at 23, is similarly misplaced. It misreads the opinion—and *NetChoice, LLC v. Bonta* ("*Bonta I*"), 113 F.4th 1101 (9th Cir. 2024), which preceded it. Both affirm that, when a provision of a law that regulates online businesses in the name of protecting children "rais[es] the same First Amendment issues" "in every application to a covered business," it is properly subject to facial invalidation, *Bonta I,* 113 F.4th at 1116. In contrast, when the law's provisions do not necessarily implicate speech in every application, such a remedy is not as readily available. *Bonta II,* 170 F.4th at 758.

If a law is insufficiently tailored on its face, facial invalidation is the proper remedy. To hold otherwise—as Virginia argues—would force plaintiffs (and courts) to do double duty: to show (and hold) both that a law is unconstitutional in all its applications *and* that it is substantially overbroad through an assessment of its many possible applications.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order and maintain the permanent injunction against SB 854 for violating the First Amendment rights of minors and adults.

Dated: May 22, 2026                              Respectfully submitted,

Cody Venzke                                      Vera Eidelman
AMERICAN CIVIL LIBERTIES UNION                   */s/ Esha Bhandari*
   FOUNDATION                      Esha Bhandari
915 15th St. NW                                  AMERICAN CIVIL LIBERTIES UNION
Washington, DC 20005                                FOUNDATION
Email: cvenzke@aclu.org                          125 Broad Street, 18 Fl.
Tel.: (202) 457-0800                             New York, NY 10004
*Licensed only in California.*                   Email: ebhandari@aclu.org
   *Application pending in*         Tel.: (212) 549-2500
   *the District of Columbia.*


Matthew Callahan, VSB No. 99823                  Aaron Mackey
ACLU OF VIRGINIA FOUNDATION                       ELECTRONIC FRONTIER FOUNDATION
P.O. Box 26464                                   815 Eddy Street
Richmond, VA 23261                               San Francisco, California 94109
Email: mcallahan@acluva.org                      Email: amackey@eff.org
Tel.: (804) 523-2146                             Tel.: (415) 436-9333

                                                  *Counsel for Amici Curiae*

27

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

Pursuant to Fed. R. App. P. 32(g)(1), I certify as follows:

1.      This Brief of Amici Curiae in Support of Plaintiff-Appellee and Affirmance complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6453 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: May 22, 2026

/s/ Esha Bhandari
Esha Bhandari

*Counsel of Record for Amici Curiae*

28

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system on May 22, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 22, 2026                    */s/ Esha Bhandari*
                                        Esha Bhandari

                                        *Counsel of Record for Amici Curiae*

29